# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARSHALL ABRAHAM<br>WEXLER,<br>Plaintiff,<br>v.<br>Ira Schwartz, Uri Kaufman, Steven B Rothschild, Et Al. continued on next<br><br>page<br><br>JAMES D'AUGUSTE, in his official capacity as Justice of the New York Supreme Court;<br>LOUIS L. NOCK, in his official capacity as Justice of the New York Supreme Court;<br>LOUIS L. NOCK, ESQ.;<br>LAWRENCE ZOMBEK*<br>HARRY SKYDELL;<br>LEON MELOHN;<br>IRA SCHWARTZ;<br>STEVEN B. ROTHSCHILD;<br>GEORGE KARRASICK;<br>MARK KARRASICK;<br>URI KAUFMAN;<br>MARTIN SHULMAN, in his official capacity as Justice of the New York Supreme Court;<br>AARON COHEN, ESQ.;<br>ABRAHAM SCHWARTZ;<br>TZIREL SCHWARTZ;<br>MOSHE SCHWARTZ;<br>BARUCH SCHWARTZ;<br>JACQUELINE COHEN;<br>AARON WEXLER;<br>JORDAN WEXLER;<br>SHIMSHON WEXLER, ESQ.;<br>WARREN WEXLER; | Case No.<br>RICO Complaint For Money and Injunctions<br><br>March12 2026 |

| | |
|---|---|
| ROCHEL WEXLER;<br>VIRGINIA TOY;<br>GERARD PROEFREIDT, ESQ.;<br>NORRIS McLAUGHLIN;<br>BUILDING EQUITY MANAGEMENT LLC;<br><br>Tort Group LLC<br><br>BORAH, GOLDSTEIN, ALTSCHULER & NAHINS, LLP;<br><br>NEW LANDLORD ENTITIES (John Doe Defendants I–X);<br>OLD HOLDING COMPANIES (John Doe Defendants XI–XX);<br>PETER MAGNONE;<br>MARY MAGNONE;<br>JARED MINC;<br>BRIAN REILLY;<br>MICHAEL VINOCUR;<br>STEVEN SHULMAN, ESQ.;<br>268 W 77TH LLC;<br>268 WEST 77TH STREET LLC;<br>HERTZ, CHERSON & ROSENTHAL, P.C.;<br>STREETEASY, INC.;<br>SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW<br>YORK;<br>NEW YORK STATE SUPREME COURT, CIVIL DIVISION;<br>SKYDELL-RELATED DEFENDANTS (John Doe XXI–XXX);<br>CHAIM ROTHSCHILD;<br>HOWARD “SHMULI” ROTHSCHILD;<br>RACHEL ROTHSCHILD;<br>YAKOV ROTHSCHILD;<br>ZEV ROTHSCHILD;<br>BOYANER SHUL-RELATED DEFENDANTS<br>Sander Gerber<br>LOUIS BARRA, New York State Bar, First Department Grievance Committee; | |

| | |
|---|---|
| PETER BRILL, ESQ.;<br>ROBERT SILVERSTEIN, ESQ.;<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP;<br>JONATHAN ROSENBLATT, ESQ., Clerk of the New York State Supreme Court;<br>BENJAMIN BRAFMAN;<br>ARTHUR SCHWARTZ;<br>MARK HAGER;<br>STEVEN KREIGER, ESQ.;<br>AMOS ALTER, ESQ.;<br>ELIYAHU SAFRAN;<br>EDWARD NEIGER, ESQ.;<br>ALEXANDRA ROBERTSON, ESQ.;<br>DAVID STERN, ESQ.;<br>JOE STEINFELD, ESQ.;<br>ASK LLP;<br>TYLER MAULSBY<br>Frankfurt Kurnit Klein & Selz PC<br>KUCKER MARINO LAW FIRM;<br>NEW YORK STATE COMMISSION ON JUDICIAL CONDUCT;<br>AMRAM KASS;<br>YAIR GOLDSTEIN, ESQ.;<br>CITY OF NEW YORK LAW DEPARTMENT;<br>NEW YORK LAW SCHOOL;<br>ANTHONY CROWELL, ESQ., Dean;<br>FAITH STEVELMAN, ESQ.;<br>ROBERT MARINO, ESQ.;<br>ADREAMA ISHE MACKEY PONTE, ESQ.;<br>PETER JAY SPERONI;<br>TOURO LAW SCHOOL;<br>MARJORIE SILVER, ESQ.;<br>HOWARD FOSTER, ESQ.;<br>BRAFMAN LAW FIRM;<br>BARBARA LAM, ESQ.;<br>UNITED AIRLINES; | |

| | |
|---|---|
| AIRBNB, INC.;<br>PRICELINE / BOOKING.COM;<br>CHASE BANK;<br>HERTZ CORPORATION;<br>APPLE INC.;<br>AVIS;<br>BUDGET;<br>ENTERPRISE;<br>FORD MOTOR COMPANY;<br>TESLA, INC.;<br>TRANSPORTATION SECURITY ADMINISTRATION (TSA);<br>STATE OF HAWAII;<br>OUTRIGGER HOTELS;<br>HAWAII POLICE DEPARTMENT;<br>CHABAD;<br>GER;<br>SATMAR;<br>VIZHNITZ;<br>BRESLOV;<br>BILL DE BLASIO;<br>ERIC ADAMS;<br>NEW YORK CITY POLICE DEPARTMENT;<br>SAN FRANCISCO POLICE DEPARTMENT;<br>MIRIAM ADELSON;<br>FLOYD MAYWEATHER / MAYWEATHER PROMOTIONS;<br>BENJAMIN "BIBI" NETANYAHU (né Mielkowsky);<br>ITAMAR BEN-GVIR;<br>ARGUS TECHNOLOGIES (AUTOMOTIVE CYBERSECURITY);<br>JUSTIN KUEHN, ESQ.;<br>FLETCHER MOORE, ESQ.;<br>LARRY EAGEL, ESQ.;<br>HEMISPHERO SUL INVESTIMENTO, owner of Rio Hilton Copacabana Atlântico;<br>ACCOR HOTELS, owner of Mercure Hotels (Brazil);<br>MALADANI JEWELERS (NYC); | |

| | |
|---|---|
| BISHOP SF;<br>SAN FRANCISCO SUPERIOR COURT;<br>PG&E;<br>DAVID ABRAMS;<br>JACOB WEINREB;<br>MOTEL 6;<br>BLACKROCK / BLACKSTONE, former owner of Rio Atlântico, Rio de Janeiro,<br>Milestone Seventh,<br>Defendants. | |

**JURISDICTION AND VENUE**

**JURISDICTION**

Federal question jurisdiction exists under 28 U.S.C. §§1331, 1343, 42 U.S.C. §§1981, 1982, 1983, 1985, 1988, and 18 U.S.C. §§1961–1968 (RICO) 28 U.S.C. § 1331 (RICO, EFTA, FCRA, FCBA, TILA) Violation of DOT Denied Boarding Regulations (14 C.F.R. Part 250)

**VENUE**

Venue is proper because a substantial amount of the conduct that is the basis for the subject of this lawsuit occurred in this district.

**PARTIES INVOLVED**

Plaintiff, **Marshall Abraham Wexler**, is an attorney admitted to practice law in New York and California. At all relevant times, Plaintiff resided in New York City and California, including at the following addresses: 268 West 77th Street, Apartment 1, New York, New York 10024; 1311 Diamond Street, San Diego, California; 5434 Geary Boulevard, Apartment 1, San Francisco, California 94121; and 1234 Great Highway, Apartment 310, San Francisco, California 94122.

At all relevant times, Plaintiff was the lawful tenant of rent-regulated and residential premises located at 268 West 77th Street, Apartment 1, New York, New York, and 5434 Geary Boulevard, Apartment 1, San Francisco, California.

Plaintiff also utilized certain of these premises as law offices.

Plaintiff additionally maintained law offices at 11 Broadway, New York, New York, until approximately 2023.

At all relevant times, Plaintiff was the hotel tenant

At all relevant times, Plaintiff was the hotel tenant of the Airbnb reservation #s in, Brazil, USA and Fiji,

At all relevant times, Plaintiff was the renter/driver of the Ford Mustang from budget

At all relevant times, Plaintiff was the renter/ driver of the Tesla Model 3 from Hertz

At all relevant times, Plaintiff was the renter driver of the KIA SUV from budget

***Defendants***

**IRA SCHWARTZ**
**ABRAHAM SCHWARTZ;**
**TZIREL SCHWARTZ;**
**MOSHE SCHWARTZ;**
**BARUCH SCHWARTZ**
153 Harborview N. Lawrence, NY 11559
**JACQUELINE COHEN**.
4802 12th Avenue. Unit 3H. Brooklyn,

27 Madison Avenue, New York, NY 10010 747 Chestnut Ridge Road
Suite 200
Spring Valley, NY 10977
276 Fifth Avenue
Suite 704-207
New York, NY 10001
**STEVEN B ROTHSCHILD IRAS LAWYER AND ARTHURS LAWYER**
**CHAIM ROTHSCHILD;**
**HOWARD "SHMULI" ROTHSCHILD;**
**YAKOV ROTHSCHILD;**
**WILLIAM ZEV ROTHSCHILD;**
**-**
*** AARON**
**COHEN**
**THE COHEN LAW OFFICE**, PC, 675 3rd Ave - 8th Fl, New York, NY \

*
**AARON WEXLER;**
127 willow road woodmere ny
1000 central avenue woodmere ny
*
**JORDAN WEXLER**
44 Vinton street long beach ny
*
**Shimshon Wexler** 2244 Henderson Mill Rd, Suite 108
Atlanta, GA 30345

*
**WARREN WEXLER**
1420 avenue L
Brooklyn NY
*
**Rochel Wexler**

Doctor Marton Cedarhurst

451 west end avenue
**BOYANER SHUL-RELATED DEFENDANTS;**

The Boyaner defendants and affiliated individuals are alleged to include

**AMRAM KASS;**

**Harry Skydell**

**Markus Hager;**

**Shea Schwebel and the broader Schwebel family;**

**Judah Wassner and the Wassner family;**

**Leon Melohn and the Melohn family;**

**Guilermo Bron;**

**Sander Gerber;**

**Amos Alter,** identified as counsel for Melohn; Eliyahu Safran and the Safran family;

**Soli Foger( Melohn Building)**

**George Karasick and the Karasick family;**

**Mark Karasick, George Karasick's brother;**

**Amraam Kass and the Kass family;**

**Bob Chambre and the Chambre family;**

**Ruby Schron and the Schron family;**

**David Gibber,**

535 west end avenue,

573 West End Avenue
**Jacob weinreb Weinreb Management**, which has listed its headquarters at
276 Riverside Dr, Apt 2G, New York, NY 10025

Uri Kaufman Albany? Harborview?

**YAIR GOLDSTEIN**, ESQ.;building next door to jewish center on 86st, CITY OF NEW YORK LAW DEPARTMENT

**NEW YORK LAW SCHOOL;**
**ANTHONY CROWELL, ESQ., Dean;**
**FAITH STEVELMAN, ESQ.;**
**ADREAMA ISHE MACKEY PONTE, ESQ.;**

**TOURO LAW SCHOOL;**
**MARJORIE SILVER, ESQ**.;
-
**LOUIS BARRA, New York State Bar, First Department Grievance Committee**
180 Maiden Lane, 17th Floor

New York, NY 10038

**JONATHAN ROSENBLATT, ESQ., Clerk of the New York State Supreme Court;**
**Justice James d'Auguste** (Part 55) Room 684 at 111 Centre Street,
**Louis L Nock**
7 Times Square, New York, NY, 10036
**SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK CIVIL DIVISION;**

**Eric Adams (former NYC Mayor)**: City Hall, New York, NY 10007.
**New York City Police Department** (NYPD): One Police Plaza, New York, NY 10038.
**San Francisco Police Department** (SFPD): 1245 3rd St, San Francisco, CA 94158.
400 McAllister St., Room 103, San Francisco, CA 94102.
**San Francisco Superior Court**

1663 Mission Street, Suite 225
San Francisco, CA 94103
**LEGAL ASSISTANCE**
**FOR THE ELDERLY**
**SAN FRANCISCO**
**Barbara lam**
**-**
**United States Bill Sorro Housing Program (BiSHoP)**
1338 Mission St FL3, San Francisco, CA 94103
**VIRGINIA TOY**
950 Stockton St, #398
San Francisco, CA 94108·

**GERARD PROEFREIDT, ESQ.;**
**NORRIS McLAUGHLIN**

7 Times Square, 21st Floor
New York City
NY 10036

**TYLER MAULSBY**

**Frankfurt Kurnit Klein & Selz PC**
28 Liberty Street
New York, NY 10005
& 2029 Century Park East
Los Angeles, CA 90067

**Building Equity Management LLC**
**268 W 77TH LLC;**
**268 WEST 77TH STREET LLC**
Address: 1261 Broadway Suite 1002, New York, NY 10001, United States

**NEW LANDLORD ENTITIES (John Doe Defendants I–X);**
**OLD HOLDING COMPANIES (John Doe Defendants XI–XX);**
**PETER MAGNONE;**
**MARY MAGNONE;**
**JARED MINC;**
**BRIAN REILLY;**
**MICHAEL VINOCUR;**

140 Broadway, Ste 2450, New York, NY 10005

**Jacob Kaplan AGNIFILO INTRATER**
140 Broadway, Ste 2450, New York, NY 10005

**Brafman & Associates, P.C., Ben Brafman, is located at**
767 Third Avenue, 26th Floor, New York, NY 10017.

**BORAH, GOLDSTEIN, ALTSCHULER & NAHINS, LLP; STEVEN SHULMAN, ESQ**;
Address: 377 Broadway, New York, NY 10013, United States

**Peter Brill, Esq. of Brill Legal Group, P.C**.
operates from several New York locations, with main offices
including:
Hauppauge: 150 Motor Parkway, Suite 401, Hauppauge, NY 11788.
**Robert Silverstien ESQ.**

2050 M Street NW Washington
D.C. 20036 United States

New York City office is located at
One Manhattan West, 395 9th Ave, New York, NY 10001. This location serves as the firm's headquarters.
**Skadden, Arps, Slate, Meagher & Flom LLP's**

405 Candlewood Commons, Howell Township, NJ 07731, United States
**Arthur schwartz**
451 west end avenue
https://www.regahventures.com/team
**Samuel M. Krieger, Esq.**
39 Broadway, Suite 920
New York, NY 10006
**AMOS ALTER Esq.**
50 Fountain Plaza
Suite 1300
Buffalo, NY 14202
**MILESTONE SEVENTH**
405 Lexington Ave
New York, NY 10017 US
**EDWARD NEIGER, ESQ.;**
**ALEXANDRA ROBERTSON, ESQ.;**
**DAVID STERN, ESQ.;**
**JOE STEINFELD, ESQ.;**
**TESSA CUNEO**
**ASK LLP;**

155 N. Wacker Drive.
Suite 4250 Chicago,
IL 60606
**Howard Foster**

1212 Avenue of the Americas. New York, NY 10036
**UNITED AIRLINES GLOBAL**
- 999 Brannan / Airbnb Environments | ArchDaily

Airbnb's global headquarters is located at 888 Brannan Street in San Francisco, California

**Airbnb Office**

**Priceline / Booking.com (Booking Holdings)**: 800 Connecticut Avenue, Norwalk, CT 06854

**Chase Bank (JPMorgan Chase & Co.):** 270 Park Avenue, New York, NY 10017 (New global headquarters opened October 21, 2025)

**Hertz Corporation**: 8501 Williams Road, Estero, FL 33928

**Avis / Budget (Avis Budget Group):** 379 Interpace Parkway, Parsippany, NJ 07054

**Ford Motor Company:** 1 American Road, Dearborn, MI 48126 (The new "Hub" world headquarters replaced the former Glass House in late 2025)

**Tesla, Inc.:** 1 Tesla Road, Austin, TX 78725 (Also referred to as Gigafactory Texas)

**Outrigger Hotels & Resorts**
: 2255 Kuhio Avenue, Suite 1800, Honolulu, HI 96815

**Transportation Security Administration** (TSA): 6595 Springfield Center Drive, Springfield, VA 20598

**State of Hawaii** (Capitol)
Department of the Corporation Counsel (Legal representation for the City & County of Honolulu)
1001 Bishop Street, Suite 2020
Honolulu, HI 96813

**Religious Organizations (Hasidic Dynasties)**

**Chabad-Lubavitch World Headquarters**
: 770 Eastern Parkway, Brooklyn, NY 11213.

**Ger (Gerrer Hasidim):**
Global Headquarters
: Beis Medrash Gur, 15 Yirmeyahu St, Jerusalem, Israel.
New York Hub
: Mesivta Beis Yisroel, 1312 50th St, Brooklyn, NY 11219.

**Satmar**
Williamsburg Base (Zalman Leib faction)
: 152 Rodney Street, Brooklyn, NY 11211.
Kiryas Joel Base (Aaron faction)

: 5 Garfield Rd, Monroe, NY 10950.
**Vizhnitz Global Headquarters**
: 19 Givat Pinchas St, Bnei Brak, Israel.
North American Center (Viznitz Monsey)
: 25 Phyllis Terrace, Monsey, NY 10952.

Business & Media Personalities
**Miriam Adelson / Las Vegas Sands Corp**: 3355 Las Vegas Blvd S, Las Vegas, NV 89109.
**Floyd Mayweather / Mayweather Promotions**: 4616 W Sahara Ave #290, Las Vegas, NV 89102.
100 Church St, NY 10007
1 Dr. Carlton B. Goodlett Pl, SF 94102

**Justin Kuehn, Esq. (Kuehn Law, PLLC)**
Address: 53 Hill Street, Suite 605, Southampton, NY 11968
**Fletcher Moore, Esq. (Moore Law, PLLC)**
Address: 30 Wall Street, 8th Floor, New York, NY 10005
**Lawrence P. Eagel, Esq. (Bragar Eagel & Squire, P.C.)**
Address: 810 Seventh Avenue, Suite 620, New York, NY 10019
345 Park Avenue, New York, NY 10154, United States
**BLACKSTONE**
A Brazilian real estate investment firm, HSI, is the current owner of the hotel located on the Copacabana beachfront, which operates as the Hilton Rio de Janeiro Copacabana HSI acquired the hotel from Blackstone in a deal beginning in and around 2024.
**ACCOR HOTEL CORP.** also maintains a New York corporate office at 711 5th Ave, New York, NY 10022, United States.
**MALIDANI JEWELRY** 1200 6th Ave, New York, NY 10036
**EXTRA SPACE STORAGE** 2501 Cesar Chavez St, San Francisco, CA 94124, United States
**DRIVE UP STORAGE** 54 Nardozzi Pl, New Rochelle, NY 10805, United States

**VERIZON** Daniel Burnham Ct Ste 20c, San Francisco, CA 94109, United States
**San Francisco** store2
5223 13th Ave, Brooklyn, NY 11219, United States **Brooklyn** store

1300 Lakeside Drive, Oakland, CA 94612 pg and e Corporate Owner: G6 Hospitality.

Headquarters: 4001 International Parkway, Carrollton, TX 75007 (outside of California**).MOTEL 6**

**Ford** is a prominent automotive manufacturer.
Plaintiff is a consumer who, in or around August 2024, rented a new 2024 Red Soft Top Ford Mustang Convertible manufactured by Defendant Ford. Inc., d/b/a Ford Motors, Inc., a Michigan Corp>
Defendant **Tesla** is a prominent electric automotive manufacturer.
Plaintiff is a consumer who, in or around July 2023, rented a new 2023 Tesla Model 3 manufactured by Defendant Tesla. Inc., d/b/a Tesla Motors, Inc., a Nevada and Texas Corporation.

**Vicarious Liability**

At all times herein mentioned, Defendants, whether or not specifically identified or designated herein as a DOE, and each of them, were the agents, employees, servants, partners, independent contractors, joint ventures and participants with all other Defendants, and with each other, and in doing the things hereinafter mentioned, were agents, employees, servants, partners, joint ventures, and with the consent and permission of the co-Defendants and each of them.
The true names and capacities, whether individual, corporate, associate or otherwise of the Defendants named herein as DOES 1 through 20, are unknown to Plaintiff at this time. Plaintiff therefore sues said Defendants by such fictitious names pursuant to the applicable section of the applicable Federal or State Code of Civil Procedure
Plaintiff is informed and believes, and thereon alleges, that at all times, each Defendant was acting as an agent for each of the other Defendants and each were co-conspirators with respect to the acts and the wrongful conduct alleged herein so that each is responsible for the acts of the other in connection with the conspiracy in such wrongful acts in connection with the other Defendants.

## INTRODUCTION AND OVERVIEW OF THE ENTERPRISE

This action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and related federal and state laws. Plaintiff brings this civil action against a coordinated criminal enterprise referred to herein as the **Schwartz–Kaufman Syndicate ("SK Syndicate")**, an association-in-fact enterprise composed of real estate operators, attorneys, corporate actors, family members, and associated individuals who allegedly engaged in a continuous pattern of racketeering activity across multiple jurisdictions.

The SK Syndicate is alleged to function as both the **"rim and spokes"** of a racketeering enterprise. The central coordinating figures—principally **Ira Schwartz and Uri Kaufman**—formed the core of the enterprise, while numerous affiliated actors operated as spokes carrying out coordinated schemes in furtherance of the enterprise's objectives.

The enterprise allegedly operated through interlocking familial, business, religious, and political relationships. Its activities included harassment of tenants, extortion, fraudulent eviction practices, manipulation of rent-stabilized housing markets, interference with Plaintiff's employment and professional prospects, and other racketeering acts carried out through interstate communications and coordinated business practices.

The enterprise operated across multiple jurisdictions, including **New York and California**, and targeted vulnerable tenants and individuals in rent-regulated housing markets. The enterprise's conduct spanned more than a decade, from approximately **2010 to the present**, and involved repeated acts of fraud, coercion, retaliation, and obstruction of justice.

The Schwartz Kaufman Syndicate's enterprise purpose was to **control real estate holdings and related investments while maximizing profits through coercive and unlawful means**, including rent overcharges, tenant harassment, and manipulation of ownership structures.

---

## THE RICO ENTERPRISE

Plaintiff alleges that Defendants formed and operated an organized association-in-fact enterprise referred to herein as the **Schwartz–Kaufman Syndicate**, also described as the **Israeli Religious Organized Real Estate Syndicate ("IRORES")**.

The enterprise consisted of:

• Ira Schwartz
• Uri Kaufman
• Steven B. Rothschild (also known as Tuvia)
• Arthur Schwartz
• Associated members of the Rothschild, Schwartz, Cohen, Wexler, and related family networks
• Attorneys, real estate agents, corporate actors, and municipal actors who knowingly assisted the enterprise.

Plaintiff further alleges that certain religious, business, and political networks were used to facilitate or conceal the enterprise's activities. These relationships allegedly enabled coordination among real estate interests, legal professionals, and community actors to exert pressure on tenants and individuals asserting legal rights.

The enterprise allegedly coordinated with landlord associations and property interests, including entities associated with the **Building and Managers Association of New York ("BEMNY")** and other affiliated property networks.

---

## PURPOSE OF THE ENTERPRISE

The purpose of the enterprise included:

1. Maintaining and expanding control over rent-regulated and other real estate assets.

2. Maximizing profits through unlawful rent overcharges and tenant displacement.

3. Harassing or coercing tenants who asserted rights under rent stabilization laws.

4. Concealing ownership relationships and financial interests through affiliated entities.

5. Interfering with Plaintiff's employment, professional prospects, and legal rights.

6. Manipulating legal processes and government systems to obstruct accountability.

Plaintiff alleges that the enterprise used familial relationships, religious networks, legal professionals, and corporate infrastructure to carry out these objectives.

---

**PATTERN OF RACKETEERING ACTIVITY**

Plaintiff alleges that Defendants engaged in a **pattern of racketeering activity** consisting of numerous predicate acts, including but not limited to:

- Extortion and attempted extortion, including violations of the Hobbs Act
- Wire fraud and electronic communications used to coordinate unlawful activity
- Fraudulent eviction practices
- Harassment and stalking
- Interference with contractual and employment relationships
- Manipulation of housing markets and rent stabilization systems

• Credit reporting manipulation and fraudulent financial charges
• Retaliation against individuals asserting legal rights

These acts were coordinated through **telephone calls, text messages, electronic messaging systems, and digital platforms**, enabling the enterprise to operate across state lines.

The enterprise's conduct demonstrates both **closed-ended continuity**—through repeated racketeering acts over multiple years—and **open-ended continuity**, as Defendants allegedly continue to engage in similar schemes targeting tenants and individuals.

**COORDINATED REAL ESTATE AND TENANT HARASSMENT SCHEMES**

Plaintiff alleges that Ira Schwartz and members of the SK Syndicate coordinated with affiliated property interests to implement coercive practices across multiple residential buildings.

These practices allegedly included:

• Illegal rent overcharges
• Tenant harassment campaigns
• Surveillance and intimidation
• Manipulation of ownership structures
• Fraudulent eviction proceedings

These same tactics tactics were employed at multiple properties, including locations in **New York and California**, demonstrating a systematic pattern of conduct rather than isolated incidents or mere garden variety breaches of contract.

**INTERFERENCE WITH PLAINTIFF'S PROFESSIONAL AND PERSONAL AFFAIRS**

Plaintiff further alleges that members of the enterprise interfered with Plaintiff's professional career and personal affairs.

These actions allegedly included:

• Surreptitious sharing of personal background information
• Defamation and community harassment
• Interference with Plaintiff's employers
• Manipulation of legal proceedings
• Unauthorized involvement of attorneys with conflicting interests.

These acts were intended to isolate Plaintiff, damage professional opportunities, and maintain control over Plaintiff's living arrangements and financial affairs.

**CORPORATE AND MUNICIPAL INFRASTRUCTURE**

Plaintiff alleges that the enterprise exploited technical and customer service infrastructure associated with various corporations and municipal systems to interfere with Plaintiff's business operations and access to services.

These entities allegedly included telecommunications providers, financial institutions, travel and lodging companies, and municipal service systems.

Plaintiff alleges that this interference disrupted communications, financial transactions, and lodging arrangements as part of the enterprise's broader harassment campaign.

**268 W 77 STREET APT 1 NEW YORK NY 10024 – HARASSMENT AND ILLEGAL EVICTION**

The plaintiff moved into the Schwartz Kaufman Syndicate's apartment at 268 West 77th Street New York NY 10024 #1, in June 2020, at the height of the pandemic, when Manhattan's vacancy rate reached a historic low of 3.5%. The lease provided by the landlord explicitly stated the apartment was not subject to rent stabilization.

However, the apartment was in fact rent-stabilized, as the purported decontrol in 2009 was fraudulent. The landlord, Peter Magnone and BEMNY, falsely claimed that nearly $60,000 in Individual Apartment Improvements ("IAIs") had been performed to justify luxury decontrol.

The plaintiff observed that no such work was performed as prompted by defendant Ira Schwartz who was posing as his friend and counsel to check.

Under the 2008 Individual Apartment Improvement rules pursuant to the New York Rent Stabilization Laws, landlords in New York could raise rent only 1/40th of the improvement cost and minor repairs did not qualify.

The apartment's rent should have been $591.77, not the inflated amounts charged.

The plaintiff paid $6,550 at the stabilized rent and nearly $20,000 through the Emergency Rental Assistance Program for market rent, yet the landlord refused to

apply the overpayment toward future rent, prompting the plaintiff to file a rent overcharge complaint with DHCR in August 2020 at Ira Schwartz's instructions. He also hired attorney Gerard Proefreidt and lawfirm Norris McLaughlin PC, at Ira Schwartz instruction because Ira Schwartz was his uncle and Gerard Proefreidt was Ira's attorney.

He performed exactly as *Ira* instructed the whole time, unbeknownst to him he was just a tool Ira and Uri used as an insurance fraud and divorce fraud asset protection device when the rent stabilization buildings value crashed in 2020 the Schwartz Kaufman syndicate was ready with its buildings with plans to use a family member, like how Ira used Jordan Wexler as a scapegoat while he harassed the other random tenants at the parc Vendome around 2003.

From the moment of tenancy, BEMNY and the landlord engaged in a campaign of harassment and intimidation designed to force the plaintiff out and accept an undervalued settlement. Brian Reilly repeatedly knocked on the plaintiff's window at night, followed the plaintiff to DHCR offices, and disrupted synagogue services with assistance of Boyaner Shul Defendants who did not like him and were helping further their interests in their investment in the building where Plaintiff lived. Michael Vinocur similarly interfered with the plaintiff's religious observances. Jared Minc, acting on the landlord's behalf, oversaw construction and harassment intended to inflict emotional distress. BEMNY agents bribed City Department of

Buildings employees to threaten the plaintiff in their apartment late at night. Stephen Shulman, as attorney for the landlord and BEMNY enterprise, coordinated the deletion of key evidence and misrepresented the nature of the settlement in court filings.

The plaintiff's attempts to settle the overcharge complaint and avoid litigation were systematically thwarted. The landlord filed a defective five-day notice in May 2022, provoking a nonpayment case while refusing lawful rent payments. Attempts to mitigate disturbances from a new electronic buzzer system were blocked, preventing the plaintiff from observing the Sabbath and exacerbating harassment. The plaintiff faced ongoing threats of false criminal charges and bar complaints designed to create duress, economic coercion, and fear of eviction. This conduct ultimately rendered the plaintiff constructively evicted, prevented attendance at court proceedings, and limited the plaintiff's access to legal counsel.

Compounding the harassment, Hertz Cherson P.C., a landlord-tenant law firm, was used to assist the BEMNY enterprise by Schwartz Kaufman Syndicate attorney Stephen Shulman.

The plaintiff was initially hired to perform residential evictions at HCR creating a conflict of interest that prevented representation by legal aid. Hertz Cherson's IT manager deleted key communications between the plaintiff and family members and documents related to harassment. These actions, orchestrated by Shulman and

Minc, at the Schwartz Kaufman syndicates behest, interfered with the plaintiff's ability to preserve evidence and pursue remedies.

The settlement agreement imposed by the landlord and BEMNY, facilitated by Proefreidt and Shulman, was executed under extreme duress. Proefreidt, acting merely as a placeholder was actually Ira Schwartz and Uri Kaufmans lawyer which was unknown to Plaintiff. Proefreidt did not provide full scope legal representation, leaving the plaintiff with no realistic opportunity to resist the landlord's extortion. The landlord's threats through Minc to file false criminal and bar complaints, combined with targeted harassment, economic duress, and interference with the plaintiff's religious practices, violated New York rent stabilization law and federal statutes.

The Plaintiff asserts that the new LLC owning the property is substantially similar to the prior holding company, with opaque ownership that may involve Mary Magnone, suggesting a deliberate effort to conceal assets and shield them from litigation. The Plaintiff notes that Borah, Goldstein, and BEMNY have not demonstrated ownership or official status in the landlord entity at the time of the settlement, and therefore the release executed in the settlement should not bar claims against these parties.

A Brownstone Rehabilitation Company, was responsible for abusive ongoing construction noise and violent threats in 2020 and 2021 as part of a racketeering effort to interfere with Plaintiff's ability to live in Plaintiff's own home orchestrated by Plaintiff's own family as well as the Boyaner Defendants like Bob Chambre' who helped hire the motorcycle gang member from the Hells Angels motorcycle club who moonlighted as a bouncer/ fixer at the ongoing Trinity College Construction site on w77-78st. This gang member literally idled his loud 1000cc+ Harley Davidson motorcycle without any exhaust mufflers or sound mitigation whatsoever just to disturb me and cause me to wake up early at the behest of Chambre' who got pleasure with having others shock Plaintiff. Like the time we walked back together and he had a woman attack us with anti semitic slurs while he regaled me with his "war stories" about how he helped organize the financing assemblage at the ongoing trinity church construction site on w77-w78st and how he knows the bastard on that bike. How the time he met me at the park on W 81st street and CPW where he had a woman walk up to me nearly completely naked in public while we were talking to see Plaintiff's reaction where he told me he worked with Plaintiff's uncle Arthur Schwartz and Aaron Cohen sometime around 2021 July. Bob Chambre and I davened at the Boyaner Shul.

There were also several other individuals involved, including Plaintiff's uncles Steven B. Rothschild and Ira Schwartz, Plaintiff's aunt Jacqueline Schwartz, and

Plaintiff's brother Warren Wexler, through Proefreidt, Brafman, Kaplan, Lieberman, Alter, Aaron Cohen, Shimshon Wexler, Adreama Mackey Ponte, David Abrams, and others.

The 2023 upper west side NY and 2024 SF Inner Richmond settlement agreements were two separate agreements that should be set aside for duress fraud and other illegality designed to mislead the court and public.

What were portrayed as fair, negotiated agreements, were in fact extortionate and coercive.

The plaintiff was forced to use a specific attorney, sign a general release, and relinquish property rights under conditions that misrepresented the fairness of the settlement. Coercion impeded proper negotiation and fair compensation, with threats, delay tactics, and stalling forcing the plaintiff to accept significantly less than the true value of the claim.

The assignment of property between the old and new holding companies was executed with the intent to coerce forfeiture of rights and to favor the purchaser, making the conveyance fraudulent, void against public policy, and in violation of the Statute of Frauds.

Since approximately 2008, BEMNY and the building's management, including Magnone, allegedly engaged in systematic fraud to illegally decontrol rent

stabilized apartments and relet them at market rents. BEMNY, through agents such as Jared Mine, Michael "Mike" Vincocur, and Brian Reilly, directly targeted the plaintiff with harassment to coerce settlement of a lawsuit for damages at a fraction of its true value. Magnone falsely claimed in annual rent registrations that certain apartments were no longer subject to rent stabilization due to luxury decontrol rules, asserting that nearly $60,000 in individualized apartment improvements had been completed to justify this decontrol. In reality, the required work was not performed. On information and belief, other apartments in the building were similarly decontrolled illegally and continue to be relet at exorbitant market rents despite not meeting the legal thresholds. Some tenants have been charged four to five times what other rent-stabilized tenants pay. BEMNY also acted as a sales broker for the landlord, attempting to sell the building without disclosing that the purported decontrol was achieved through fraudulent alterations of business records.

The plaintiff endured ongoing harassment by BEMNY agents as part of what is alleged to be a coordinated enterprise targeting the plaintiff. Brian Reilly repeatedly disturbed the plaintiff's sleep by knocking on the windows of the ground floor apartment, followed the plaintiff to DHCR offices in Harlem, and engaged in disruptive behavior. Michael Vinocur followed the plaintiff into the Boyaner Synagogue, disrupting services. Both Reilly and Vinocur benefit

personally from the rents and profits collected by BEMNY. Minc allegedly ordered construction activity designed to harass and injure the plaintiff. Certain BEMNY agents also bribed New York City Department of Buildings employees to visit the plaintiff's apartment late at night on Thanksgiving weekend 2020 to intimidate and threaten eviction.

Plaintiff was also followed and stalked online and in person by the wives and relatives of the Boyaner defendants like Goerge Karrasicks wife Miriam Karrasick Ne~ Rieder.

Oversight and orchestration of these actions is attributed to Shulman Ira Schwartz and Uri Kaufman who provided scouting reports on Plaintiff, legal advice and coordinated with Hertz Cherson to delete evidence and mislead both DHCR and the court. This cover-up involved filing the illegally obtained settlement in court and misrepresenting the nature of the harassment and extortion, thereby obstructing justice and protecting the actions of the enterprise. Collectively, these allegations suggest a coordinated effort by BEMNY and its agents to manipulate rent stabilization laws, harass tenants, conceal illegal conduct, and obstruct legal remedies through coercion, fraud, and bribery.

As part of the racketeering enterprises corrupt scheme and goal, several lawyers Plaintiff hired were simultaneously working for both the buyer of the building and

the landlord who was the Schwartz Kaufman Syndicate. Including Justice Nock who deliberately acted without jurisdiction for a bribe of a job, which constitutes a clear conflict of interest and a breach of fiduciary duty. Honorable Judge Waterman-Marshall had originally scheduled the conference for October 2, 2024. However, as Plaintiff was an observant Orthodox Jew and does not work during Rosh Hashanah, Plaintiff was unable to attend. The judge has since been replaced, Louis Nock resigned on corruption related charges and Judges Nock D'Auguste and Waterman Marshall are disqualified under New York's Judiciary Law Section 14 saying that judges must recuse where there is an appearance of bias due to the enumerated reasons listed regarding the judges relationship to parties in the case .

Furthermore, the eCourts system indicated that Plaintiff's appearance was not required on September 25, 2024, which I had confirmed by checking the upcoming appearances section of Plaintiff's case. I would like to bring to the court's attention that during the oral arguments scheduled for August 10 and September 25, I had to arrange for a replacement to appear in Plaintiff's stead. Unfortunately, Greg Sun, the replacement, defaulted on purpose because he was actually working for the Schwartz Kaufman Syndicate and not because he was as he claims unaware of the court's location.

I have now learned much more about the situation, even though the defendants continue to attempt to conceal their racketeering enterprise.

Specifically, that in the days following the forced settlement, defendants exerted undue influence and power over me through coercion and extortion as the landlord of the building where I lived.

The landlord through Kevin and Jared Minc unlawfully took Plaintiff's keys, by pickpocketing me and changed Plaintiff's electronic lock, and refused to replace Plaintiff's Sabbath key after I informed them that it had been misplaced. Instead of providing a new key, and the footage they had on the cameras SK syndicate installed when I moved in SK syndicate ordered Jared Minc, the building manager to force me to come to their office to obtain a new fob. Additionally, Steven Shulman, the escrow agent, deliberately caused me to appear in person under false pretenses, likely with the intention of having me arrested.

This pattern of coercion and fraud was designed to create the appearance of compliance while furthering a constructive eviction scheme. The defendants aimed to have me arrested so that I would be barred from the building and unable to continue the legal proceedings. In addition to deleting evidence and trying to force a settlement under duress, they also used state agencies, including the Department

of Buildings, police, fire department, and DHCR, to facilitate the ongoing harassment with no fear of consequences.

I would also like to add that the Brownstone Rehabilitation Company, another defendant, was responsible for the ongoing construction noise and violent threats in 2020 and 2021, which were part of an effort to interfere with Plaintiff's ability to live in Plaintiff's own home. There were also several other individuals involved, including Plaintiff's uncles Steven B. Rothschild and Ira Schwartz, Plaintiff's aunt Jacqueline Schwartz, and Plaintiff's brother Warren Wexler, through Proefreidt, Brafman, Kaplan, Lieberman, Alter, Aaron Cohen, Shimshon Wexler, Adreama Mackey Ponte, David Abrams, and others.

These individuals have caused significant harm through breach of fiduciary duty, fraud, and tortious interference. Additionally, a tenant named Robert Silverstein, worked as an agent of the landlord, engaged in harassment, such as slamming doors during sleeping hours and dumping foul-smelling garbage in front of Plaintiff's apartment on behalf of his employer and landlord Abraham Schwartz's attorney Skadden Arps.

Furthermore, the misconduct at issue appears to be part of a broader ongoing pattern of racketeering orchestrated by Ira Schwartz, involving multiple evictions, harassment campaigns, and systemic abuses across New York City. These actions

are carried out in concert with licensed attorneys, prominent real estate syndicators, and corrupt public officials, particularly those within several city agencies.

I have reason to believe that the New York City Department of Buildings has routinely failed to penalize landlords involved with Schwartz's network, despite clear violations of the building code. The New York Police Department has been deployed on at least two occasions to intimidate me, further supporting a pattern of racketeering. Additionally, the Department of Housing and Community Renewal (DHCR) compromised Plaintiff's legal position by informing the landlord and Brian Reilly of Plaintiff's request for records relating to Plaintiff's apartment.

Similarly, the Fire Department of New York (FDNY) failed to take enforcement action after I reported dangerously installed window grates at Plaintiff's apartment, and the local fire station exacerbated Plaintiff's health issues by conducting loud fire drills during the night. The New York City Sanitation Department also played a role in ongoing harassment and surveillance as part of a campaign to destabilize and displace me.

These actions constitute Hobbs Act violations (18 U.S.C. §1951) as the plaintiff and other tenants were forced to relinquish property rights to rent-stabilized apartments under threats, harassment, and fear of economic or legal harm. The landlord's and BEMNY's conduct further violates the Fair Housing Act (42 U.S.C.

§3604), as the harassment and extortion were racially and religiously targeted, interfering with the plaintiff's rights as an Orthodox Jew, including observance of the Sabbath and Jewish fast days like Tisha B'Av.

The landlord's actions created constructive eviction through targeted religious, economic, and racial harassment, including the installation of intrusive electronic devices to disrupt the plaintiff's home life and prevent religious observance.

The coordinated enterprise employed threats, coercion, fraudulent filings, and interference with legal representation to pressure the plaintiff into accepting settlements well below the apartments' true value. These actions were designed to benefit BEMNY, Magnone, and associated entities, while circumventing rent stabilization laws and public policy protections. The plaintiff was never able to meaningfully consent to the settlement, and the conveyance of property to the new landlord entity was executed to conceal misconduct and avoid judicial scrutiny.

These acts violate New York Rent Stabilization laws, the Hobbs Act, the Fair

Housing Act, and civil rights protections, and constitute an ongoing pattern of misconduct designed to deprive tenants of lawful rights, conceal wrongdoing, and profit illegally. The plaintiff seeks relief to set aside fraudulent transfers, void coercive releases, pursue RICO and civil rights claims, and enjoin the continuation of this enterprise.

The preceding allegations are incorporated herein as though fully set forth.

Defendant BEMNY constitutes a RICO enterprise under 18 U.S.C. §1961(3). The landlord, BEMNY, and its agents, including Jared Minc, Vinocur, Reilly, and attorney Steven Shulman, have engaged in a pattern of violations of the Hobbs Act, 18 U.S.C. §1951, and the Fair Housing Act, 42 U.S.C. §3604, over the past four years and continuing. Each act of coercion, harassment, filing of false complaints, and constructive eviction constitutes a racketeering activity under 18 U.S.C. §§1961(1)(B) and (C).

BEMNY has systematically imposed market-rate rents and non-rent stabilized leases on tenants to evade rent stabilization laws, relying on economic fear, harassment, and threats to induce compliance. These acts also violate the Fair Housing Act due to the racially and religiously targeted nature of the harassment against tenants asserting their legal rights. The enterprise functions as an association-in-fact under 18 U.S.C. §1961(4), including BEMNY, the Magnone family, Borah Goldstien, Ira Schwartz, the Schwartz-Kaufman syndicate, and Rothschild-affiliated property interests. This network operates with a common purpose: to maximize profits by flouting rent stabilization laws, coercing tenants into accepting settlements, and suppressing tenants' rights through intimidation and

economic duress. The enterprise relies on ongoing coordination, communications, and mutual understanding among its members to achieve its illegal objectives.

The agents of this enterprise have engaged in numerous acts to further the scheme, including filing false statements with courts and regulatory agencies, orchestrating harassment campaigns, and misrepresenting apartments as market-rate to prospective tenants and buyers. This conduct has been ongoing for many years and is designed to generate illicit profit at the expense of law-abiding tenants.

Accordingly, BEMNY and its co-conspirators, including Schwartz, the Schwartz Kaufman syndicate, and Rothschild affiliates, have violated 18 U.S.C. §1962(c) by participating directly and indirectly in the affairs of the enterprise through a pattern of racketeering activity.

Other tenants, such as Sam and Helena Roth, were forced to vacate their apartments due to targeted harassment orchestrated by the enterprise. Vulnerable populations, including unhoused and mentally ill individuals, were exploited by the enterprise to intimidate lawful tenants into leaving.

As a direct and proximate result of the Israeli Bond Corporation and SK syndicate's pattern of racketeering, Marshall Wexler has been injured by being forced to settle for an amount estimated at much less than the value of his claims

and his earnings from his lawfirm have been severely negatively impacted by the SK syndicates illegal racketeering.

Specific acts of harassment included hiring unstable individuals to intimidate tenants, playing loud music late at night, obstructing entry, and other intrusive behaviors. These actions primarily targeted newer tenants residing on lower floors, creating a pattern of coercion to force turnover and prevent tenants from exercising their rent-stabilization rights. The enterprise also misrepresented the status of apartments to potential buyers, concealing the buildings' rent-stabilization history, thereby perpetuating the fraudulent scheme.

Plaintiff Marshall Wexler demands judgment against BEMNY pursuant to 18 U.S.C. §1964(c), including treble damages, attorneys' fees, costs, and prejudgment interest.

**FRAUD, DURESS, AND COERCION UNDERLYING THE SETTLEMENT**

At all relevant times, BEMNY, Borah Goldstein, and the corporate holding entities named in this litigation acted under the direction and control of Uri Kaufman, Ira Schwartz, Abraham Schwartz, and Steven B. Rothschild without Plaintiff's consent or knowledge. Their conduct, including the manipulation and coercion underlying the settlement, renders the agreement invalid, as it was obtained under duress. Ira Schwartz, Rochel Wexler Ovits, and attorney Robert Silverstein of Skadden Arps

conspired to unlawfully evict Plaintiff by filing false charges with assistance from Detective Mohamed Qazi of the 20th Precinct, who obtained evidence through bribery. This conduct constitutes duress and extortion under the Hobbs Act (18 U.S.C. § 1951), reflecting a pattern of calculated abuse and legal misconduct designed to strip Plaintiff of his rights and property.

**CLAIM AGAINST BEMNY FOR VIOLATING 18 U.S.C. §1962(D)**

The Plaintiff incorporates all preceding allegations as though fully set forth herein.

The Plaintiff alleges that, in carrying out the RICO violations described above, BEMNY formed an agreement with the Magnone landlords and the Borah, Goldstein, and Hertz Cherson firms to achieve the objectives outlined previously. According to the Plaintiff, this agreement has been ongoing for at least the last four years, and likely longer. Under 18 U.S.C. §1962(d), it is unlawful for any person to conspire to violate subsection (c) of that section. Therefore, the Plaintiff alleges that this agreement constitutes a conspiracy to violate §1962(c) and thus violates 18 U.S.C. §1962(d). As a direct and proximate result of BEMNY, Magnone, and the other defendants' conspiracy to violate §1962(c), the Plaintiff claims he has been injured in his business and property, pursuant to 18 U.S.C. §1964(c).

The Plaintiff requests judgment against BEMNY, Magnone, Hertz Cherson, Borah, Goldstein, and the other individual defendants for damages, trebled, together with attorney's fees, costs, and pre-judgment interest, pursuant to 18 U.S.C. §1964(c).

The Plaintiff also seeks preliminary and permanent injunctions preventing BEMNY from continuing to enforce the illegal decontrol of rent-stabilized apartments.

The Plaintiff further alleges that the conveyance of the property shortly after a settlement was reached creates a strong presumption of fraudulent intent, aimed at hindering or delaying his ability to collect on valid claims. The Plaintiff contends that such conveyances, occurring so close to litigation or settlement, are highly suspect under New York Debtor and Creditor Law and relevant case law.

Plaintiff Marshall Wexler brings this Complaint against the members of this complex racketeering enterprise, alleging that they orchestrated a scheme to fraudulently evict him at least 7 times and, coerce him into signing a settlement agreement at least 3 times, and execute fraudulent property transfers to shield assets from legal claims. The defendants, including Ira Schwartz, Uri Kaufman, Abraham Schwartz, and Steven Rothschild, are alleged to have used threats, intimidation, and fraudulent tactics to compel the Plaintiff into signing contracts that were voidable due to fraud duress and coercion.

Plaintiff seeks relief from these alleged racketeering activities, requesting that the Court vacate prior orders obtained under fraudulent pretenses and prevent the ongoing violations of 18 U.S.C. § 1962 (RICO) and the Hobbs Act (18 U.S.C. § 1951) for extortion.

Plaintiff's claims arise from a long-standing pattern of racketeering, fraud, and extortion, allegedly designed to harm his property rights and impede his ability to pursue legitimate claims. Plaintiff seeks relief to address these violations, including pursuing claims for racketeering, fraudulent conveyance, extortion, and civil rights violations, and respectfully requests that the Court allow refiling in an appropriate forum to assert these claims.

The defendants engaged in a coordinated conspiracy to violate the Hobbs Act by extorting me into signing the settlement. I filed this action pro se while residing in San Francisco, and despite agreeing to e-filing, the defendants continued to serve papers to Plaintiff's former physical address before I received Plaintiff's eCourts credentials. This resulted in a default. Later, when I retained counsel, they failed to appear, and a different judge issued an order that violates CPLR §3221 and §2222(a).

I am now seeking to vacate that order and renew the case based on critical new evidence. Specifically, I have discovered that Plaintiff's uncle Ira Schwartz

orchestrated a fraud bribery and coercion scheme involving Justice Nock, family members, law firms, and other entities to manipulate me into abandoning Plaintiff's legitimate claims by default. Sometime around 2019-2020 Justice Nock a NY Supreme Court Judge was set for mandatory retirement and the SK Syndicate sought to get "insurance" a judge who will perform honest services fraud in exchange for a partnership at a mid sized insurance defense firm called Anderson Kill. There was no subject matter jurisdiction because Judge Nock was disqualified under section 14 for many factors of the statute including financial( bribery), and because he had past client attorney relationships and professional relationships with defendant attorney Steven Shulman, Real estate Developer and Nursing Home guys Melohn, Skydell and Karrasick along with SK syndicate itself.

The court knowingly acted without jurisdiction and deliberately proceeded without subject matter and personal jurisdiction. For example, there was no personal jurisdiction because the service of process was improperly carried out in 2024 april allegedly under CPLR §308 and §2103, while I was physically in Japan, depriving me of proper notice and the opportunity to be heard while is was being illegally stalked by ethos investigations in sf and beyond. The mischaracterization of Plaintiff's filings by the clerk further compounds these procedural issues.

Additionally, the substitution of the judge who heard the oral arguments without any explanation undermines due process. After Plaintiff's legal papers were filed in

that case exposing harassment misconduct by his landlord, Plaintiff received business cards from two detectives (Mohamed Qazi of the 20th Precinct and Hoestetter from the 17th Precinct), indicating retaliatory actions and corruption. These incidents occurred each time I was in New York and about to appear in court.

Plaintiff also discovered around 2024 in the fall before he got evicted from 5434 Geary boulevard, that Ira Schwartz paid attorneys managing the IT department with valuable business retainers for his daycare business and Hertz Cherson Illegally pyramided Plaintiffs unnecessary payroll taxes and paid Adrian Beltran at Hertz Cherson & Rosenthal $7,700 to delete evidence from his phone and sabotage Plaintiff's case against the landlord who he did not know at the time was the Schwartz Kaufman syndicate and their affiliates within the IRORES.

This act was sanctioned by law firms that are in good standing to practice law

Hertz Cherson, Borah Goldstien, Jacob Kaplan, Brafman and Associates, Ben Brafman, Norris McLaughlin Gerard Proefreidt and constitutes obstruction of justice.

In addition, I learned that Kevin, the building superintendent, was paid by Ira Schwartz or one of his partners to spy on me and report Plaintiff's movements.

This constitutes a clear violation of housing laws and Plaintiff's constitutional privacy rights.

**Claims vs. Hertz Cherson Rosenthal PC**

At all relevant times, Defendants Hertz Cherson Rosenthal P.C. was a landlord-tenant law firm operating in Queens, New York whose partners included Eliot J. Cherson, Michael C. Rosenthal, Steven M. Hertz, and others.

Plaintiff was employed by Hertz Cherson Rosenthal beginning in or about November 2022.

During Plaintiff's employment, Defendants had access to Plaintiff's electronic devices and communications through the firm's internal information-technology infrastructure and personnel, including Defendant Adrian Beltran, an IT manager or technical employee acting on behalf of the firm.

At the same time, Defendants maintained ongoing professional and financial relationships with commercial real-estate operators including Ira Schwartz, Uri Kaufman, and Steven B. Rothschild, who owned and operated multiple properties and daycare-related commercial real estate ventures requiring frequent landlord-tenant litigation.

These real-estate operators generated significant legal work for Hertz Cherson Rosenthal, including eviction proceedings and commercial landlord-tenant matters, representing a valuable and recurring source of revenue for the firm.

In exchange for maintaining and expanding this legal work, Defendants agreed, directly or indirectly, to assist Ira Schwartz and his associates in suppressing and destroying evidence that could expose harassment, extortion, or unlawful conduct related to Plaintiff's housing dispute and related matters.

As part of this arrangement, Defendant Adrian Beltran obtained Plaintiff's cellular phone under false pretenses while Plaintiff was employed at the firm.

After gaining access to the device, Beltran intentionally accessed Plaintiff's personal communications and deleted messages, photographs, and other electronically stored information belonging to Plaintiff.

The deleted communications included messages between Plaintiff and family members, as well as communications with attorney Jared Minc and others relating to harassment, threats, and housing-related disputes.

Upon information and belief, these deletions were performed to prevent Plaintiff from preserving evidence of threats, coercion, and extortion committed by the landlord and associated actors.

Plaintiff later confirmed through communications with Hertz Cherson Rosenthal's Human Resources department in or about April 2024 that messages had in fact been deleted from Plaintiff's device.

Plaintiff subsequently learned that Defendant Ira Schwartz paid approximately $7,700 to Adrian Beltran or others associated with Hertz Cherson Rosenthal in connection with accessing and deleting evidence from Plaintiff's phone.

Defendants Hertz Cherson Rosenthal and its partners knowingly permitted and ratified this conduct because of their ongoing financial relationship with Ira Schwartz, Uri Kaufman, and Steven B. Rothschild, whose landlord-tenant and daycare-related real-estate businesses generated substantial legal work for the firm.

Defendants therefore exchanged illegal destruction and suppression of evidence for valuable legal business from these real-estate operators.

Defendants' actions were undertaken intentionally, maliciously, and in conscious disregard of Plaintiff's legal rights.

---

**Causes of Action**

**(Against Hertz Cherson Rosenthal and its Partners)**

Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

As Plaintiff's employer and a law firm with access to Plaintiff's confidential communications and personal property, Defendants owed Plaintiff duties of trust, loyalty, and confidentiality.

Defendants breached these duties by accessing Plaintiff's phone without authorization, deleting Plaintiff's communications, and assisting third parties in suppressing evidence relevant to Plaintiff's legal rights.

Defendants acted in their own financial interest by protecting the interests of Ira Schwartz, Uri Kaufman, and Steven B. Rothschild in exchange for valuable legal work.

As a direct result of these breaches, Plaintiff suffered damages including impairment of legal claims, financial losses, and emotional distress.

---

**Second Cause of Action – Trespass to Chattels**

**Against Hertz Cherson Rosenthal and its Partners)**

Plaintiff repeats and realleges the preceding paragraphs.

Plaintiff owned and possessed a cellular phone containing personal data, communications, and evidence.

Defendants intentionally accessed and interfered with Plaintiff's phone without authorization.

Defendants materially impaired the value and functionality of the device by deleting communications and digital evidence stored on it.

This interference constitutes trespass to chattels under applicable law.

Plaintiff suffered damages as a direct result of this interference.

---

Third Cause of Action – Gross Negligence and Reckless Misconduct

Plaintiff repeats and realleges the preceding paragraphs.

Defendants owed Plaintiff a duty to refrain from intentionally or recklessly interfering with Plaintiff's personal property and legal rights.

Defendants breached that duty through conduct that was grossly negligent, reckless, and in conscious disregard of Plaintiff's rights.

Defendants' conduct included unauthorized access to Plaintiff's device, destruction of evidence, and participation in a scheme designed to obstruct Plaintiff's legal claims.

Such conduct constitutes gross negligence and reckless misconduct.

Fourth Cause of Action – Intentional Spoliation and Obstruction

Plaintiff repeats and realleges the preceding paragraphs.

Defendants knew that the communications stored on Plaintiff's phone constituted evidence relevant to anticipated litigation.

Defendants intentionally destroyed or caused the destruction of that evidence.

The destruction of evidence was undertaken to prevent Plaintiff from proving claims relating to harassment, coercion, and extortion by the landlord and associated actors.

Defendants' conduct materially impaired Plaintiff's ability to pursue those claims.

---

Fifth Cause of Action – Civil Conspiracy

Plaintiff repeats and realleges the preceding paragraphs.

Defendants Hertz Cherson Rosenthal, Adrian Beltran, Ira Schwartz, Uri Kaufman, and Steven B. Rothschild knowingly agreed to participate in a scheme to destroy evidence and interfere with Plaintiff's legal rights.

Each Defendant committed overt acts in furtherance of this conspiracy, including unauthorized access to Plaintiff's phone, deletion of communications, and payment for these services.

As a direct and proximate result of the conspiracy, Plaintiff suffered damages.

RICO and Related Causes of Action

Factual Allegations – Enterprise and Quid Pro Quo Scheme

Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

At all relevant times, Defendant Hertz Cherson Rosenthal P.C. was a landlord-tenant law firm operating in Queens, New York.

The firm's partners included Eliot J. Cherson, Michael C. Rosenthal, Steven M. Hertz, and others who exercised managerial authority over firm operations and personnel.

Defendant Adrian Beltran acted as an information-technology manager or technical employee responsible for maintaining and accessing electronic devices and communications systems used by employees.

Defendants maintained ongoing business relationships with commercial real-estate operators including Ira Schwartz, Uri Kaufman, and Steven B. Rothschild, who owned and operated properties and daycare-related commercial real estate.

These operators regularly required landlord-tenant litigation services and eviction proceedings, generating substantial legal work and revenue for Hertz Cherson Rosenthal.

In order to maintain and expand this lucrative business relationship, Defendants knowingly agreed to assist these real-estate operators in suppressing and destroying evidence harmful to their interests.

During Plaintiff's employment with the firm beginning in or about December 2022, Defendants obtained access to Plaintiff's cellular phone through Adrian Beltran.

Beltran obtained the device under false pretenses and accessed Plaintiff's personal communications and data.

Beltran intentionally deleted messages, photographs, and other electronically stored information from Plaintiff's phone.

The deleted information included communications between Plaintiff and family members, as well as communications with attorney Jared Minc relating to harassment, threats, and the housing dispute involving Plaintiff's rent-stabilized apartment.

The communications constituted evidence relevant to anticipated litigation and legal proceedings.

Upon information and belief, Defendant Ira Schwartz paid approximately $7,700 to Adrian Beltran or other agents associated with Hertz Cherson Rosenthal in connection with accessing Plaintiff's phone and deleting evidence.

The destruction of evidence was performed with the knowledge, approval, or ratification of the firm's partners and management.

In exchange for this assistance, Hertz Cherson Rosenthal continued to receive valuable landlord-tenant litigation work from Ira Schwartz, Uri Kaufman, and Steven B. Rothschild, including matters relating to commercial real-estate properties and daycare operations.

This exchange of illegal evidence destruction for valuable legal work constituted a corrupt quid pro quo arrangement.

As a result of Defendants' actions, Plaintiff lost critical evidence supporting his housing and harassment claims and suffered significant damage to his legal case.

Plaintiff also lost his employment at Hertz Cherson Rosenthal and suffered financial and professional harm as a result of the Defendants' conduct.

---

Causes of Action

First Cause of Action – Civil RICO

(18 U.S.C. §1962(c))

Plaintiff repeats and realleges all preceding paragraphs.

Defendants formed and participated in an association-in-fact enterprise consisting of:

- Hertz Cherson Rosenthal P.C.
- Adrian Beltran
- Ira Schwartz
- Uri Kaufman
- Steven B. Rothschild
- and other participants presently unknown.

The enterprise functioned as an ongoing organization whose members associated together for the common purpose of protecting the business interests of the real-estate operators and suppressing evidence harmful to those interests.

The enterprise affected interstate commerce through the operation of real-estate businesses, daycare operations, and legal services.

Defendants conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

The pattern of racketeering activity included predicate acts such as:

- obstruction of justice
- witness tampering and destruction of evidence
- wire fraud through electronic communications and coordination
- extortionate conduct designed to coerce Plaintiff regarding the housing dispute.

These acts were related and constituted a continuing pattern of racketeering activity.

As a direct and proximate result of Defendants' racketeering conduct, Plaintiff suffered injury to his business and property, including:

- loss of employment at Hertz Cherson Rosenthal
- impairment of Plaintiff's legal claims and evidence
- loss of income and professional opportunities
- litigation expenses and related damages.

190. Pursuant to 18 U.S.C. §1964, Plaintiff is entitled to treble damages and attorneys' fees.

Second Cause of Action – Breach of Fiduciary Duty

191. Plaintiff repeats and realleges the preceding paragraphs.

192. As Plaintiff's employer and a law firm entrusted with access to Plaintiff's communications and property, Defendants owed Plaintiff duties of trust, confidentiality, and loyalty.

193. Defendants breached these duties by accessing Plaintiff's phone without authorization and deleting Plaintiff's communications for the benefit of third parties.

194. These breaches caused Plaintiff substantial damages, including loss of employment and impairment of legal claims.

---

Third Cause of Action – Trespass to Chattels

195. Plaintiff repeats and realleges the preceding paragraphs.

196. Plaintiff owned and possessed the cellular phone that contained personal communications and evidence.

197. Defendants intentionally accessed and interfered with the phone without authorization.

198. By deleting communications and data, Defendants materially impaired the value and use of Plaintiff's property.

199. Plaintiff suffered damages as a result of this interference.

---

Fourth Cause of Action – Intentional Spoliation and Obstruction

200. Plaintiff repeats and realleges the preceding paragraphs.

201. Defendants knew that Plaintiff's communications constituted evidence relevant to anticipated litigation.

202. Defendants intentionally destroyed that evidence in order to prevent Plaintiff from proving claims against the landlord and related actors.

203. This conduct impaired Plaintiff's legal rights and ability to pursue claims.

---

Fifth Cause of Action – Unjust Enrichment

204. Plaintiff repeats and realleges the preceding paragraphs.

205. Defendants received financial benefits in the form of valuable landlord-tenant legal work from Ira Schwartz, Uri Kaufman, and Steven B. Rothschild.

206. These benefits were obtained in exchange for Defendants' participation in destroying Plaintiff's evidence and sabotaging Plaintiff's legal claims.

207. It would be inequitable for Defendants to retain the benefits obtained through this misconduct.

208. Plaintiff is entitled to restitution and disgorgement of all profits obtained through this scheme.

---

Damages

209. As a direct result of Defendants' conduct, Plaintiff suffered damages including:

- loss of employment and wages
- impairment of Plaintiff's legal case and claims
- destruction of critical evidence
- litigation costs and investigative expenses
- emotional distress and reputational harm.

210. Because Defendants acted intentionally and maliciously, Plaintiff is entitled to punitive damages.

211. Under the civil RICO statute, Plaintiff is entitled to treble damages, costs, and attorneys' fees.

224. As a direct and proximate result of Defendants' conduct, Plaintiff suffered injuries to his business and property, including:

- loss of employment at Hertz Cherson Rosenthal;
- loss of wages, benefits, and professional opportunities;
- impairment and sabotage of Plaintiff's legal case through destruction of evidence;
- litigation costs and investigative expenses;
- emotional distress and reputational harm.

225. Defendants acted intentionally, maliciously, and with reckless disregard for Plaintiff's rights.

226. Plaintiff is therefore entitled to:

- compensatory damages;
- punitive damages;
- treble damages under civil RICO;
- disgorgement under unjust enrichment;

- attorneys' fees and costs;
- and any further relief the Court deems just and proper.

**THE RELEASE DOES NOT CLEARLY EXTEND TO AGENTS, LAWYERS, OR AFFILIATED THIRD PARTIES NOT NAMED IN THE AGREEMENT.**

Even if the release for the buyout of Plaintiff's rent stabilization rights at his apartment by Ira Schwartz and Uri Kaufman etc., that was obtained by fraud and duress and is not valid, were to be deemed valid.

The claims at issue arose contemporaneously with or after the execution of the release and are therefore not barred under New York law unless explicitly stated. Additionally, the Plaintiff asserts that the release was signed under duress, coercion, and extortion, rendering it voidable.

The Plaintiff was forced to sign the release under threats related to eviction and legal intimidation, and that releases induced by fraud or extortion are unenforceable.

Stephen Shulman, acting as the landlord's attorney escrow agent, materially breached fiduciary duties owed to him, supporting separate claims, including RICO, and further justifying setting aside the releases obtained through duress.

The illegal luxury decontrol and harassment enterprise extended beyond BEMNY and Magnone to include Ira Schwartz, the Schwartz/Kaufman syndicate, and the Rothschild network, all of whom participated in rent stabilization violations, coercive buyouts, and fraudulent property transfers.

By falsely classifying rent-stabilized apartments as decontrolled and enforcing extortionate settlements, these entities deprived tenants of legally mandated protections, including quiet enjoyment, fair rent calculations, and compensation for overcharges.

**5434 GEARY BOULEVARD EVICTION SEPTEMBER'23AUGUST'24**

Marshall Abraham Wexler is an Orthodox Jewish individual residing in New York who has been subjected to a sustained, multi jurisdictional pattern of harassment, intimidation, obstruction, and retaliatory conduct orchestrated by Ira Schwartz, Steven B. Rothschild, Abraham Schwartz, Moshe Schwartz, Arthur Schwartz Tzirel Schwartz, Virginia Toy, and associated actors associated actors operating across New York and California. The events described herein occurred primarily in Brooklyn, New York, and San Francisco, California, and involve alleged conduct by private individuals, real estate operators, attorneys, religious institutions, community power brokers, private security contractors, and members of law enforcement acting individually and in concert.

Operating across New York, California, and abroad. Notably, Virginia Toy is alleged to have played a central role in furthering a complex scheme of harassment and retaliation against Wexler. She is accused of engaging in bribery and fraud to harass and unlawfully evict tenants, including Wexler.

This allegedly included bribing inspectors to ignore building code violations, influencing PG&E employees to facilitate or overlook unlawful utility shutoffs, and bribing Verizon employees to aid identity-theft schemes. Toy also allegedly corrupted the legal system by bribing tenants' rights attorney Virginia Lam, a BISHOP-paid manager named Soumiah, and a social services attorney at Eviction Defense Collaborative to intentionally sabotage Wexler's legal cases. These actions are alleged to have obstructed Wexler's efforts to seek justice and allowed Toy and her network to avoid accountability.

Wexler further alleges that Toy orchestrated harassment designed to humiliate and defame him, including creating excessive bus and car traffic and intentionally arranging overweight truck deliveries to disturb tenants. She is accused of violating California tenant-purchase laws, including SB 1079, by denying Wexler the opportunity to purchase his building or apartment despite his ability to secure financing. Through these acts, Toy and her co-conspirators allegedly operated as part of a multi-jurisdictional enterprise involving landlords, lawyers, police officers, inspectors, utility company employees, 311 operators, and municipal

actors, whose goal was to remove tenants from rent-controlled properties, suppress tenant rights, extract financial gain, and shield participants from accountability.

Wexler alleges that Ira Schwartz maintained control over his San Francisco residence through Virginia Toy, including properties at 5434 Geary Boulevard in San Francisco and 268 West 77th Street in New York. These properties allegedly functioned as extensions of the enterprise, facilitating harassment, unlawful eviction, and utility-based coercion. Schwartz is further alleged to operate a multigenerational system of coercion and control over family members, influencing education, careers, marriage, reproduction, housing, and religious compliance. Extended family members, including Aaron Cohen, allegedly participated in enforcement and harassment activities.

After enduring sustained harassment in New York, Plaintiff relocated to San Francisco, California, seeking stability and the protections afforded under California tenant laws. Plaintiff's first residence in San Francisco was 5434 Geary Boulevard, a rent-controlled property owned and operated by Defendant Virginia Toy. At all relevant times, Defendant Toy acted individually and in concert with members of the Toy family, Toy & Toy Development, and a network of associated real estate actors, attorneys, municipal employees, and government agents. Plaintiff used his apartment as both a residence and a home office, relying on it for personal and professional purposes.

Shortly after Plaintiff moved into 5434 Geary Boulevard, Defendant Toy engaged in a deliberate, sustained, and escalating course of conduct designed to force Plaintiff out of his home and home office through unlawful means. This included intentional shutoffs of essential services such as electricity, water, toilet functionality, and shower access, as well as repeated refusals to repair serious habitability defects, including the apartment door. These actions were intended to make the property uninhabitable, coerce Plaintiff into vacating outside lawful procedures, and disrupt his professional activities conducted from the home office.

Defendant Toy further engaged in extreme forms of harassment and invasion of privacy. On one occasion, she entered Plaintiff's apartment without consent while Plaintiff was using the bathroom and undressed. Defendant also arranged for individuals to surveil Plaintiff through his windows and restricted access to common areas of the property, including the backyard, thereby denying Plaintiff and other tenants lawful access to shared spaces. Through these actions, Defendant Toy converted the rent-controlled building into a de facto hotel, maintaining high tenant turnover and employing harassment to remove long-term tenants for financial gain.

Plaintiff further alleges that Defendant Toy's conduct was motivated by discriminatory animus. Defendant intentionally released gas into Plaintiff's apartment in an act designed to harm and intimidate him because of his Jewish

identity. Additionally, Defendant Toy deliberately served Plaintiff with legal papers on a Saturday, knowing Plaintiff observes the Jewish Sabbath. These actions were intended to humiliate, intimidate, and harass Plaintiff on the basis of religion and ethnicity, forming part of a broader pattern of targeted discrimination.

Defendant Toy also engaged in coercion, extortion, and settlement abuse. Plaintiff was coerced into signing a settlement agreement through threats, utility shutoffs, intimidation, and persistent harassment. Defendant also retained Plaintiff's security deposit in bad faith, consistent with a repeated pattern of wrongfully withholding deposits from tenants. She misused city resources—including garbage trucks, roads, and municipal agencies—to harass Plaintiff and pressure him into vacating, reflecting the widespread and coordinated nature of her illegal actions.

The harassment and eviction campaign was supported by bribery, fraud, and corruption involving public and private actors. Defendant bribed building inspectors to ignore code violations and PG&E employees to facilitate or overlook unlawful utility shutoffs. She engaged in corrupt relationships with officers of the San Francisco Police Department, who refused to accept Plaintiff's reports or maintain records of complaints, leaving Plaintiff without recourse. Defendant also bribed a Verizon employee to facilitate identity-related fraud and engaged tenants' rights and social services attorneys to sabotage Plaintiff's case by providing bad advice and coercing Plaintiff into adverse decisions.

Plaintiff further alleges that Defendant Toy violated California tenant-purchase protection laws, including SB 1079, by preventing Plaintiff from exercising his statutory right to purchase the building or his unit. Despite Plaintiff's ability to secure financing, Defendant Toy deliberately obstructed him from exercising these protections, denying him opportunities under state law to maintain housing stability and use his home office for professional purposes.

Defendant Toy's conduct was part of a broader racketeering enterprise. Acting together with landlords, attorneys, police officers, inspectors, utility company employees, 311 personnel, and municipal actors, Defendant Toy participated in an enterprise whose common purpose was to remove tenants from rent-controlled housing, suppress tenant rights, extract financial gain, and shield participants from accountability through bribery, corruption, and abuse of public office. Predicate acts include bribery, extortion, fraud, identity theft, witness intimidation, deprivation of housing rights, civil rights violations, and obstruction of justice, committed repeatedly and continuously against multiple victims.

Shepherd Law Group; Ira Schwartz; Uri Kaufman; Edward Neiger; Soumiah, affiliated with BISHOP Housing and the Eviction Defense Collaborative; tenants' rights attorney Virginia Lam; a social services attorney; inspectors; employees of PG&E and Verizon; members of the San Francisco Police Department (SFPD); 311

employees; and other unidentified co-conspirators who knowingly participated in or facilitated the racketeering conduct described herein.

Defendant Virginia Toy, acting through intermediaries, engaged in identity theft and evidence tampering by bribing employees at the Civic Center San Francisco Verizon store to delete material evidence from Plaintiff's iPhone 14, including data relevant to harassment, surveillance, and unlawful eviction efforts.

Tenants' rights attorney Barbara Lam, who is related to a San Francisco Superior Court clerk, knowingly participated in this scheme by facilitating and encouraging the destruction of electronic evidence at the Civic Center Verizon location. Lam further used her professional position to discourage and interfere with other law firms from representing Plaintiff, effectively isolating Plaintiff from legal counsel.

After enduring sustained harassment in New York, Plaintiff relocated to San Francisco, California, seeking stability and the protections afforded under California tenant laws. Plaintiff's first residence in San Francisco was 5434 Geary Boulevard, a rent-controlled property owned and operated by Defendant Virginia Toy. At all relevant times, Defendant Toy acted individually and in concert with members of the Toy family, Toy & Toy Development, and a network of associated real estate actors, attorneys, municipal employees, and government agents. Plaintiff

used his apartment as both a residence and a home office, relying on it for personal and professional purposes.

Shortly after Plaintiff moved into 5434 Geary Boulevard, Defendant Toy engaged in a deliberate, sustained, and escalating course of conduct designed to force Plaintiff out of his home and home office through unlawful means. This included intentional shutoffs of essential services such as electricity, water, toilet functionality, and shower access, as well as repeated refusals to repair serious habitability defects, including the apartment door. These actions were intended to make the property uninhabitable, coerce Plaintiff into vacating outside lawful procedures, and disrupt his professional activities conducted from the home office.

Defendant Toy further engaged in extreme forms of harassment and invasion of privacy. On more than one occasion, she entered Plaintiff's apartment without consent while Plaintiff was using the bathroom and undressed,

Defendant also arranged for her employee individuals to surveil Plaintiff through his windows and restricted access to common areas of the property, including the backyard, thereby denying Plaintiff and other tenants lawful access to shared spaces. Through these actions, Defendant Toy converted the rent-controlled building into a de facto hotel, maintaining high tenant turnover. The short term rental situation also helped give her new tools of harassment and a large cast of

"guest" characters to choose from to implement harassment tactics to remove long-term tenants for financial gain.

Defendant Virginia Toy's conduct was motivated by racially discriminatory animus. Defendant intentionally released harmful gas into Plaintiff's apartment in an act designed to harm and intimidate him because of his Jewish identity, referencing the infamous gas chambers that Germany used in its time during the elected dictator Hitler's reign against millions of Jewish people, possibly more than 6 million, and other groups of prisoners and others he did not care about and wanted gone. Additionally, Defendant Toy deliberately served Plaintiff with legal papers on a Saturday, knowing Plaintiff observed the Jewish Sabbath in violation of the Newman line of cases.

These actions were intended to humiliate, intimidate, and harass Plaintiff on the basis of religion and ethnicity, forming part of a broader pattern of targeted discrimination.

Defendant Toy also engaged in coercion, extortion, and settlement abuse. Plaintiff was coerced into signing a settlement agreement through threats, utility shutoffs, intimidation, and persistent harassment.

Defendant also retained Plaintiff's security deposit in bad faith, consistent with a repeated pattern of wrongfully withholding deposits from tenants. She misused city resources—including garbage trucks, roads, and municipal agencies—to harass

Plaintiff and pressure him into vacating, reflecting the widespread and coordinated nature of her illegal actions.

The harassment and eviction campaign was supported by bribery, fraud, and corruption involving public and private actors. Defendant bribed building inspectors to ignore code violations and PG&E employees to facilitate or overlook unlawful utility shutoffs. She engaged in corrupt relationships with officers of the San Francisco Police Department, who refused to accept Plaintiff's reports or maintain records of complaints, leaving Plaintiff without recourse. Defendant also bribed a Verizon employee to facilitate identity-related fraud and engaged tenants' rights and social services attorneys to sabotage Plaintiff's case by providing bad advice and coercing Plaintiff into adverse decisions.

Plaintiff further alleges that Defendant Toy violated California tenant-purchase protection laws, including SB 1079, by preventing Plaintiff from exercising his statutory right to purchase the building or his unit. Despite Plaintiff's ability to secure financing, Defendant Toy deliberately obstructed him from exercising these protections, denying him opportunities under state law to maintain housing stability and use his home office for professional purposes.

Defendant Toy's conduct was part of a broader racketeering enterprise. Acting together with landlords, attorneys, police officers, inspectors, utility company

employees, 311 personnel, and municipal actors, Defendant Toy participated in an enterprise whose common purpose was to remove tenants from rent-controlled housing, suppress tenant rights, extract financial gain, and shield participants from accountability through bribery, corruption, and abuse of public office. Predicate acts include bribery, extortion, fraud, identity theft, witness intimidation, deprivation of housing rights, civil rights violations, and obstruction of justice, committed repeatedly and continuously against multiple victims.

Defendant Toy also acted in concert with Ira Schwartz and Steven B. Rothschild to launder and invest racketeering proceeds through sham real estate transactions, including fraudulent §1031-style exchanges, while continuing to defame Plaintiff and interfere with his housing and business activities. Together, Defendant Toy and Schwartz sought to undermine SB 1079 and other tenant-protection measures through targeted harassment, psychological manipulation, and obstruction, aiming to prevent Plaintiff from achieving long-term housing and professional stability.

As a direct result of Defendant Toy's actions, Plaintiff suffered severe emotional distress, loss of housing and home office rights, invasion of privacy, religious discrimination, financial harm, and physical manifestations of stress and trauma. Certain facts remain under investigation, including the identities of additional coconspirators, suppressed or destroyed records, and intermediaries involved in coercive settlement agreements. Plaintiff brings these claims under state law and

RICO statutes, alleging that Defendant Toy's conduct furthered a criminal enterprise orchestrated by Ira Schwartz and others, causing substantial harm to Plaintiff's civil rights, housing security, and professional activities.
Plaintiff subsequently relocated to 5434 Geary Boulevard, a property owned by Toy Real Estate and affiliated with the Schwartz-Kaufman syndicate, where Virginia Toy agreed to lease the apartment to Plaintiff as part of a plan to harass and control him. At this location, Plaintiff endured repeated illegal acts, including utility shutoffs, refusal to repair habitability issues, unauthorized entry into his apartment while undressed, surveillance through windows, denial of access to common areas, and coercion to sign settlement agreements under threats, all orchestrated in coordination with Ira Schwartz, Virginia Toy, and their associates.

This enterprise operates as a multi-jurisdictional scheme involving Ira Schwartz, Virginia Toy, Toy & Toy Development, Shepherd Law Group, Benjamin Broffman, municipal employees, utility company workers including PG&E and Verizon, social services attorneys, Virginia Lam, and others. The purpose of the enterprise is to exploit vulnerable tenants, coerce legal outcomes, and maximize financial gain while suppressing opposition and insulating Defendants from accountability. The scheme includes discriminatory and fraudulent eviction practices by Virginia Toy, psychological manipulation and financial control by Ira Schwartz over his family and associates, bribery of public officials, abuse of municipal systems including

311 and social services agencies, and coercion of family members and associates, including Plaintiff's cousins, to enforce compliance. These actions constitute RICO predicate acts, including extortion, fraud, bribery, obstruction of justice, and civil rights violations.

Ira Schwartz exercises control over his family and associates through manipulation of personal, educational, religious, and financial decisions, employing attorneys such as Benjamin Broffman and Shepherd Law Group to shield his actions from legal scrutiny. Virginia Toy, through Toy & Toy Development, has subjected tenants, including Plaintiff, to habitability violations, unauthorized entry, utility shutoffs, and harassment. She has bribed inspectors, social services attorneys, and municipal employees to avoid accountability. Attorney Virginia Lam, related to a Superior Court clerk, acted as Virginia Toy's attorney in a clear conflict of interest while working to sabotage Plaintiff's case, encouraged other law firms not to represent Plaintiff, and facilitated deletion of critical evidence from Plaintiff's iPhone 14 at the Civic Center Verizon store, further obstructing justice. Social services attorneys, including Soumiah from Bishop Housing and Eviction Defense Collaborative, were coerced or bribed to interfere with Plaintiff's legal rights.

San Francisco Police Department officers failed to take reports, record incidents, or protect Plaintiff, consistent with bribery and corruption within the force. 311 employees were manipulated or coerced to suppress complaints, delay remedies,

and shield Defendants' illegal actions. Utility employees at PG&E and Verizon were bribed or otherwise induced to participate in unlawful shutoffs and evidence tampering. Chabad and other Hasidic groups participated in coordination with the Schwartz-Kaufman syndicate, using Israeli bond market funds and other racketeering funds to facilitate and finance ongoing harassment and obstruction.

As a result of Defendants' actions, Plaintiff has suffered severe emotional distress, financial loss, loss of housing rights and privacy, trauma and psychological abuse, and threats to physical safety due to coordinated surveillance, harassment, and intimidation.

**AUTOMOBILE SABOTAGE USING CELEBRITIES NATIONWIDE CONNECTIONS AND CAR CRASHES TO FRAME PLAINTIFF FOR MURDER, COMITT INSURANCE FRAUD, RUIN HIS REPUATION AND STOP HIS LAWSUIT**

Across multiple states—New York, California Florida, Washington, and others—Plaintiff's vehicles have been compromised through a combination of cyber intrusions, physical sabotage, and coordination with connected networks. These acts are consistent with the broader conspiracy, demonstrating the enterprise's capacity to manipulate vehicle systems, monitor Plaintiff's movements, and endanger his personal safety.

Since initiating this action, Plaintiff has uncovered evidence that strengthens allegations of fraud, duress, and extortion, specifically identifying Ira Schwartz and Uri Kaufman as the primary ringleaders of the enterprise. Evidence includes emails and financial transactions demonstrating direct tampering, confessions and admissions from family members indicating broader involvement, and documentation of police retaliation such as business cards left at Plaintiff's residence. Surveillance conducted by the building superintendent, who was reportedly paid by Ira Schwartz to monitor Plaintiff, further supports these claims. Aaron Cohen's involvement in facilitating these activities has also been identified through Associated individuals and entities involved in this scheme include, but are not limited to:

Brooklyn NY – Tire Tampering, 2018

In 2018, while going on a date in New York, in Herkimer Street Plaintiff's tire was deliberately punctured by individuals allegedly connected to the Chabad network and Aaron and Jordan and Warren Schwartz Cohen Kaufman and Rothschild. This incident demonstrates a pattern of targeted physical interference with Plaintiff's vehicles in coordination with prior and subsequent cyber intrusions.

Five Towns NY- Staged Car Crash 2019

At Aaron Wexlers instruction while Plaintiff was turning into the 7/11 at the main street in the five towns a woman deliberately sideswiped him and pretended like he was in the wrong side of the street even though she drove into him from the side. Aaron was friendly with the Nassau Geico Insurance Adjuster so was Uncle Arthur Schwartz, and so was Jordan and other people, he also used this adjuster to file a claim on his Range Rover two times.

Tampa, Florida – Tire Tampering, 2022

In 2022, while attending prayer services in Tampa, Florida, Plaintiff's tire was deliberately punctured by individuals allegedly connected to the Chabad network. This incident demonstrates a pattern of targeted physical interference with Plaintiff's vehicles in coordination with prior and subsequent cyber intrusions.

Tesla – July 2023 and April 2024 near death experience and accident Defendants, including Tesla, Elon Musk, Kimbal Musk, Ford Motor Company, Mark Fields, Stephen Scherr, Hertz, and associated entities, hacked into, knowingly designed, manufactured, marketed, and sold vehicles that were susceptible to hacking, remote control, and unauthorized surveillance. These Defendants were aware that their vehicles contained software and hardware vulnerabilities that allowed third parties to remotely access critical systems, including GPS, telematics, infotainment, and autonomous driving features. Despite this knowledge,

Defendants misrepresented the safety, security, and privacy of their vehicles through marketing, social media, press releases, and official statements, while deliberately concealing the true risks of hacking and stalking from consumers.

Defendants Tesla, Musk, and Scherr promoted their vehicles as safe for everyday use, including for young and inexperienced drivers, while intentionally withholding information about serious cybersecurity flaws. Similarly, Ford and Fields failed to implement adequate security measures or to warn consumers of vulnerabilities in their vehicles, which allowed unauthorized actors to gain access to personal data and vehicle systems. Hertz participated in these schemes by knowingly purchasing and renting vehicles that were defective or insecure, while concealing these risks from the public and continuing to profit from their distribution.

Argus, a third-party entity allegedly collaborating with Defendants, provided technology that facilitated the exploitation of these vulnerabilities, enabling third parties to remotely access and manipulate vehicles. SK Syndicate, using Argus's assistance, hacked into Plaintiffs' vehicles, gaining unauthorized control and tracking capabilities. Defendants were aware, or should have been aware, that these systems could be exploited for stalking, harassment, and other unlawful purposes. Defendants' failure to secure their vehicles and warn consumers of these

known risks constitutes both negligence and intentional concealment of material facts.

The Defendants' fraudulent misrepresentations induced Plaintiffs to purchase or use vehicles under the belief that they were secure, reliable, and safe for normal driving. These representations were false. Plaintiffs reasonably relied on these statements when purchasing vehicles and entrusting themselves to their operation. Defendants concealed prior incidents of hacking, vehicle manipulation, and remote surveillance, intentionally misleading Plaintiffs and the public to protect their commercial interests and maintain market share.

As a direct and foreseeable consequence of Defendants' conduct, Plaintiffs have suffered severe emotional distress, including anxiety, panic, fear of stalking, loss of privacy, and the ongoing stress of knowing their vehicles are vulnerable to remote manipulation. Plaintiffs' emotional harm was caused directly by Defendants' negligent failure to secure their vehicles and their intentional misrepresentations regarding the safety and security of these vehicles. The risk of unauthorized access and surveillance continues to cause substantial mental anguish, physical symptoms, and disruption of daily life.

Defendants' conduct also constitutes violations of the Taylor Houck Act. Through deliberate misrepresentations, concealment of defects, and deceptive marketing

practices, Defendants misled the public regarding the security and privacy of their vehicles. They intentionally sought to increase vehicle sales and market share while exposing Plaintiffs to unnecessary and foreseeable risks. Plaintiffs relied on these misrepresentations in purchasing and operating their vehicles, sustaining both financial losses and emotional injuries as a result.

Plaintiffs purchased or used vehicles from Tesla, Ford, Budget, and Hertz in reasonable reliance on Defendants' assurances regarding cybersecurity, safety, and privacy. Had Plaintiffs been informed of the actual risks of hacking, remote access, and tracking—including the role of Argus and SK Syndicate in exploiting these vulnerabilities—they would not have purchased or used these vehicles or would have paid substantially less.

Defendants' ongoing concealment and failure to remediate these risks continue to expose Plaintiffs to hacking, stalking, and emotional harm, directly resulting from the Defendants' intentional and negligent conduct.

Plaintiff, Marshall Abraham Wexler, has been subjected to ongoing harassment, intimidation, and unlawful eviction in both New York and California. The facts underlying these incidents reveal a pattern of criminal activity aimed at suppressing Plaintiff's legal rights and gaining financial and ideological control. Plaintiff was deliberately endangered and surveilled in connection with ongoing

court proceedings. Ira Schwartz, aided by a network of political operatives, police connected individuals, and racketeers, orchestrated a staged vehicle collision involving manipulated traffic signals, coordinated lookouts, and selective evidence recording. New York Police Department (NYPD) officers intentionally refused to take complaints, consistent with a broader conspiracy to intimidate, discredit, and retaliate against Plaintiff for his prior filings and investigations.

Seattle, Washington – Ford Mustang, Seattle Airport, August 2024 – Near-Death Experience

In August 2024, while Plaintiff was in Seattle to relocate after being illegally evicted by Virginia Toy and Shepherd—who, unbeknownst to him, were affiliated with his uncle's gang, the SK Syndicate—Argus Technologies, one of its employees or clients, or an associated actor allegedly hacked into Plaintiff's Ford Mustang rented through Budget Rent A Car at Seattle Airport. This intrusion reportedly disabled the vehicle's power steering, creating a hazardous driving condition that nearly caused a fatal accident, forcing Plaintiff to swerve into oncoming traffic for several terrifying seconds.

The alleged attack was executed through plug-and-play access points or other connected vehicle interfaces, allowing the perpetrators to monitor the vehicle and potentially track the entire Budget fleet. The connection between the network and

rental car fleets suggests a broader capacity to surveil Plaintiff's movements and interfere with his mobility.

Around August 23, 2024, Plaintiff rented a vehicle from Budget at the Seattle Airport. The company claimed to have provided an upgrade. Because Plaintiff's last name is Jewish-sounding, he believes the vehicle assignment may have involved discriminatory intent. The car—a Ford Mustang—had a known recall defect in violation of the Raechel and Jacqueline Houck Safe Rental Car Act of 2015. This federal law prohibits rental car companies from renting, selling, or loaning unsafe or recalled vehicles. The law is named after sisters Jacqueline and Raechel Houck, who were killed in a 2004 crash involving a recalled rental car, and went into effect on June 1, 2016.

On the night of Saturday, August 24, 2024, while driving on the highway and accelerating to safely merge lanes, the Mustang's steering system completely failed. For approximately three to five seconds, the vehicle had no steering, creating a life-threatening situation. Miraculously, Plaintiff survived and recited the traditional Jewish blessing for surviving a near-death experience.

When Plaintiff contacted Budget to report the incident, the company agreed to pick up and tow the vehicle. Instead of waiving the charges and providing alternate

transportation, Budget charged Plaintiff the full rental price and for the gas, despite his inability to safely operate the defective car.

This was not the first instance of receiving a recalled or unsafe vehicle from Budget. A few months earlier, Plaintiff rented a Kia in San Francisco that would start on its own—a severe safety risk, particularly in densely populated areas.

These issues are not limited to a single manufacturer. Tesla and Ford, two iconic American companies, produce vehicles that are unsafe not only due to manufacturing defects but also because of persistent software vulnerabilities, leaving cars susceptible to hacking and exploitation by malicious actors.

Accordingly, the car manufacturers who sell the defective cars, rental fleet companies who are the main bulk purchaser of defective cars, and affiliated technology firms—such as Argus Technologies, which develops hacking vulnerabilities—share responsibility for these unsafe conditions. Their failure to prevent the distribution of defective, unsafe, and hackable vehicles places consumers at serious risk, comparable to the deliberate financial and physical sabotage perpetrated by entities such as the Schwartz Kaufman Syndicate.

Las Vegas, Honolulu, Maui 2024 September October

**PLANES / STORAGE( PERSONAL PROPERTY)**

**Chronology of Travel Following the Las Vegas Incidents**

The Plaintiff alleges that the Japan layover incident occurred after his travel to Las Vegas, which involved multiple professional and evidentiary objectives. According to the Plaintiff, he first traveled to Las Vegas to attend a mining convention and pursue business opportunities related to his professional activities. After concluding his business in Las Vegas, he traveled to San Francisco to address commercial and administrative matters associated with those activities.

From San Francisco, the Plaintiff alleges that he traveled to Hawaii, including Maui and Oahu, for the purpose of obtaining police body-camera footage and related records.

He contends that the footage concerned prior incidents in which local police officers allegedly harassed him after being bribed by Edward Neiger through intermediaries associated with Chabad. The Plaintiff states that this trip was undertaken to document and preserve evidence of misconduct that he believed formed part of a broader pattern of harassment and obstruction affecting his personal, financial, and professional affairs.

Following his time in Hawaii, where he was harassed at the outrigger hotels in both Maui and Honolulu as well as the hotel where he was illegally evicted by the police in Hawaii, the Plaintiff alleges that he traveled onward to Japan and then to Mongolia to initiate a copper mining project. He contends that these plans were

ultimately frustrated due to structural and political barriers within Mongolia's mineral rights system. The Plaintiff further alleges that while in Mongolia, he was subjected to targeted harassment and intimidation orchestrated by Reuven Sujnow, Jacqueline Cohen, and unidentified individuals described as former USSR Central Asian "Kavkaz" organized-crime figures. He contends that these individuals bribed local, China aligned Mongolians to follow him, waste his financial resources, and deliberately create a hostile environment. The Plaintiff alleges that these actors engaged in verbal intimidation, including extremist statements

According to the Plaintiff, the cumulative effect of these alleged actions was the prevention of lawful mining operations, financial loss, and continued disruption of his professional and personal activities. He further contends that these incidents are part of a broader, coordinated pattern of international interference, harassment, and obstruction spanning multiple jurisdictions and professional domains.

Plaintiff brings this action under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, for racketeering activity including fraud, extortion, bribery, civil rights violations, and obstruction of justice. Plaintiff seeks treble damages, an injunction prohibiting further harassment

and unlawful eviction attempts, punitive damages, and legal fees and costs associated with bringing this action.

Defendants have engaged in an ongoing and continuous pattern of racketeering activity, including fraud, bribery, extortion, and civil rights violations, spanning multiple jurisdictions and family generations. The conduct of Ira Schwartz and Virginia Toy represents a systemic abuse of power, using influence across family, business, religious, and municipal systems to perpetuate their criminal enterprise.

Plaintiff respectfully requests that this Court grant the relief sought, ensuring justice and accountability for the harm caused by Defendants' unlawful actions.

Defendant Virginia Toy, acting through intermediaries, engaged in identity theft and evidence tampering by bribing employees at the Civic Center San Francisco Verizon store to delete material evidence from Plaintiff's iPhone 14, in what would be a repeat of what happened to Plaintiff in NY,  including data relevant to harassment, surveillance, and unlawful eviction efforts.

Tenants' rights attorney Barbara Lam, who is related to a San Francisco Superior Court clerk, knowingly participated in this scheme by facilitating and encouraging the destruction of electronic evidence at the Civic Center Verizon location. Lam further used her professional position to discourage and interfere with other law firms from representing Plaintiff, effectively isolating Plaintiff from legal counsel.

Claims vs. VIRGINIA TOY, BARBARA LAM (SF Legal Assistance for the Elderly), SHEPHERD LAW GROUP, MITCHEL DUTRA, SHEPHERD, Principal of Shepherd Law Group, SOUMIA [Last Name Unknown], EVICTION DEFENSE COLLABORATIVE, VERIZON WIRELESS, APPLE INC., SF SUPERIOR COURT CLERK LAM, UNNAMED MEDIATOR, and DOES 1–50,

Defendants.

**RICO ENTERPRISE ALLEGATIONS**

3. Plaintiff alleges an association-in-fact enterprise consisting of:

Virginia Toy, Babara Lam, Certain Verizon retail employees (New York City Boro Park and San Francisco Civic Center location), Soumiah affiliated with BISHOP Housing, Certain unidentified participants, The enterprise operated across New York and California. The common purpose of the enterprise was to: Force Plaintiff from rent-controlled housing, Obstruct his legal proceedings Interfere with electronic evidence, Extract financial advantage.

---

III. PREDICATE ACTS (EXAMPLE STRUCTURE)

A. Wire Fraud (18 U.S.C. § 1343)

6. On specific dates (to be inserted), electronic communications were transmitted: Emails coordinating actions regarding Plaintiff's tenancy, Electronic billing manipulation relating to Verizon accounts., Unauthorized discount

applications benefiting third parties. These communications were made with intent to defraud Plaintiff of money and property.

B. Identity Theft (18 U.S.C. § 1028)

8. Verizon employee(s), acting in coordination with Lam and/or Toy (as evidenced by communications), accessed Plaintiff's account.

9. Discounts or account modifications were removed from his account and applied to a third party account without authorization.

10. Plaintiff suffered identity theft as documented in attached reports.

---

C. Obstruction of Justice

11. Evidence stored on Plaintiff's phone was deleted or interfered with.

12. Plaintiff possesses metadata, transcripts, and recordings supporting interference prior to scheduled court proceedings.

CIVIL RICO
(18 U.S.C. § 1962(c))

13. Defendants conducted the affairs of the enterprise through a pattern of racketeering activity.

14. At least two predicate acts occurred within a 10-year period.

15. Plaintiff suffered injury to business and property, including:

- Loss of housing,
- Legal expenses,
- Lost electronic evidence,
- Identity theft damages,
- Financial overcharges.

---

RICO CONSPIRACY

(18 U.S.C. § 1962(d))

16. Defendants knowingly agreed to facilitate the enterprise.

CALIFORNIA LANDLORD RETALIATION

(Cal. Civil Code § 1942.5)

21. Plaintiff exercised tenant rights.

22. Shortly thereafter, adverse housing actions occurred.

23. Timing and documented communications support retaliatory motive.

---

COUNT V – BREACH OF WARRANTY

(Against Apple Inc.)

24. Apple represented that specific devices (iPhone 15 Pro Max bundle including Watch, iPad, AirPods) included tracking functionality.

25. Plaintiff relied on these representations.

26. Devices failed to perform as advertised.

27. Written warranty denial is attached.

---

COUNT VI – CONSUMER PROTECTION

(Cal. Bus. & Prof. Code § 17200)

28. Defendants engaged in unfair and fraudulent business practices including: Misapplied promotional discounts, Overbilling, Defective device representations.

COUNT VII – CONVERSION

29. Defendants interfered with Plaintiff's property rights in his Electronic data, Account funds, and Stored belongings.

Plaintiff brings this action to address a coordinated conspiracy by Defendants to defraud, harass, obstruct justice, and violate Plaintiff's legal and consumer rights.

Defendants acted through a series of coordinated acts, including device sabotage, identity theft, fraudulent representations, housing harassment, denial of legal counsel, and obstruction of Plaintiff's access to justice. Plaintiff suffered financial losses, deprivation of property, physical and emotional harm, and interference with legal claims.

---

Civil RICO

Defendants collectively engaged in a pattern of racketeering activity spanning San Francisco and New York, including wire fraud, identity theft, obstruction of justice, and housing harassment. A Verizon store employee, acting in concert with Barbara Lam, her sibling, Eviction Defense Collaborative, and Virginia Toy, tampered with Plaintiff's replacement iPhone 14 Pro Max so that backups and data could not be accessed. Plaintiff also suffered financial loss purchasing unnecessary devices in a misrepresented Apple/Verizon bundle. Defendants' repeated coordination demonstrates a long-term enterprise aimed at defrauding, coercing, and obstructing Plaintiff.

---

RICO Conspiracy

Defendants conspired to commit wire fraud and identity theft. Verizon employees were bribed to misrepresent bundles and insurance, while Apple failed to prevent device theft vulnerabilities. Barbara Lam and her sibling orchestrated corrupt mediations favorable to Virginia Toy. Shepherd Law Group and Mitchel Dutra facilitated suppression of evidence and misleading legal communications. These coordinated acts caused ongoing harm, deprivation of property, and interference with Plaintiff's access to counsel.

---

Wire Fraud

On April 1, 2025, a Verizon store employee represented that the Apple bundle, including the iPhone 15 Pro Max, Apple Watch, and iPad, would save Plaintiff money. In reality, it was more expensive, led to unnecessary purchases, and did not apply promised discounts. Plaintiff relied on these representations and paid upfront for devices that were defective or sabotaged. The Verizon employee, acting in concert with Barbara Lam and Virginia Toy, misrepresented insurance claims and delivered a tampered replacement iPhone 14 Pro Max.

---

Identity Theft

On July 7, 2025, the Verizon store employee denied Plaintiff's identity theft complaint but showed a device with a different color and phone number tied to Plaintiff's account. The employee misappropriated the bundle discount for himself, yelled at Plaintiff, and forced him to leave. Plaintiff's personal information and property were compromised, as the tampered iPhone 14 Pro Max could not be recovered. This theft was coordinated with Barbara Lam, her sibling, and Virginia Toy.

---

California Landlord Retaliation and Habitability Violations

Virginia Toy rented an apartment at 5434 Geary Blvd that was uninhabitable for 3–4 months, with no heat in winter and pervasive odors. Plaintiff was forced to sleep in the kitchen due to uninhabitable conditions. Toy intentionally withheld repairs while pressuring Plaintiff to leave or face harassment, mirroring strategies used by SK Syndicate in New York. Plaintiff's statutory rights under SB 1079, including first-right-of-purchase protections, were interfered with, constituting retaliation and violation of California housing laws.

---

Fraud and Misrepresentation

Defendants Barbara Lam, Lam's sibling, Eviction Defense Collaborative, Shepherd Law Group, Mitchel Dutra, Virginia Toy, Apple, and Verizon made multiple misrepresentations. Apple and Verizon falsely claimed devices were insured and backed up. Lam and her sibling arranged corrupt mediators while misrepresenting impartiality, coercing Plaintiff into duress settlements. Shepherd Law Group misrepresented legal processes, facilitated sewer service harassment, and assisted Toy in filing fraudulent lawsuits. Plaintiff relied on these misrepresentations to his detriment, suffering financial and evidentiary harm.

---

Consumer Protection (UCL)

Defendants engaged in unfair, unlawful, and fraudulent business practices. They misrepresented the Apple/Verizon device bundle, delivered a tampered iPhone 14 Pro Max, sabotaged Plaintiff's legal evidence, and engaged in housing harassment. These actions caused ongoing financial and personal injury and violated California's Unfair Competition Law.

---

UCC 2 – Warranty Breach: Eye Strain

Apple devices caused addictive eye strain. Defendants failed to disclose health risks or provide remedies, despite Plaintiff's reliance on the devices for personal and legal matters. Plaintiff suffered physical and emotional harm as a result.

---

UCC 2 – Warranty Breach: Theft Vulnerability

Apple and Verizon failed to provide adequate anti-theft and backup functionality. The replacement iPhone 14 Pro Max was intercepted, tampered with, and data could not be recovered. Plaintiff's personal property and information were compromised, as part of a coordinated scheme with Barbara Lam, her sibling, Virginia Toy, and Verizon employees.

---

UCC 2 – Warranty Breach: Bundle Fraud

The Apple/Verizon bundle was misrepresented as cost-saving. Plaintiff purchased the iPhone 15 Pro Max, Apple Watch, and iPad unnecessarily, with no discounts applied, and received defective or sabotaged devices. The Verizon store employee, acting with Barbara Lam, her sibling, Eviction Defense Collaborative, and Virginia Toy, orchestrated this fraud.

---

Conspiracy and Obstruction of Justice

Barbara Lam, Lam's sibling, Shepherd Law Group, Mitchel Dutra, Eviction Defense Collaborative, SF Superior Court Clerk Lam, and the corrupt mediator conspired to obstruct justice. They sabotaged Plaintiff's devices, installed biased mediators, misrepresented legal rights, and suppressed evidence to favor Virginia Toy's eviction and fraud schemes.

---

Civil RICO / Reinvestment of Racketeering Income

Virginia Toy reinvested profits from illegal evictions and tenant harassment into additional San Francisco real estate acquisitions. These acts mirror SK Syndicate operations in New York and demonstrate a sustained pattern of racketeering, unlawful enrichment, and coordinated misconduct.

---

Civil Rights / Denial of Counsel and Duress in Mediation

Plaintiff, being indigent and self-represented, was denied access to legal counsel in violation of the U.S. Constitution and San Francisco law. Defendants orchestrated duress settlements, misrepresented mediators' impartiality, and interfered with Plaintiff's due process and ability to defend his housing and consumer rights.

---

Plaintiff seeks compensatory, treble, statutory, and punitive damages, injunctive relief to prevent further harassment and device interference, attorneys' fees, and any other relief deemed just and proper. Plaintiff demands a trial by jury on all claims.

VIRGINIA TOY, BARBARA LAM (Legal Assistance to the Elderly), SHEPHERD LAW GROUP, MITCHEL DUTRA, SHEPHERD, SF SUPERIOR COURT CLERK LAM, SF SUPERIOR COURT MEDIATOR (unnamed), EVICTION DEFENSE COLLABORATIVE, VERIZON WIRELESS, APPLE INC., SOUMIAH, and DOES 1–50,

Plaintiff brings this action against all Defendants for a pattern of racketeering, fraud, consumer protection violations, breach of warranties, housing retaliation, and obstruction of justice, including interference with statutory rights under California law. Plaintiff is indigent and relied on legal, corporate, and city actors who conspired to defraud, harass, and deprive him of property, housing, and electronic devices.

---

Count I – Civil RICO (18 U.S.C. § 1962(c))

The law requires that to prove a RICO violation, a plaintiff must show that the defendant: (1) conducted or participated in (2) an enterprise (3) through a pattern of racketeering activity (4) causing injury to plaintiff's business or property.

The enterprise here consists of Defendants including Verizon, Apple, Shepherd Law Group, Barbara Lam, Eviction Defense Collaborative, Virginia Toy, SF Superior Court actors, and associated affiliates. They engaged in multiple acts of wire fraud, identity theft, and obstruction to further a scheme to defraud Plaintiff.

Defendants knowingly participated in the enterprise by orchestrating the interception of Plaintiff's replacement iPhone 14 Pro Max, misrepresenting bundle discounts on Apple devices, withholding proper insurance, sabotaging backups, and coordinating housing harassment. Plaintiff suffered financial loss, deprivation of property, and impairment of access to legal remedies.

---

Count II – RICO Conspiracy (18 U.S.C. § 1962(d))

A RICO conspiracy claim requires proof that: (1) two or more persons agreed to conduct an enterprise, (2) through a pattern of racketeering activity, and (3) the defendant knowingly joined the conspiracy.

Defendants Lam, her sibling, Shepherd Law Group, Dutra, SF Court mediator, SF Clerk Lam, Eviction Defense Collaborative, Verizon employees, and Virginia Toy agreed to obstruct justice and interfere with Plaintiff's rights, including intercepting and tampering with electronic devices, filing coercive lawsuits, and preventing access to counsel.

Defendants knowingly executed their plan to deprive Plaintiff of property, housing rights, and statutory protections, and Plaintiff suffered economic, emotional, and physical harm.

---

Count III – Wire Fraud (18 U.S.C. § 1343)

Wire fraud requires: (1) a scheme to defraud, (2) intent to defraud, (3) use of interstate wire communications, and (4) resulting harm.

Verizon employees induced Plaintiff to purchase a device bundle, misrepresented discount savings, and falsified insurance coverage. Plaintiff relied on the representations, purchased the Apple Watch, iPad, and iPhone 15 Pro Max, and suffered financial loss when devices were defective and discounts not applied. Intercepted replacement iPhone 14 Pro Max was tampered with to prevent proper backup, demonstrating intent to defraud.

Plaintiff was harmed through unnecessary expenditure, deprivation of property, and inability to access his data.

---

Count IV – Identity Theft (18 U.S.C. § 1028)

To prove identity theft, Plaintiff must show: (1) unlawful use of a means of identification, (2) without consent, and (3) resulting in harm.

On July 7, 2025, Verizon employees altered device account information, linking Plaintiff's iPhone to a different number and color, while refusing to apply bundle discounts. The employee also falsely claimed backups existed, constituting unauthorized use of Plaintiff's identity to obtain personal gain.

Plaintiff suffered loss of property, denial of contract benefits, and interference with access to devices.

---

Count V – California Landlord Retaliation (Cal. Civ. Code § 1942.5)

To prove retaliation, Plaintiff must show: (1) engagement in protected activity, (2) adverse action by landlord, and (3) causal link.

Plaintiff engaged in protected activities including asserting SB 1079 rights and reporting housing violations. Virginia Toy withheld heat, failed to maintain the apartment at 5434 Geary Blvd for 3–4 months, created intolerable odors, and pressured Plaintiff to leave. She also bribed city actors to escalate harassment, including 38 Bus traffic manipulation, demonstrating adverse action motivated by Plaintiff's rights exercise.

Plaintiff suffered loss of habitable housing, emotional distress, and obstruction of statutory protections.

---

Count VI – Common Law Fraud

Fraud requires: (1) a false representation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual reliance, and (5) resulting harm.

Verizon and Apple misrepresented insurance, bundle savings, and device functionality. Plaintiff relied on these representations to purchase the device bundle and lost money when devices were defective and insurance claims denied. Lam, Shepherd Law Group, and Eviction Defense Collaborative conspired to suppress evidence and misrepresent legal rights. Plaintiff suffered financial and personal harm.

---

Count VII – California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200)

To prevail under the UCL, Plaintiff must show (1) an unlawful, unfair, or fraudulent business act, and (2) resulting harm.

Defendants engaged in unfair, fraudulent, and unlawful acts including device misrepresentation, insurance denial, legal obstruction, and housing harassment.

Plaintiff was deprived of property, financial losses occurred, and access to legal protections was hindered.

---

Count VIII – UCC Article 2 – Breach of Warranty (Device Bundle)

To prove breach of warranty, Plaintiff must show: (1) a valid warranty, (2) breach, and (3) resulting damages.

Apple and Verizon sold Plaintiff a device bundle (iPhone 15 Pro Max, iPad, Apple Watch) represented as functional and insured. Devices failed to function, and insurance was denied. Plaintiff suffered financial loss, inability to access data, and frustration due to device unreliability.

---

Count IX – UCC Article 2 – Breach of Warranty (Eye Strain / Device Addiction)

Warranty claims also include implied fitness for ordinary use. Apple devices caused excessive eye strain, impairing Plaintiff's ability to work. Devices were marketed without warning of potential harm, constituting breach. Plaintiff suffered physical and emotional injury due to reliance on devices for daily activities.

---

Count X – UCC Article 2 – Breach of Warranty (Theft Vulnerability)

Apple devices failed to safeguard Plaintiff's property. Replacement iPhone 14 Pro Max was intercepted and tampered with, bundle devices were misrepresented, and Find Plaintiff's iPhone/iPad/Watch features did not provide adequate protection. Plaintiff suffered theft of property and inability to recover data.

---

Count XI – Obstruction / Conspiracy by Legal Actors

Plaintiff must show (1) agreement to obstruct justice, (2) overt act, and (3) resulting harm.

Barbara Lam, her sibling, Shepherd Law Group, Dutra, SF Superior Court Clerk Lam, SF Court mediator, and Eviction Defense Collaborative conspired to suppress evidence from Plaintiff's devices, orchestrate coercive settlements, and misrepresent legal processes. Plaintiff was denied meaningful counsel and suffered prejudice in eviction and consumer cases.

---

Count XII – Violation of California Consumer Law / Magnusen-Moss

Plaintiff must show (1) purchase of consumer product, (2) warranty violation, and (3) resulting injury.

Apple and Verizon failed to honor warranties on devices, misrepresented functionality, and denied insurance claims. Plaintiff was forced to purchase additional devices unnecessarily, resulting in financial loss and deprivation of property rights.

---

Count XIII – Civil Rights / Right to Counsel / SF City Conspiracy

Plaintiff must show: (1) deprivation of a federal or state right, (2) under color of law or via conspiracy, and (3) resulting harm.

SF City actors, Mayor London Breed, and associated legal assistance programs (Barbara Lam, Eviction Defense Collaborative) conspired with Virginia Toy and Shepherd Law Group to deny Plaintiff access to legal counsel for eviction defense, intercept device evidence, and mislead him in settlement. Plaintiff, being indigent, was denied meaningful representation, constituting a violation of constitutional and state rights.

---

PRAYER FOR RELIEF

Plaintiff requests compensatory, treble, and punitive damages; statutory damages; injunctive relief preventing further harassment, device interference, or obstruction; attorneys' fees and costs; and any other relief deemed just and proper.

JURY DEMAND

Plaintiff demands a trial by jury on all claims.

________________________________________

Count 1 – Civil Rights / Conspiracy to Deny Access to Counsel (42 U.S.C. § 1983 / U.S. Constitution / California Law)

Defendants: SF Superior Court, Clerk Lam, Mediator

Plaintiff was indigent and entitled to legal counsel in eviction and housing matters. Defendants conspired with Virginia Toy, Barbara Lam (Legal Assistance to the Elderly), Shepherd Law Group, and Eviction Defense Collaborative to interfere with Plaintiff's access to counsel.

Facts:

Clerk Lam and the mediator knowingly installed a corrupt settlement process favorable to Virginia Toy, misrepresented Plaintiff's rights, and assisted conspirators in coercing Plaintiff to accept an unfair settlement. Plaintiff was

unaware of the full scope of the conspiracy until later verification of Verizon and Apple records showed evidence tampering and misrepresentation of his devices.

Elements:

- Plaintiff had a constitutional and statutory right to counsel and fair hearing.
- Defendants acted under color of law to interfere with that right.
- Defendants knowingly conspired with private actors to deprive Plaintiff of these rights.
- Plaintiff suffered actual harm, including coerced settlement, loss of evidence, and deprivation of legal recourse.

Harm: Loss of access to legal representation, coercive settlement, emotional distress, and interference with property rights.

---

Count 2 – Obstruction of Justice / Evidence Suppression

Defendants: SF Superior Court, Clerk Lam, Mediator

Defendants knowingly facilitated suppression and tampering of Plaintiff's electronic evidence on the iPhone 14 Pro Max and related Apple devices, in coordination with private actors (Barbara Lam, Shepherd Law Group, Virginia Toy).

Facts:

The mediator installed by Shepherd Law Group and assisted by Clerk Lam obstructed Plaintiff's ability to recover accurate electronic evidence. The iPhone 14 Pro Max replacement was intercepted, tampered with, and misrepresented as containing backups, forcing Plaintiff into additional purchases and causing identity and property harm.

Elements:

- An agreement or overt act to obstruct justice or suppress evidence.
- Intent by the defendants to prevent Plaintiff from exercising his legal rights.
- Actual obstruction resulting in harm to Plaintiff's ability to litigate and recover property.

Harm: Coerced settlement, loss of recoverable evidence, financial and emotional harm.

---

Count 3 – Fraud / Misrepresentation / Unlawful Assistance to Private Actors

Defendants: SF Superior Court, Clerk Lam, Mediator

Defendants knowingly participated in a scheme with Virginia Toy, Barbara Lam, and Shepherd Law Group to misrepresent Plaintiff's legal rights, facilitate coerced settlements, and assist in the theft or sabotage of devices and digital records.

Facts:

Clerk Lam and the mediator assisted in misrepresenting the status of Plaintiff's eviction case, falsely claiming that evidence had been preserved and that legal remedies were available, while actively coordinating with private actors to suppress documents and electronic backups.

Elements:

- Misrepresentation of material facts.
- Knowledge of falsity by the defendants.
- Intent to induce reliance by Plaintiff.
- Plaintiff's actual reliance and resulting harm.

Harm: Financial, emotional, and legal injury, including coerced acceptance of corrupt settlement.

---

Count 4 – Unfair Competition / UCL – Unlawful, Unfair, and Fraudulent Practices

Defendants: SF Superior Court, Clerk Lam, Mediator

Plaintiff alleges that SF Superior Court actors participated in practices that were unlawful, unfair, and fraudulent in coordination with private actors.

Facts:

Defendants' actions in installing a corrupt mediator, misrepresenting legal rights, and enabling evidence tampering were inherently unfair and unlawful. These acts directly contributed to Plaintiff's coerced settlement and deprivation of statutory tenant protections (SB 1079).

Elements:

- Engagement in unfair, unlawful, or fraudulent business practices.
- Actual harm suffered by Plaintiff.
- Causal connection between the defendants' acts and Plaintiff's injury.

Harm: Coerced settlement, deprivation of counsel, emotional and financial damages.

**Defendants Hertz Corp., Tesla Inc., and JPMorgan Chase & Co**

**Defendants are being sued under the Section 17000 of the California**

**Business & Professions Code, The Magnuson–Moss Warranty Act The Electronic Fund Transfer Act, CA Civ Code § 3294 fraud, and RICO .**

THE HERTZ CORPORATION ("Hertz"), a subsidiary of Hertz Global Holdings, Inc., is a Delaware corporation with its principal place of business in Naples, Florida. Hertz is the world's largest airport general-use car-rental company, with more than 2,900 airport locations, including 1,600 in the United States. Hertz operates and conducts extensive business in California and the rest of the country. During all relevant times, Hertz rented cars to the public on Pricelines app, its own website www.Hertz.com, and over the phone.; and at all relevant times operated at its San Francisco International Airport location.

The Hertz Corporation breaches its car-rental agreements with its customers and defrauds them by both overcharging excessive and unwarranted fees for car rentals, failing to correct such charges when they are confronted and falsely advertsing the capabilities of certain cars consisting of Tesla driving range/fuel econoPlaintiff's false statements

pricelines helps facilitate consumer rights violations in the rental car industry by adding a layer of confusion by inserting itself into customers contracts to collect commisions and then disclaiming any liability when such contracts are breached.

When the defrauded customers contact Priceline and Hertz' customer service number, Hertz representatives wrongfully deny requests to reimburse the fraudulent charges.

Plaintiff rented a Tesla Model 3 vehicle from Hertz at San Francisco Airport for one week and extended the rental with Hertz Telephone Customer Service several times, paying each week at an avg rate of $500. Yet Hertz charged Plaintiff an additional $3800 on his chase business credit card even though Plaintiff paid the rental and has confirmation of such.

Plaintiff’s Tesla Model 3 was purportedly the long range model which was supposed to last around 300 miles, but it severely underperformed in fuel econoPlaintiff’s and had less than half the advertised range set forth by Tesla Motors and the Hertz Company.

This action seeks to recover for fraudulent advertising and the fraudulent and unwarranted charges and to enjoin Hertz’s unlawful billing practices in the future, including an order enjoining Hertz from: (i) Wrongfully processing duplicate charges on customers credit cards and not duly investigating such charges when confronted with contrary evidence of the charge.

ii) falsely advertising the range capability of Tesla Model 3 leading to a loss of time and a cause for delay due to the constant need to charge the cars;

JURISDICTION AND VENUE

3. Pursuant to the California Constitution jurisdiction is proper in the Superior Court of California, County of San Francisco, in the State of California. The

jurisdiction of this Court is proper for the relief sought herein, and the amount demanded by Plaintiff exceeds $25,000.

4. Venue as to each Defendant is proper in this judicial district, pursuant to the code of Civil Procedure section 395, et seq, San Francisco county is where the wrongful act, fraud, negligence; or the breach of contract is made or is to be performed, or where the obligation or liability arises, or the breach occurs; or an action arising from a transaction consummated as a proximate result of either an unsolicited telephone call made by a seller; or in the county where the principal place of business of such corporation is situated.

PARTIES

5. Plaintiff Marshall Wexler ("Plaintiff" or "Wexler") is an individual with a law firm in the County of San Francisco, in the state of California. During all relevant times, Plaintiff was a consumer and individual transacting business with Defendants from and in San Francisco County, California, and in Los Angeles County, California.

6. Defendant Tesla is a prominent electric automotive manufacturer. Plaintiff is a consumer who, in or around july 2023, rented a new 2023 Tesla Model 3 manufactured by Defendant Tesla. Inc., d/b/a Tesla Motors, Inc., a Nevada and Texas Corporation.

7. THE HERTZ CORPORATION (“Hertz”), a subsidiary of Hertz Global Holdings, Inc., is a Delaware corporation with its principal place of business in Naples, Florida. Hertz is the world’s largest airport general-use car-rental company, with more than 2,900 airport locations, including 1,600 in the United States. Hertz operates and conducts extensive business in California and the rest of the country. During all relevant times, Hertz rented cars to the public on pricelines app, its own website www.Hertz.com, and over the phone.; and at all relevant times operated at its San Francisco International Airport location.

8. Defendant Tesla Motors is a prominent electric automotive manufacturer

9. Defendant Priceline is a major third party travel booking agenc7

10. Defendant Chase Bank is a major US Bank.

11. At all times herein mentioned, Defendants, whether or not specifically identified or designated herein as a DOE, and each of them, were the agents, employees, servants, partners, independent contractors, joint ventures and participants with all other Defendants, and with each other, and in doing the things hereinafter mentioned, were agents, employees, servants, partners, joint ventures, and with the consent and permission of the co-Defendants and each of them.

12. The true names and capacities, whether individual, corporate, associate or otherwise of the Defendants named herein as DOES 1 through 20, are unknown to

Plaintiff at this time. Plaintiff therefore sues said Defendants by such fictitious names pursuant to section 474 of the California Code of Civil Procedure

13. Plaintiff is informed and believes, and thereon alleges, that at all times, each Defendant was acting as an agent for each of the other Defendants and each were co-conspirators with respect to the acts and the wrongful conduct alleged herein so that each is responsible for the acts of the other in connection with the conspiracy in such wrongful acts in connection with the other Defendants.

FACTUAL ALLEGATIONS

14. Plaintiff used Priceline to rent a vehicle on or about July 18, 2023, under reservation confirmation No. #, and selected the "pay later" option.

15. In accordance with Priceline's business model, practices, and guarantees, Plaintiff compared prices of various rental car companies on Priceline and selected an electric Tesla Model 3 offered by Hertz.

16. Plaintiff selected this offer for the best rate, advertised fuel econoPlaintiff's range, and amenities as compared to other available offers.

17. Plaintiff's reservation was scheduled for pick-up at Hertz San Francisco International Airport ("SFO") on Monday, July 28, 2023 at 5:00 p.m., and return to the same location on Tuesday, September 19, 2023, at 5:00 p.m.

18. The reservation was subject to optional extension up to eight (8) weeks through Hertz by telephone.

19. Plaintiff paid for the rental by credit card, including his Chase Business Card Visa ending LAST 4 on or about July 20, 2023. 20. Plaintiff arrived for his scheduled pick-up, but was informed that the vehicle was not ready. For the inconvenience, Plaintiff was advised that he has been upgraded to the Long-Range Tesla Model 3, from the Standard Tesla Model 3, at no additional charge.

21. Plaintiff agreed to the upgrade and, thus, Plaintiff's reservation was modified by Hertz in agreement with this offer and acceptance thereof.

22. The Standard Tesla Model 3 is advertised as providing approximately 303 miles per charge, while the Long-Range is advertised as providing approximately 350 miles per charge.

23. Tesla–as promoted by Hertz and Priceline—held out the EPA range as guaranteed in specific, real-world performance of the Tesla Model 3.

24. Plaintiff relied on Tesla's statements—as promoted by Hertz and Priceline—on the EPA-approved label, as any reasonable consumer would in belief that the vehicle is capable of achieving these advertised EPA estimates under real world conditions

25. However, Plaintiff only enjoyed about 200 miles on a full charge while using the Long-Range Tesla Model 3. Furthermore, the range could drop by as much as 50% in cold weather conditions, a fact not noted in Priceline's, Hertz's, nor Tesla's advertising of the rental offer.

26. Plaintiff successfully renewed the rental reservation weekly by authorized charges through a Hertz telephone customer agent representative for five (5) weeks.

27. Plaintiff attempted to renew the rental lease for another week, but at that time Hertz breached the rental agreement by demanding Plaintiff return the vehicle without cause on Friday.

28. At the time of Hertz's breach, Plaintiff was in Las Vegas, Nevada, more than an eight (8) hour drive away from Hertz SFO.

29. Plaintiff advised the Hertz representative that he could not return the vehicle on such short notice, especially given the Jewish Sabbath preventing Plaintiff from driving the car in observance with Plaintiff's faith.

30. Plaintiff agreed to return the vehicle on Sunday, DATE, and the Hertz representative agreed, noting that Plaintiff would not be charged any fees beyond the daily rental rate.

31. Plaintiff returned the vehicle.

32. To Plaintiff's surprise, he was charged significant additional fees:

EXTRA DAYS 50 @ 62.08 3104.00

SUBTOTAL 3104.00

CA TOURISM FEE 108.64

OTHER ADDL CHARGES 12.00

CHARGE PURCHASE OPTION 35.00

TESLA REBILL 475.75

EMERGENCY ROAD SERVICE 24.00

KEYS/PARTS 250.00

And the MISCELLANEOUS CREDITS meaning the -3858.25

33. EXPLAIN THE CHARGE THAT REFLECTS THE FUEL ECONOPLAINTIFF'S

34. Plaintiff specifically selected Hertz's offer for the Tesla Model 3 based on the fuel econoPlaintiff's. Plaintiff was advised that the Long-Range Tesla Model 3 afforded Plaintiff an even better fuel econoPlaintiff's.

35. Plaintiff would not have made the reservation for the Tesla Model 3 through Hertz if he had known that the fuel econoPlaintiff's was grossly overstated and that the low fuel range estimate required frequent charging breaks.

36. Plaintiff also would not have made the reservation for the Tesla Model 3 through Hertz, if he had known that Hertz would arbitrarily breach the rental agreement's extension provision.

37. Beginning in or about 2021, Tesla and Hertz colluded to mislead customers about the fuel range of the Tesla Model 3.

38. Tesla needed Hertz, both to promote its Tesla 3 and steal business local gas powered taxi drivers by using these cars as rideshare to exploit its zero emission vehicle free money . https://www.nbcnews.com/business/autos/after-4-billion-deal-tesla-hertz-says-it-will-rent-n1282576

39. During all relevant times, Tesla's, Hertz's, and Priceline's misleading advertising and Hertz's fraudulent billing practices set forth herein were part of an intentional scheme to boost profits by first luring consumers into selecting rental vehicles with better advertised features than actually existed; including even lower pre-paid prices; but in reality, Hertz nearly doubles the agreed upon rental rates after consumers pick up the vehicle, either in retaliation for keeping a vehicle past

some "deadline" set after the contract was agreed to or by negligence by adding substantial charges that the consumer never agreed to and are not authorized.

40. Hertz charged Plaintiff's Chase credit card for this Charge.

41. Plaintiff attempted to dispute the charge with Chase by providing the receipt from Hertz, which showed that Hertz fraudulently altered the billing statement, namely by retroactively removing a charge on a date prior to the charge.

42. Plaintiff pointed this out to Chase as proof of the fraudulent nature of the charge.

43. Chase's investigation allegedly concluded that the charge was not fraud and was for a Kia Optima.

44. Despite being advised that Plaintiff did not rent a Kia Optima at any time, and that Plaintiff only rented the Tesla, Chase did not honor its obligation to protect Plaintiff against fraud and erroneously found in favor of Hertz's billing of the fraudulent charge.

45. On January 31, 2024, Plaintiff also spoke with a Hertz customer service representative to dispute the false charges.

46. Plaintiff informed the Hertz representative that the charges were unwarranted because he had already paid the charges already.

47. Hertz has since blacklisted Plaintiff from renting from Hertz and its affiliated company “Thrifty”.

FIRST CAUSE OF ACTION

BREACH OF CONTRACT

(Against Tesla, Hertz, and Priceline)

48. Plaintiff hereby incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege: under California’s Consumers Legal Remedies Act (“CLRA”), Business and Professions Code § 17500, and Business and Professions Code § 17200

49. Plaintiff contracted with Tesla, Hertz, and Priceline through Priceline’s reservation platform under confirmation No. #.

50. Plaintiff contracted for a Standard Tesla Model 3 with at least 300 miles fuel econoPlaintiff’s per full charge.

51. Plaintiff’s contract included the option for weekly extensions of the rental period up to eight (8) weeks.

52. Plaintiff's contract was modified by verbal agreement through a representative at Hertz SFO and such agreement was memorialized in the rental account for Plaintiff's reservation.

53. Plaintiff performed all obligations pursuant to the rental agreement, except as same may have been excused, waived, or with respect to which the Defendants are estopped from asserting.

54. Neither Defendant disclosed any fees or penalties as were charged to Plaintiff.

55. Neither Defendant disclosed the accurate fuel econoPlaintiff's to Plaintiff.

56. Neither Defendant disclosed any right of Hertz to breach the rental extension provision.

57. Defendants, individually and collectively, breached the rental agreement through their various acts and failures to disclose information as required.

58. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff has been damaged in an amount in excess of the minimum jurisdictional limits of this Court, which amount will be proven at trial.

SECOND CAUSE OF ACTION

BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(Against Tesla, Hertz, and Priceline)

59. Plaintiff hereby incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege:

60. To the extent not duplicative of Plaintiff's cause of action for Breach of Contract, Defendants also breached their duty of good faith and fair dealing.

61. Additionally, and specifically as to Hertz, Hertz breached its duty of good faith and fair dealing when it fraudulently billed Plaintiff substantial fees not agreed to in the rental agreement.

62. Additionally, and specifically as to Chase, Chase breached its duty of good faith and fair dealing when it failed to honor its obligation to protect Plaintiff from Hertz's fraudulent billing.

63. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff has been damaged in an amount in excess of the minimum jurisdictional limits of this Court, which amount will be proven at trial.

THIRD CAUSE OF ACTION

(FRAUD)

(California Civil Code §§ 1572, 1573, et seq.)

(Against Tesla, Hertz, and Priceline)

64. Plaintiff hereby incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege:

65. Tesla, Hertz, and Priceline falsely represented that the Tesla Model 3 would provide a fuel range econoPlaintiff's of over 300 miles per full charge.

66. Tesla, Hertz, and Priceline knew this representation was false and misleading, but made the representation in pursuit of profits.

67. Hertz and Priceline falsely represented that Plaintiff would enjoy up to eight (8) weeks of rental extension periods, that there would be no additional/hidden fees, and that Plaintiff's reservation was paid in full.

68. Hertz and Priceline knew these representations were false, but made the representations in pursuit of profits.

69. Plaintiff reasonably relied on all representations to his detriment.

70. To the extent, Tesla, Hertz, and/or Priceline did not intend to act fraudulently, they remain liable to Plaintiff pursuant to California Civil Code section 1573 because their breaches of duty gained them an advantage by misleading Plaintiff and/or because their breaches would otherwise be declared fraudulent without respect to actual fraud.

71. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff has been damaged in an amount in excess of the minimum jurisdictional limits of this Court, which amount will be proven at trial.

FOURTH CAUSE OF ACTION

(FRAUD)

(California Civil Code §§ 3294)

(Against Tesla, Hertz, and Priceline)

72. Plaintiff hereby incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege:

73. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff is entitled to exemplary pursuant to California Civil Code section 3294, which will be proven at trial.

FIFTH CAUSE OF ACTION

UNFAIR COMPETITION LAW

(California Business & Professions Code § 17200, et seq.)

(Against Tesla, Hertz, and Priceline)

74. Plaintiff hereby incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege:

75. Tesla, Hertz, and Priceline violated California Bus. & Prof. Code section 17200, et seq., by misrepresenting the fuel econoPlaintiff's for the Tesla Model 3.

76. Plaintiff selected the rental offer based on the advertised fuel econoPlaintiff's of the Tesla Model 3 being over 300 miles per full charge.

77. Had Plaintiff known of the misrepresentation, Plaintiff would not have contracted for the Tesla Model 3 and selected a different offer from a competitor manufacturer, rental company, and/or third-party booking company.

78. Hertz and Priceline violation California Bus. & Prof. Code section 17200, et seq., by misrepresenting the rental terms, namely for the extension period provision.

79. Plaintiff selected the rental offer based on the advertised extension option of up to eight (8) weeks, which did not disclose any right of Hertz to withdraw said offer without cause.

80. Had Plaintiff known of the misrepresentation, Plaintiff would not have contracted for the Hertz offer and selected a different rental company and/or third-party booking company.

81. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff has been damaged in an amount in excess of the minimum jurisdictional limits of this Court, which amount will be proven at trial.

82. 73. Plaintiff requests attorneys' fees and costs pursuant to Business and Professions Code § 17000, et seq., and Civ. Code § 1021.5.

SIXTH CAUSE OF ACTION

CONVERSION

(Against Chase and Hertz)

83. Plaintiff hereby incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege:

84. Plaintiff owned, possessed, or had a right to possess a specific property right in, control over, and exclusive claim to their credit-card account and the funds in this account.

85. Hertz and chase intentionally and substantially interfered with the Plaintiff's ownership of these funds by wrongfully taking possession of funds from their

credit card without permission for Hertz's undisclosed and fraudulent billing fees, a sum that is specific and identifiable, and by preventing Plaintiff from having access to the credit-card funds that were wrongly charged for unwarranted refueling and service fees.

86. Plaintiff did not consent to Hertz taking possession of these funds for that purpose.

87. Plaintiff was harmed by their loss of these funds, and Hertz's conduct was a substantial factor in causing this harm.

88. As a direct and proximate result of Hertz's and Chase's acts and/or omissions, Plaintiff has been damaged in an amount in excess of the minimum jurisdictional limits of this Court, which amount will be proven at trial.

SEVENTH CAUSE OF ACTION

(FALSE ADVERTISING)

(CA Bus & Prof Code §17500 et seq.)

(Against Tesla, Hertz, and Priceline)

89. Plaintiff hereby incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege:

90. Tesla, Hertz, and Priceline violated California Bus. & Prof. Code section 17500 et seq., also known as the California False Advertising Law, by inducing the Plaintiff and the public to enter into any obligation relating vehicle rentals, making and/or disseminating and/or causing to be made or disseminated before the public in this state, and/or making and/or disseminating and/or causing to be made or disseminated from this state before the public in any state, any publication, or any advertising device, or in any other manner or means whatever, including over the Internet, any statement, concerning property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised.

91. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff has been damaged in an amount in excess of the minimum jurisdictional limits of this Court, which amount will be proven at trial.

SEVENTH CAUSE OF ACTION

(CONSUMER LEGAL REMEDIES ACT)

(CA Civil Code §1750, et seq.)

(Against Tesla, Hertz, and Priceline)

92. Plaintiff hereby incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege:

93. Tesla, Hertz, and Priceline violated California Civil Code section 1750 et seq., also known as the California Consumer Legal Remedies Act ("CLRA"), by advertising goods or services with intent not to sell them as advertised, making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions.

94. The false and deceptive statements regarding the authenticity of said price disseminated by Defendants have deceived and will continue to deceive the consuming public.

95. Plaintiff additionally sent a Consumer Notice to Defendants pursuant to Civil Code section 1782, subd. (a), but Defendants failed to remedy the violation as required in Civil Code section 1782, subd. (c), (1) through (4).

96. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff has been damaged in an amount in excess of the minimum jurisdictional limits of this Court, which amount will be proven at trial

1. On or about August 23, 2024, Plaintiff rented a Ford Mustang from Budget at Seattle–Tacoma International Airport.

2. Upon information and belief, the vehicle was subject to an open safety recall affecting its steering and/or electronic power steering system at the time of rental.

3. On August 24, 2024, while traveling at highway speed and merging lanes, the Mustang experienced a sudden loss of steering assist for approximately three to five seconds.

4. Loss of steering control at highway speed presents a severe and foreseeable risk of catastrophic injury or death.

5. Plaintiff narrowly avoided collision and suffered emotional distress and economic damages.

6. Plaintiff also experienced unsafe or erratic behavior in other vehicles, including a 2023 Tesla vehicle exhibiting unexpected stops and a Kia vehicle with unintended activation events.

7. Modern vehicles utilize networked electronic control units (ECUs), telematics systems, and software capable of remote updates or data transmission.

8. Upon information and belief, the steering loss and system interruptions may have resulted from one or more of the following:

a. Latent electronic defects;

b. Faulty software updates;

c. Improper remote configuration;

d. Cybersecurity vulnerabilities;

e. Unauthorized third-party access;

f. Negligent failure to secure vehicle electronic systems.

9. Defendants had a duty to implement reasonably secure telematics and control systems and to prevent foreseeable unauthorized interference or system instability.

10. Plaintiff has not yet been provided access to diagnostic logs, telematics records, or cybersecurity audit data sufficient to determine the precise mechanism of the malfunctions.

11. Defendants rented or sold vehicles despite knowing or having reason to know that defects, software failures, or system vulnerabilities existed.

## IV. CLAIMS FOR RELIEF

### COUNT I – NEGLIGENCE (Rental Companies & Manufacturers – Cybersecurity / Vehicle Systems)

1. Plaintiff incorporates all prior paragraphs.

2. Defendants owed a duty of care to ensure vehicles were safe for ordinary driving and that electronic and telematics systems were reasonably secure.

3. Defendants breached this duty by failing to prevent foreseeable vehicle malfunctions, unsafe behavior, and potential unauthorized access.

4. As a direct and proximate result, Plaintiff suffered damages including severe emotional distress, economic loss, and risk of injury.

COUNT II – NEGLIGENCE PER SE (Raechel and Jacqueline Houck Safe Rental Car Act, 49 U.S.C. § 30120(i))

1. Plaintiff incorporates all prior paragraphs.

2. 49 U.S.C. § 30120(i) prohibits rental companies from renting vehicles subject to unrepaired safety recalls.

3. Budget and other rental defendants violated this statute by renting Plaintiff a vehicle subject to an open recall.

4. Plaintiff is within the class of persons the statute was intended to protect, and the harm suffered is precisely what the statute seeks to prevent.

5. Defendants' statutory violation constitutes negligence per se.

COUNT III – STRICT PRODUCTS LIABILITY (Design and Manufacturing Defects – Manufacturers)

1. Plaintiff incorporates all prior paragraphs.

2. The Ford Mustang, Tesla, and Kia vehicles contained defects in steering, power electronics, and/or safety-critical systems rendering the vehicles unreasonably dangerous.

3. Defects existed when vehicles left manufacturer control.

4. Defective conditions directly caused Plaintiff's damages.

COUNT IV – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

(UCC § 2-314 & State Analogues)

1. Plaintiff incorporates all prior paragraphs.

2. Vehicles were not fit for ordinary driving purposes.

3. A vehicle that loses steering control at highway speed is unmerchantable.

4. Defendants breached implied warranties, causing Plaintiff's damages.

COUNT V – MAGNUSON–MOSS WARRANTY ACT (15 U.S.C. § 2301 et seq.)

1. Plaintiff incorporates all prior paragraphs.

2. Vehicles are "consumer products" under 15 U.S.C. § 2301.

3. Defendants issued written and implied warranties guaranteeing safe, operable vehicles.

4. Vehicles exhibited defects and unsafe conditions, breaching those warranties.

5. Plaintiff is entitled to damages, attorneys' fees, and costs under 15 U.S.C. § 2310(d).

COUNT VI – LIMITED CIVIL CONSPIRACY (Alternative / Conditional – All Defendants & Does 1–50)

1. Plaintiff incorporates all prior paragraphs.

2. Upon discovery, Plaintiff may show coordinated actions among manufacturers, rental companies, and Doe Defendants relating to fleet vehicle software, telematics management, or defect remediation.

3. If such coordination existed, it could constitute concerted action in violation of law.

4. Plaintiff pleads this claim in the alternative, pending discovery.

COUNT VII – UNFAIR AND DECEPTIVE BUSINESS PRACTICES (State Consumer Protection Statutes)

1. Plaintiff incorporates all prior paragraphs.

2. Renting or distributing defective or unsafe vehicles constitutes unlawful and unfair business conduct.

3. Plaintiff suffered damages as a result.

V. DAMAGES

Plaintiff seeks:

1. Compensatory damages;

2. Emotional distress damages;

3. Statutory damages;

4. Attorneys' fees and costs;

5. Pre- and post-judgment interest;

6. Such other relief as the Court deems just and proper.

VI. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

CHASE BANK

Chase bank allows customers to apply for lines of credit business lines of credit over the phone. I was approved for one over the phone and they told me to fly into a chase bank branch but when I flew in from Columbia to Chase Bank, the teller simply said that, this was not the case I was not approved for a loan and they told me that the only thing I could do is create another account and apply for a loan that way in the bank branch and I was declined.

This leads me to believe that I was never approved for alone is unreasonably high sales expectations to encourage the fraudulent and inception of new accounts.

Chase bank is also not using lawyers or people who can actually interpret contracts to resolve disputes. They are using people who use English as their second language for them. This is problematic because when interpreting contracts or when understanding American commerce Chase bank is always getting it wrong and such an obvious way as to lead to the assumption that it's either a person who makes very little money in another country who is resolving the credit card disputes or debit card disputes, or are using a computer software program that is the merchant. Chase has a conflict of interest because it also processes merchant credit card transactions and receives money for that.

Chase bank allows customers to apply for lines of credit business lines of credit over the phone. I was approved for one over the phone and they told me to fly into

a chase bank branch but when I flew in from Columbia to Chase Bank, the teller simply said that, this was not the case I was not approved for a loan and they told me that the only thing I could do is create another account and apply for a loan that way in the bank branch and I was declined.

This leads me to believe that I was never approved for alone is unreasonably high sales expectations to encourage the fraudulent and inception of new accounts.

Chase bank is also not using lawyers or people who can actually interpret contracts to resolve disputes. They are using people who use English as their second language for them. This is problematic because when interpreting contracts or when understanding American commerce Chase bank is always getting it wrong and such an obvious way as to lead to the assumption that it's either a person who makes very little money in another country who is resolving the credit card disputes or debit card disputes, or are using a computer software program that is the merchant.  Chase has a conflict of interest because it also processes merchant credit card transactions and receives money for that.

Additionally, chase bank has about $1 trillion. It claims of art which it accumulated since allegedly 1950 Chase bank is a controversial bank. It was founded through fraud and Hamilton founded the bank by using stolen funds from the yellow fever

crisis of New York City and since then, this bank has been profiting from Human suffering and stealing from people who can't fight back.

It's known that Chase Bank helped the slave trade. They also help Nazi Germany and they are likely the reason why the Manhattan project is called the Manhattan Project because Chase Bank was known as the Manhattan Company. Also the bank may have been a way for former Nazis stash their loot Because it's questionable how an American bank somehow acquired $900 billion worth of European art all of the sudden after World War II after operation Neptune use by the CIA during the Greek communist revolution and the operation paperclip

Chase bank allows customers to apply for lines of credit business lines of credit over the phone. I was approved for one over the phone and they told me to fly into a chase bank branch but when I flew in from Columbia to Chase Bank, the teller simply said that, this was not the case I was not approved for a loan and they told me that the only thing I could do is create another account and apply for a loan that way in the bank branch and I was declined.

This leads me to believe that I was never approved for alone is unreasonably high sales expectations to encourage the fraudulent and inception of new accounts.

Chase bank is also not using lawyers or people who can actually interpret contracts to resolve disputes. They are using people who use English as their second language for them. This is problematic because when interpreting contracts or when understanding American commerce Chase bank is always getting it wrong and such an obvious way as to lead to the assumption that it's either a person who makes very little money in another country who is resolving the credit card disputes or debit card disputes, or are using a computer software program that is the merchant. Chase has a conflict of interest because it also processes merchant credit card transactions and receives money for that.

Chase bank allows customers to apply for lines of credit business lines of credit over the phone. I was approved for one over the phone and they told me to fly into a chase bank branch but when I flew in from Columbia to Chase Bank, the teller simply said that, this was not the case I was not approved for a loan and they told me that the only thing I could do is create another account and apply for a loan that way in the bank branch and I was declined.

This leads me to believe that I was never approved for alone is unreasonably high sales expectations to encourage the fraudulent and inception of new accounts.

Chase bank is also not using lawyers or people who can actually interpret contracts to resolve disputes. They are using people who use English as their second language for them. This is problematic because when interpreting contracts or when understanding American commerce Chase bank is always getting it wrong and such an obvious way as to lead to the assumption that it's either a person who makes very little money in another country who is resolving the credit card disputes or debit card disputes, or are using a computer software program that is the merchant. Chase has a conflict of interest because it also processes merchant credit card transactions and receives money for that.

Additionally, chase bank has about $1 trillion. It claims of art which it accumulated since allegedly 1950 Chase bank is a controversial bank. It was founded through fraud and Hamilton founded the bank by using stolen funds from the yellow fever crisis of New York City and since then, this bank has been profiting from Human suffering and stealing from people who can't fight back.

JPMorgan Chase Bank, N.A., and DOES 1–100,

A. ESG / Operational Disclosure Failures

7. Plaintiff is informed and believes that Defendant markets itself as a trusted, ethical, and customer-focused financial institution.

8. Defendant has not publicly disclosed material historical, operational, or ESG-related risks, including corporate governance practices, call center policies, or conflict-of-interest considerations that materially affect customer decisions.

9. Plaintiff relied on Defendant’s representations in opening accounts and conducting financial business.

---

B. Call Center Mismanagement & Servicing Errors

10. Between January 2024 and December 2025, Plaintiff submitted numerous disputes via letters and phone regarding:

- o Unauthorized transactions
- o Misapplied charges
- o Falsely promised loan funds (e.g., $60,000 loan)
- o Credit reporting errors and identity theft consequences

11. Defendant repeatedly routed disputes to call centers staffed by personnel without sufficient legal knowledge, English proficiency, or ability to interpret contracts.

12. Plaintiff alleges misrepresentations made via phone and in writing, including:

- o False statements that disputes were being processed or loan funds approved
- o Misleading timelines for reimbursements and provisional credits

13. Defendant's failure to use trained personnel or properly handle disputes caused millions of dollars in financial harm, including lost business opportunities, credit damage, and account mismanagement — totaling at least $27,000,000.

14. Defendant's dual role as both merchant credit processor and account manager creates a material conflict of interest affecting impartial dispute resolution.

---

C. Credit Reporting Harm

15. Defendant reported inaccurate, negative, and derogatory information to credit bureaus despite Plaintiff disputing the information.

16. This harmed Plaintiff's ability to obtain loans, conduct business, and maintain financial stability.

---

IV. RICO ALLEGATIONS

17. Defendant and DOES 1–50 constitute an association-in-fact enterprise engaged in interstate commerce.

18. The Enterprise coordinated call center rerouting, misrepresentations, and account mismanagement via telephone and electronic communications, constituting predicate acts of wire fraud.

19. These acts were continuous and caused injury to Plaintiff's business and property.

20. Defendants knowingly participated in and conspired to commit these acts in furtherance of the enterprise.

---

V. COMMON LAW AND STATUTORY CLAIMS

Fraud / Misrepresentation – Defendant knowingly misrepresented account status, dispute resolution, and loan approvals.

Negligence / Negligent Misrepresentation – Defendant breached duties by misrouting disputes, failing to properly investigate, and relying on unqualified personnel.

Breach of Contract / Implied Covenant – Defendant failed to perform according to account agreements, including timely and lawful dispute resolution.

Conversion – Defendant wrongfully withheld or misapplied Plaintiff funds.

Unjust Enrichment – Defendant benefitted from retaining misapplied funds and failing to resolve disputes.

Promissory Estoppel – Plaintiff relied on Defendant's promises regarding dispute handling and loan approvals.

Intentional Infliction of Emotional Distress (IIED) – Defendant's repeated misrepresentations and mishandling caused severe emotional harm.

EFTA / FCBA / TILA / FCRA Violations – Defendant failed to investigate unauthorized electronic transfers, billing errors, credit card disputes, and improperly reported account information to credit bureaus.

---

VI. INJUNCTIVE RELIEF

Plaintiff requests the Court to:

1. Stop all negative or derogatory reporting to credit bureaus related to Plaintiff's accounts;

2. Require Defendant to correct and update all disputed account and credit information;

3. Mandate proper dispute-handling procedures and provisional credits;

4. Require disclosure of ESG, operational, and historical practices that materially affect consumer decision-making;

5. Prevent further call center rerouting practices that impede lawful dispute resolution.

---

VII. PRAYER FOR RELIEF

Plaintiff requests:

- Compensatory damages of at least $27,000,000;
- Treble damages under RICO;
- Statutory damages under EFTA, FCBA, TILA, FCRA;
- Punitive damages;
- Injunctive relief stopping negative credit reporting and requiring proper dispute resolution;
- Full ESG and operational disclosure;
- Attorney’s fees and costs;
- Any other relief the Court deems just and proper.

---

VIII. CONFLICT OF INTEREST AND IMPROPER SERVICING

31. Plaintiff is informed and believes, and on that basis alleges, that Defendant routinely assigns account disputes, billing complaints, and loan inquiries to call centers staffed by individuals who do not possess legal training, law degrees, or sufficient knowledge of Chase policies and procedures.

32. Many of these personnel are located in foreign countries and communicate primarily in languages other than English. As a result, disputes and customer complaints are frequently misunderstood, mishandled, or improperly escalated.

33. Defendant has a material conflict of interest because it serves simultaneously as the bank for both merchants and customers. In practice, this creates a strong financial incentive to favor merchants—who generally have larger accounts or more transactional volume—over individual customers in disputes and investigations.

34. Plaintiff experienced this conflict firsthand, where complaints regarding unauthorized charges, misapplied payments, and disputed transactions were routinely handled in a manner favoring the merchant, despite clear evidence supporting Plaintiff's claims.

35. Plaintiff repeatedly experienced:

- Delays in dispute investigations
- Contradictory or false information regarding account status
- Denials of promised funds or credit adjustments that were warranted

36. Defendant's dual role as both merchant processor and customer account handler undermines impartiality and constitutes a systemic conflict that materially impacts dispute outcomes.

37. Plaintiff reasonably relied on Defendant's representations that disputes and complaints would be handled lawfully and in accordance with contracts and statutes, yet the lack of competent personnel and systemic favoritism toward merchants caused substantial financial harm, credit damage, and lost business opportunities.

38. Defendant's failure to handle customer complaints properly by phone, including repeated misrouting, false statements, and inadequate resolution, constitutes negligence, misrepresentation, and breach of contractual and statutory obligations.

LAS VEGAS HARASSMENT, SURVEILLANCE, AND TRAVEL INTERFERENCE 2024 SEPTEMBER

The Plaintiff alleges that even after being evicted from 5434 Geary Boulevard by extortionate conduct perpetrated by the SK syndicate he was not left alone.

Indeed during his presence in Las Vegas in 2024, including on September 11, he was subjected to a coordinated campaign of harassment, surveillance, intimidation, and interference with travel and professional activities. According to the Plaintiff, these events occurred alongside repeated denials of boarding and reimbursement by United Airlines and followed earlier travel disruptions, including a mishandled layover in Japan where reimbursement was promised and later denied. The

Plaintiff contends that these incidents were not isolated customer service failures but part of a broader pattern of obstruction linked to his movements and work related travel.

The Plaintiff further alleges that Miriam Adelson and Aryeh Deri were alerted to his presence in Las Vegas through intermediaries connected to the Schwartz, Kaufman, Rothschild, or Boyaner defendants like mark karrasick. Following this notification, the Plaintiff alleges that individuals associated with Las Vegas Chabad became involved in monitoring and influencing events surrounding his stay. According to the Plaintiff, these actors leveraged connections within the Israeli

government security apparatus and their self-proclaimed expertise in counterterrorism to exert influence over airport operations, airline personnel, and private security actors, enabling interference with his travel and financial recovery efforts.

On or about September 11, 2024, the Plaintiff alleges that local Las Vegas celebrity-connected conspirators revealed themselves through overt acts of stalking and intimidation. He asserts that Floyd Mayweather, members of Mayweather's family, and individuals associated with Mayweather's entourage harassed him and made defamatory statements to police falsely alleging that the Plaintiff was a sex offender, which the Plaintiff categorically denies. According to the Plaintiff, these false statements were made with the intent to provoke law enforcement intervention, damage his reputation, and portray him as dangerous or criminal despite the absence of any factual basis.

The Plaintiff further alleges that individuals associated with the Mayweather group orchestrated additional acts of intimidation, including arranging for an 18-wheeler refrigerated truck to park directly outside his hotel room. He states that this occurred contemporaneously with other loud and disruptive environmental conditions, including illegally excessive aircraft noise, and that the hotel cooperated in facilitating these disturbances. According to the Plaintiff, these

actions were designed to harass, intimidate, and deprive him of rest, privacy, and the ability to conduct his professional affairs.

The Plaintiff also alleges that during this period, a detective with whom he had previously attended night and occasional day classes at New York Law School was present in Las Vegas and engaged in conduct consistent with covert monitoring. According to the Plaintiff, this individual made remarks indicating awareness of changed circumstances and familiarity with the Plaintiff's activities, and followed him during his stay and this detective acted on behalf of Miriam Adelson or her associates, reinforcing the atmosphere of surveillance and intimidation.

The Plaintiff contends that United Airlines' repeated denial of boarding and refusal to reimburse expenses—despite earlier assurances and despite his timely arrival at the airport—occurred in parallel with these alleged acts of harassment and surveillance. He alleges that airline personnel, including Orthodox Jewish employees, acted in ways that disregarded his stated religious observance needs and travel rights, and that promises of reimbursement were used to induce additional expenditures on hotels and related expenses that were never honored.

The cumulative effect of these actions—including defamatory statements to police, coordinated stalking, environmental harassment, airline interference, and the alleged involvement of politically and religiously connected actors—was to cause

severe emotional distress, financial harm, reputational damage, and disruption of his professional business.

COUNT I – Violation of DOT Denied Boarding Regulations (14 C.F.R. Part 250)

Defendant: United Airlines

Plaintiff had a confirmed reservation, checked in on time, and arrived at the gate with valid identification more than 30 minutes before departure for a domestic flight. Despite this, United agents denied Plaintiff boarding.

Plaintiff was offered only a travel credit to rebook, and no reimbursement was provided, despite assurances of compensation. The denial occurred during Erev Shabbos.

Allegations:

- Defendant acted in violation of DOT denied boarding regulations, which require compensation when a passenger is involuntarily denied boarding for reasons other than safety, security, or aircraft swaps.
- United failed to provide cash or immediate check compensation as promised.

- Plaintiff submitted multiple reimbursement requests with receipts and case numbers documenting thousands of dollars in expenses.
- Plaintiff alleges that United agents were acting in coordination with Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives as co-conspirators to interfere with Plaintiff's travel and business activities.

Harm:

- Financial loss
- Credit damage
- Business travel disruption
- Emotional distress

---

COUNT II – Breach of Contract / Bad Faith Breach

Defendant: United Airlines

United's Contract of Carriage and post-incident assurances created binding obligations. Plaintiff fully performed by timely arriving at the gate and complying with all requirements.

United breached the contract by:

- Denying boarding without justification;
- Failing to provide promised reimbursement;
- Acting in bad faith by offering only a travel credit while retaining funds for Plaintiff's incurred expenses;
- Allegedly coordinating actions with Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives to target Plaintiff.

Harm:

- Out-of-pocket costs in the thousands of dollars
- Interest accrued on credit card payments
- Damage to credit rating
- Loss of business opportunities, including travel to Las Vegas

---

COUNT III – Fraud / Misrepresentation

Defendant: United Airlines

United representatives promised reimbursement for expenses resulting from denied boarding incidents and provided case numbers to Plaintiff. Plaintiff relied on these assurances.

United failed to perform, despite Plaintiff's reliance, causing financial and credit harm.

Additional Allegations:

- Plaintiff alleges that United agents, in coordination with Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives, acted to prevent reimbursement and interfere with Plaintiff's travel and business activities.
- Plaintiff personally observed Miriam Adelson at the Wynn Las Vegas hotel and alleges that her presence was part of a coordinated effort.

Harm:

- Financial loss
- Credit damage
- Emotional distress
- Business interference

---

COUNT IV – Tortious Interference with Prospective Economic Advantage

Defendant: United Airlines

Plaintiff had ongoing business plans requiring travel to Las Vegas, including opening new business operations. United's wrongful denial of boarding disrupted these plans.

Plaintiff alleges that the presence of Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives was coordinated with United agents to interfere with these economic opportunities.

Harm:

- Lost business opportunities
- Financial harm
- Emotional distress

---

COUNT V – Civil Conspiracy

Plaintiff alleges that United agents, Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives acted in concert to:

- Deny Plaintiff boarding;
- Fail to reimburse expenses;
- Harass and intimidate Plaintiff;

- Interfere with Plaintiff's business operations.

Plaintiff alleges coordination and deliberate intent to cause harm.

Harm:

- Financial loss in the thousands of dollars
- Credit damage
- Emotional distress
- Business interference

---

FACTUAL ALLEGATIONS

1. Plaintiff purchased confirmed United Airlines flights on [insert dates], paying all airfare, hotels, meals, and related travel expenses with a personal credit card.

2. Plaintiff checked in on time, arrived at the gate in accordance with United's published boarding requirements (more than 30 minutes prior to departure for domestic flights), and possessed valid identification.

3. Plaintiff was involuntarily denied boarding despite complying with all airline requirements. No written reason for denial was initially provided. Plaintiff was offered only a travel credit, but not reimbursement.

4. Plaintiff submitted multiple reimbursement requests, providing receipts, case numbers, and credit card statements documenting thousands of dollars in expenses.

5. On or about [insert date], United Airlines responded to Plaintiff's request under Case ID 172781664138277 (FS6LQC), stating:

"I see that both of your flights arrived early at their destinations. Unfortunately, in this situation, you would not be eligible for reimbursement. Thank you for your understanding."

6. Despite prior assurances of reimbursement, United refused to issue payment. Plaintiff relied on these promises and incurred financial loss, credit card interest, credit damage, and disruption to planned business travel, including trips to Las Vegas.

7. Plaintiff alleges that United agents, as well as co-conspirators Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives, were present or involved in coordination intended to interfere with Plaintiff's travel and business activities. Plaintiff personally observed Miriam Adelson at the Wynn Las Vegas hotel.

---

COUNT I – Violation of DOT Denied Boarding Regulations (14 C.F.R. Part 250)

Defendant: United Airlines

Plaintiff had a confirmed reservation, checked in on time, and arrived at the gate with valid identification. Despite this, United denied boarding.

- United failed to provide cash or immediate check compensation as required for involuntary denied boarding due to oversales or operational reasons (per 14 C.F.R. Part 250).

- Plaintiff submitted reimbursement requests with receipts and case numbers, including Case ID 172781664138277 (FS6LQC).

- Plaintiff alleges that United acted in coordination with Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives to interfere with Plaintiff's travel and business activities.

Credit damage

- Business disruption

- Emotional distress

---

COUNT II – Breach of Contract / Bad Faith

Defendant: United Airlines

United's Contract of Carriage and prior assurances created binding obligations. Plaintiff fully performed all obligations.

United materially breached by:

- Denying boarding without justification;
- Failing to honor reimbursement promises;
- Acting in bad faith by offering only a travel credit;
- Allegedly coordinating actions with Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives.

Harm:

- Out-of-pocket expenses
- Credit card interest
- Damage to credit rating
- Loss of business opportunities

---

COUNT III – Fraud / Misrepresentation

Defendant: United Airlines

United made clear and definite promises to reimburse Plaintiff for expenses caused by denied boarding. Plaintiff reasonably relied on these promises.

United failed to perform, despite documented reliance, including Case ID FS6LQC, causing financial and credit harm.

Additional Allegations:

- Plaintiff alleges United agents coordinated with Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives to prevent reimbursement and interfere with Plaintiff's travel and business activities.

Harm:

- Financial loss
- Credit damage
- Emotional distress
- Business interference

---

COUNT IV – Tortious Interference with Prospective Economic Advantage

Defendant: United Airlines

Plaintiff had business plans requiring travel to Las Vegas, including opening new operations. United's denial of boarding disrupted these plans.

Plaintiff alleges that the presence and coordination of Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives contributed to interference with Plaintiff's economic opportunities.

Harm:

- Lost business opportunities
- Financial loss
- Emotional distress

---

COUNT V – Civil Conspiracy

Plaintiff alleges that United agents, Miriam Adelson, Aryeh Deri, and Chabad Las Vegas representatives acted in concert to:

- Deny Plaintiff boarding;
- Refuse reimbursement;
- Harass and intimidate Plaintiff;
- Interfere with Plaintiff's business operations.

Harm:

- Financial loss
- Credit damage
- Emotional distress
- Business interference

: Outrigger Ka'anapali Beach Resort (Maui), Outrigger Waikiki Beach Resort (Honolulu), Outrigger Hospitality Group, and their employees

COMPLAINT

I. PARTIES

1. Plaintiff Marshall Wexler is an individual residing outside Hawaii, visiting Hawaii on business in August–October 2024.

2. Defendants:

o Outrigger Ka'anapali Beach Resort (Maui) and its employees

o Outrigger Waikiki Beach Resort (Honolulu) and its employees

o Outrigger Hospitality Group, parent company managing both resorts.

---

III. FACTUAL ALLEGATIONS – INCIDENT 1 (Maui – Theft & Retaliation)

A. Plaintiff's Stay at Ka'anapali Beach Resort

5. Plaintiff stayed at Outrigger Ka'anapali Beach Resort, Maui from August 26–28, 2024.

6. Plaintiff requested a room upgrade due to initial room issues; Alvin Cabrera, a supervisor, reassigned him to a noisy and less private room.

7. Plaintiff requested a refund, and Defendants' staff treated him rudely and retaliated for this request.

---

B. Theft and Conversion

8. On August 27, 2024, while using the beach chair service, Plaintiff's wallet containing approximately $700 USD was stolen.

9. Plaintiff was distracted by an employee and did not leave his wallet unattended.

10. Security guard Sean inventoried the wallet after the theft but denied liability, obstructing proper reporting.

11. Plaintiff alleges the theft may have been assisted or concealed by Tracy, night manager, and other staff.

12. Plaintiff had an AirTag on his wallet, but it was intentionally disabled during the incident.

---

C. Invasion of Privacy

13. Plaintiff's room assignment placed him under observation; staff photographed him and monitored his activities without consent.

14. The intrusion caused humiliation, stress, and deprivation of privacy.

---

D. Intentional Infliction of Emotional Distress

15. The staff's theft, harassment, and retaliation were extreme and outrageous.

16. Plaintiff suffered severe emotional distress, anxiety, and humiliation.

---

E. Counts – Maui Incident

- Count I: Theft / Conversion – HRS §708-830 & common law
- Count II: Invasion of Privacy
- Count III: Intentional Infliction of Emotional Distress

---

## IV. FACTUAL ALLEGATIONS – INCIDENT 2 (Honolulu – Religious Discrimination)

### A. Plaintiff's Stay at Waikiki Beach Resort

17. Plaintiff stayed at Outrigger Waikiki Beach Resort, Honolulu in September–October 2024.

18. During this stay, Plaintiff experienced discrimination based on his Orthodox Jewish faith, including targeting for Sabbath observance, dietary restrictions, and religious practices.

19. Plaintiff was subjected to harassment, unwarranted scrutiny, and disparagement by resort employees aware of his Jewish observance.

---

### B. Retaliation and Emotional Harm

20. Plaintiff alleges Defendants intentionally disrupted his accommodations and subjected him to an environment hostile to his religious practices.

21. Defendants' conduct caused humiliation, stress, and emotional harm.

---

### C. Counts – Honolulu Incident

- Count I: Religious Discrimination (Hawaii civil rights protections / HRS Title 37)
- Count II: Invasion of Privacy (unauthorized observation, photos, or monitoring)
- Count III: Intentional Infliction of Emotional Distress

---

V. DAMAGES

22. Plaintiff suffered:

- Financial loss (wallet, money, and personal property)
- Emotional distress, humiliation, anxiety, and sleep deprivation
- Inability to fully enjoy accommodations and travel experience

23. Plaintiff seeks:

- Compensatory and punitive damages
- Pre- and post-judgment interest
- Costs and attorney’s fees

---

VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests:

1. Judgment against Defendants for compensatory and punitive damages for both incidents;

2. Injunctive relief prohibiting future harassment or discriminatory treatment;

3. Production of records, logs, and evidence relating to Plaintiff's stays and any theft investigation;

4. Any additional relief the Court deems just and proper.

________________________________________

**<u>New York law school</u>**

226. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

227. During the relevant period, Plaintiff attended **New York Law School** and later **Touro Law School**.

228. Plaintiff alleges that certain individuals associated with these institutions participated in conduct designed to interfere with Plaintiff's academic record, professional prospects, and legal career.

229. Upon information and belief, members of Plaintiff's family, including Ira Schwartz and associates including Uri Kaufman, attempted to influence individuals at these institutions in order to damage Plaintiff's academic standing.

230. Plaintiff alleges that these actions were undertaken in furtherance of the broader scheme described above, which sought to undermine Plaintiff's professional opportunities and ability to pursue legal claims.

---

**Allegations Concerning New York Law School**

232. At all relevant times, **Anthony Crowell** served as Dean of **New York Law School**.

233. Plaintiff alleges that certain actions taken by administrators and faculty at New York Law School adversely affected Plaintiff's academic performance and career opportunities.

234. Plaintiff alleges that Professor **Faith Stevelman**, who taught Plaintiff in a corporations course, assigned Plaintiff a grade that Plaintiff believes did not reflect the quality of his examination performance.

235. Plaintiff further alleges that the grading decision had the effect of lowering Plaintiff's grade point average and impairing Plaintiff's employment prospects.

236. Plaintiff alleges, upon information and belief, that individuals including **Adreama Ishé Mackey Ponte** and **Peter Jay Speroni** interacted with Plaintiff under circumstances that Plaintiff later came to believe were intended to gather information about Plaintiff's activities.

237. Plaintiff similarly alleges that an individual identified as Greg Sun maintained communications with Plaintiff that Plaintiff later believed were connected to efforts by Plaintiff's relatives to monitor Plaintiff.

238. Plaintiff alleges that these interactions were coordinated to undermine Plaintiff's academic and professional progress.

### Allegations Concerning Touro Law School

239. Plaintiff later attended **Touro Law School**.

240. Plaintiff alleges that certain faculty members and administrators engaged in conduct that Plaintiff believes was designed to discredit Plaintiff academically.

241. Plaintiff alleges that **Marjorie Silver** accused Plaintiff of academic misconduct related to a written assignment.

242. Plaintiff contends that the accusation was unfounded and caused reputational harm.

243. Plaintiff alleges that the accusation occurred in connection with Plaintiff's collaborative work with another student.

244. Plaintiff further alleges that Professor Eileen Kaufman engaged in conduct that Plaintiff believes was intended to monitor or track Plaintiff's movements.

245. Plaintiff believes that these actions were undertaken in coordination with individuals associated with Plaintiff's family.

---

### Additional Causes of Action

**Fraud**

246. Plaintiff repeats and realleges the preceding paragraphs.

247. Defendants made material misrepresentations and engaged in deceptive conduct designed to interfere with Plaintiff's academic record and professional opportunities.

248. Plaintiff relied upon representations made by the institutions and faculty members that academic evaluation and disciplinary processes would be fair and impartial.

249. These representations were false or misleading.

250. As a result, Plaintiff suffered damages including diminished academic standing and loss of career opportunities.

---

**Civil Conspiracy**

251. Plaintiff repeats and realleges the preceding paragraphs.

252. Defendants and certain third parties knowingly agreed to engage in conduct designed to damage Plaintiff's academic record and career prospects.

253. Overt acts in furtherance of this conspiracy included:

- adverse grading decisions,
- accusations of academic misconduct,
- monitoring of Plaintiff's activities, and
- dissemination of damaging information concerning Plaintiff.

254. As a result of these acts, Plaintiff suffered financial and professional harm.

---

**Tortious Interference with Prospective Economic Advantage**

255. Plaintiff repeats and realleges the preceding paragraphs.

256. Plaintiff had reasonable expectations of obtaining employment and professional opportunities following law school.

257. Defendants intentionally interfered with these opportunities by damaging Plaintiff's academic record and reputation.

258. This interference caused Plaintiff to lose employment opportunities and suffer economic harm.

**Additional Damages**

259. As a direct result of the conduct described above, Plaintiff suffered:

- loss of academic opportunities;
- damage to professional reputation;
- loss of employment opportunities;
- financial losses; and
- emotional distress.

260. Plaintiff seeks compensatory damages, punitive damages, and all other relief permitted by law.

**Defendants:** Outrigger Ka'anapali Beach Resort, Outrigger Hospitality Group, and their employees

1. Plaintiff **Marshall Wexler** is an individual residing outside Hawaii, currently without permanent housing, who visited Hawaii on business from August 26–28, 2024.
2. Defendants include **Outrigger Ka'anapali Beach Resort** located at 2525 Kaanapali Parkway, Lahaina, HI 96761, and **Outrigger Hospitality Group**, which operates the resort and maintains global management oversight.
3. Defendants' employees involved include:
   - Sean, a security guard
   - Beach chair staff member (described below)

- Alvin Cabrera, supervisor
- Tracy, night manager
- Other unknown employees who assisted or enabled the theft and harassment.

---

## II. JURISDICTION AND VENUE

4. Jurisdiction arises under **28 U.S.C. §1332**, based on diversity of citizenship (Plaintiff resides outside Hawaii; Defendants operate in Hawaii), and the amount in controversy exceeds $75,000.
5. Venue is proper in this district because the incident occurred at a Hawaii property operated by the Defendants.

---

## III. FACTUAL ALLEGATIONS

### A. Plaintiff's Stay and Interaction With Resort Staff

6. Plaintiff checked in at **Outrigger Ka'anapali Beach Resort** on August 26, 2024, staying through August 28, 2024.
7. Plaintiff requested a room upgrade due to issues with his initial room. **Alvin Cabrera**, a supervisor, reassigned him to another room, which was noisy, less private, and subject to ongoing disturbances (elevator noise, conversations, and photography by staff).
8. Plaintiff sought a refund and complained about staff behavior. Plaintiff alleges Defendants' employees retaliated against him for exercising these rights.

---

### B. Theft and Conversion

9. On or about August 27, 2024, while using the beach chairs, Plaintiff was distracted by an employee directing him to relocate.

10. Plaintiff alleges, upon information and belief, that the beach chair employee intentionally took Plaintiff's wallet, containing approximately $700 USD and other personal items.
11. The employee is described as a tall, tan male, 28–38 years old, with a short haircut, slight stubble, a tribal tattoo on his leg, wearing a white polo shirt, black shorts, and black sunglasses.
12. Plaintiff had an AirTag on his wallet, but it was disabled during the incident.
13. Security guard **Sean** inventoried the wallet after the theft but denied liability, obstructing proper reporting.
14. Plaintiff believes the theft may have been assisted or concealed by other employees, including **Tracy** (night manager) and housekeeping staff.

---

**C. Invasion of Privacy**

15. Following the reassignment of Plaintiff's room, Defendants allowed staff to observe, photograph, and otherwise intrude upon Plaintiff's privacy.
16. This conduct included documenting Plaintiff without consent and creating an environment in which Plaintiff could not reasonably enjoy privacy or security.

---

**D. Intentional Infliction of Emotional Distress**

17. Plaintiff was subjected to ongoing harassment, retaliatory treatment, and invasive conduct by employees.
18. Plaintiff experienced severe emotional distress, including anxiety, humiliation, and sleep deprivation, resulting directly from Defendants' actions and omissions.
19. Defendants' conduct was outrageous, intentional, and done with reckless disregard for Plaintiff's emotional well-being.

---

**E. Obstruction of Justice / Denial of Evidence**

20. Plaintiff sought to report the theft formally.

21. Resort staff refused to provide a police report or cooperate with the investigation, claiming the information was "confidential."

22. Plaintiff alleges, upon information and belief, that Defendants intentionally obstructed investigation to protect the thief and evade liability.

---

## IV. CLAIMS FOR RELIEF

### Count I – Theft / Conversion (Hawaii Penal Code §708-830; common law conversion)

23. Plaintiff's personal property (wallet, money, and contents) was taken without consent by Defendants' employees.

24. Defendants are liable for conversion and theft for taking, withholding, or facilitating the removal of Plaintiff's property.

---

### Count II – Invasion of Privacy

25. Defendants intruded upon Plaintiff's seclusion by allowing staff to observe, photograph, and monitor Plaintiff in his room without consent.

26. Plaintiff suffered humiliation, emotional distress, and anxiety as a direct result.

---

### Count III – Intentional Infliction of Emotional Distress

27. Defendants' actions were extreme and outrageous, including theft, harassment, retaliation, and invasion of privacy.

28. Plaintiff suffered severe emotional distress, sleep deprivation, and humiliation.

29. Defendants' conduct was intentional, reckless, and done with malice or disregard for Plaintiff's well-being.

---

## V. DAMAGES

30. Plaintiff seeks:
  a. Compensatory damages for theft of $700 USD and other personal property
  b. Compensatory damages for emotional distress and invasion of privacy
  c. Punitive damages for outrageous, intentional, and reckless conduct
  d. Pre- and post-judgment interest, costs, and attorney's fees

---

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Enter judgment against Defendants for **compensatory and punitive damages**;
2. Order Defendants to **produce all records, inventory logs, and evidence** related to Plaintiff's stay;
3. Award **pre- and post-judgment interest**, costs, and attorneys' fees;
4. Grant any other relief the Court deems just and proper.

Outrigger Ka'anapali Beach Resort (Maui), Outrigger Waikiki Beach Resort (Honolulu), Outrigger Hospitality Group, and their employees

---

## COMPLAINT

## I. PARTIES

1. Plaintiff **Marshall Wexler** is an individual residing outside Hawaii, visiting Hawaii on business in August–October 2024.
2. Defendants:
    - **Outrigger Ka'anapali Beach Resort** (Maui) and its employees
    - **Outrigger Waikiki Beach Resort** (Honolulu) and its employees
    - **Outrigger Hospitality Group**, parent company managing both resorts.

---

## II. JURISDICTION AND VENUE

3. Jurisdiction arises under **28 U.S.C. §1332** (diversity of citizenship). Plaintiff resides outside Hawaii; Defendants operate in Hawaii, and the amount in controversy exceeds $75,000.
4. Venue is proper in this district because both incidents occurred within Hawaii.

---

## III. FACTUAL ALLEGATIONS – INCIDENT 1 (Maui – Theft & Retaliation)

### A. Plaintiff's Stay at Ka'anapali Beach Resort

5. Plaintiff stayed at **Outrigger Ka'anapali Beach Resort, Maui** from **August 26–28, 2024**.
6. Plaintiff requested a room upgrade due to initial room issues; **Alvin Cabrera**, a supervisor, reassigned him to a noisy and less private room.
7. Plaintiff requested a refund, and Defendants' staff treated him rudely and retaliated for this request.

---

### B. Theft and Conversion

8. On August 27, 2024, while using the beach chair service, Plaintiff's wallet containing approximately **$700 USD** was stolen.
9. Plaintiff was distracted by an employee and did not leave his wallet unattended.
10. Security guard **Sean** inventoried the wallet after the theft but denied liability, obstructing proper reporting.
11. Plaintiff alleges the theft may have been assisted or concealed by **Tracy**, night manager, and other staff.
12. Plaintiff had an AirTag on his wallet, but it was intentionally disabled during the incident.

---

### C. Invasion of Privacy

13. Plaintiff's room assignment placed him under observation; staff photographed him and monitored his activities without consent.
14. The intrusion caused humiliation, stress, and deprivation of privacy.

---

### D. Intentional Infliction of Emotional Distress

15. The staff's theft, harassment, and retaliation were extreme and outrageous.
16. Plaintiff suffered severe emotional distress, anxiety, and humiliation.

---

### E. Counts – Maui Incident

- **Count I: Theft / Conversion** – HRS §708-830 & common law
- **Count II: Invasion of Privacy**
- **Count III: Intentional Infliction of Emotional Distress**

---

## IV. FACTUAL ALLEGATIONS – INCIDENT 2 (Honolulu – Religious Discrimination)

### A. Plaintiff's Stay at Waikiki Beach Resort

17. Plaintiff stayed at **Outrigger Waikiki Beach Resort, Honolulu** in September–October 2024.
18. During this stay, Plaintiff experienced discrimination based on his **Orthodox Jewish faith**, including targeting for Sabbath observance, dietary restrictions, and religious practices.
19. Plaintiff was subjected to harassment, unwarranted scrutiny, and disparagement by resort employees aware of his Jewish observance.

---

### B. Retaliation and Emotional Harm

20. Plaintiff alleges Defendants intentionally disrupted his accommodations and subjected him to an environment hostile to his religious practices.

21. Defendants' conduct caused humiliation, stress, and emotional harm.

---

### C. Counts – Honolulu Incident

- **Count I: Religious Discrimination** (Hawaii civil rights protections / HRS Title 37)
- **Count II: Invasion of Privacy** (unauthorized observation, photos, or monitoring)
- **Count III: Intentional Infliction of Emotional Distress**

---

## V. DAMAGES

22. Plaintiff suffered:

- Financial loss (wallet, money, and personal property)
- Emotional distress, humiliation, anxiety, and sleep deprivation
- Inability to fully enjoy accommodations and travel experience

23. Plaintiff seeks:

- Compensatory and punitive damages
- Pre- and post-judgment interest
- Costs and attorney's fees

---

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests:

1. Judgment against Defendants for **compensatory and punitive damages** for both incidents;
2. Injunctive relief prohibiting future harassment or discriminatory treatment;

3. Production of records, logs, and evidence relating to Plaintiff's stays and any theft investigation;
4. Any additional relief the Court deems just and proper.

**COMPLAINT**

Plaintiff Marshall Wexler brings this action against Outrigger Ka'anapali Beach Resort, Outrigger Waikiki Beach Resort, Outrigger East, Outrigger Hospitality Group, their employees, and associated actors, including Edward Neiger of ASK LLP and Chabad representatives, for theft, invasion of privacy, religious discrimination, harassment, bribery, conspiracy, and civil rights violations occurring in Hawaii and Las Vegas. Plaintiff is an Orthodox Jewish individual who was traveling for business and personal matters in 2024, and during his stays at the aforementioned properties and locations, he was subjected to coordinated misconduct, theft, harassment, and discrimination facilitated and concealed by the defendants.

While staying at Outrigger Ka'anapali Beach Resort in Maui from August 26 to August 28, 2024, Plaintiff requested a room change due to the condition of his initial accommodations. Following this request, hotel staff, including a security officer named Sean and supervisor Alvin Cabrera, stole approximately $700 from Plaintiff's wallet. During the incident, a beach chair employee, described as a tall tan male with a short haircut, slight stubble, a tribal tattoo on one leg, wearing a white polo shirt, black shorts, and black sunglasses, distracted Plaintiff to facilitate the theft. Security personnel subsequently inventoried Plaintiff's wallet but denied liability and refused to assist in recovering the stolen property. Plaintiff had an AirTag in the wallet, but it was disabled, and he received no notifications, suggesting intentional tampering. Plaintiff was sober and aware of the circumstances, and no other individuals had access to his property, indicating that hotel staff or individuals acting in coordination with them committed the theft. The staff's conduct was intentional, retaliatory, and designed to humiliate Plaintiff while obstructing any investigation, which constitutes theft, conversion, and invasion of privacy under Hawaii law, including Hawaii Revised Statutes §708-830.

Plaintiff's subsequent stay at Outrigger Waikiki Beach Resort in Honolulu in September–October 2024 further subjected him to religious discrimination, harassment, and emotional distress. Defendants coerced Plaintiff to desecrate the

Sabbath and Yom Tov by pressuring him to perform work, use pens, and engage in business activities contrary to his religious observances. Staff members surveilled Plaintiff, photographed him without consent, and repeatedly made false statements about his religious practices. A hotel receptionist falsely claimed not to know what a Jewish person is, creating a hostile and humiliating environment. Plaintiff was subjected to intrusive monitoring, surveillance, and coercion designed to interfere with his religious practice, constituting intentional infliction of emotional distress, negligent infliction of emotional distress, harassment, and violations of the Hawaii Civil Rights Law, the First Amendment, and federal civil rights statutes.

In Las Vegas, Plaintiff was subjected to additional harassment, intimidation, and humiliation by Miriam Adelson, Aryeh Deri, United Airlines personnel, Floyd Mayweather associates, and related actors. Defendants orchestrated a coordinated campaign to interfere with Plaintiff's travel, accommodations, and personal well-being, including racially and religiously motivated verbal harassment. Defendants' conduct included denying Plaintiff access to accommodations and services that were available to other guests, orchestrating humiliating interactions, and leveraging their influence to intimidate Plaintiff due to his prior whistleblower actions in New York regarding rent stabilization overcharges. This conduct constitutes intentional infliction of emotional distress, negligent infliction of emotional distress, harassment, and civil rights violations under Nevada Revised Statutes §§613.330–340.

Plaintiff further alleges that Edward Neiger of ASK LLP bribed Chabad representatives $10,000 to orchestrate discriminatory acts, harassment, and interference with Plaintiff's lodging, accommodations, and personal affairs. This bribery facilitated civil rights violations, invasion of privacy, and emotional harm, creating a pattern of conspiracy and aiding and abetting across multiple locations. Local police officers, including those in Maui and Honolulu, were complicit or negligent in responding to Plaintiff's complaints, further enabling the defendants' misconduct. Defendants' acts were intentional, extreme, and outrageous, causing Plaintiff severe emotional distress, humiliation, anxiety, and loss of enjoyment of accommodations, and interfering with his religious observances.

Throughout these incidents, Plaintiff was deliberately placed in circumstances designed to maximize emotional harm and violate his rights. In Maui, hotel employees deliberately assigned Plaintiff to a noisy room near elevators and other

guests, ensuring sleepless nights and further humiliating him. Defendants retaliated against Plaintiff for seeking refunds, questioning staff misconduct, and asserting his rights, and they engaged in ongoing surveillance, photographs, and coercion designed to intimidate him. In Honolulu, hotel staff explicitly attempted to interfere with Plaintiff's observance of the Sabbath and Yom Tov, forcing him to choose between religious observance and compliance with staff demands, creating a direct violation of his civil and constitutional rights.

The acts described above constitute theft, conversion, invasion of privacy, religious discrimination, harassment, civil conspiracy, intentional infliction of emotional distress, negligent infliction of emotional distress, violations of Hawaii and Nevada civil rights laws, and violations of the First Amendment. Defendants, including Outrigger Hospitality Group, are vicariously liable for the acts of their employees under the doctrine of respondeat superior. Defendants acted with knowledge, intent, and reckless disregard for Plaintiff's rights, creating a hostile environment, interfering with property, and obstructing Plaintiff's lawful attempts to report theft and discrimination.

Plaintiff seeks compensatory and punitive damages for the theft of property, emotional distress, humiliation, interference with religious observances, and loss of enjoyment of accommodations. Plaintiff seeks injunctive relief to prevent future harassment, discrimination, and retaliation, and seeks production of all records, communications, and evidence relating to the theft, surveillance, and discriminatory acts. Plaintiff also seeks attorney's fees, costs, and pre- and post-judgment interest as permitted by law.

8. Plaintiff stayed at Outrigger Ka'anapali Beach Resort in Maui from August 26 to August 28, 2024.
9. During his stay, hotel staff, including security and beach services personnel, engaged in conduct intended to harass, humiliate, and intimidate Plaintiff.
10. Defendants monitored Plaintiff's movements without consent, photographed him in hotel areas and his room, and interfered with Plaintiff's personal property.
11. Plaintiff's wallet and cash were stolen, and hotel staff obstructed recovery by denying access to reports and inventory information.

12. Defendants coerced Plaintiff to act in ways inconsistent with his Orthodox Jewish religious observance, including work on the Sabbath and use of electronics.

13. Reception and management staff lied about understanding Jewish practices and intentionally failed to accommodate Plaintiff's religious observances on the Sabbath and Yom Tov.

14. Plaintiff experienced emotional distress, fear, and humiliation due to the hostile and unsafe environment created by Defendants.

15. Plaintiff stayed at Outrigger Waikiki Beach Resort in Honolulu, Hawaii, where he was subjected to similar harassment, intimidation, and interference with religious observance.

16. Defendants' security and management staff continued to monitor Plaintiff without consent, restrict access to services, and refuse accommodation for religious needs.

17. Defendants' conduct was extreme, intentional, and outrageous, creating severe emotional and psychological harm to Plaintiff.

**FACTUAL BACKGROUND – LAS VEGAS INCIDENTS**

18. Plaintiff stayed at a hotel and used affiliated health club facilities in Las Vegas, Nevada.

19. During this stay, hotel and health club staff, including management and security, engaged in harassment, intimidation, and discriminatory treatment targeting Plaintiff based on religion and personal identity.

20. Plaintiff was denied equal access to services provided to other patrons, subjected to monitoring, and placed in a hostile environment designed to humiliate and distress him.

21. Defendants' conduct included verbal harassment, coercion, and repeated interference with Plaintiff's privacy, property, and ability to use hotel and health club services safely.

22. Plaintiff suffered emotional distress, fear, and humiliation as a direct and proximate result of Defendants' actions.

**COUNT I – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (HAWAII AND NEVADA)**

23. Plaintiff realleges and incorporates by reference all preceding paragraphs.

24. Defendants' conduct in Hawaii and Nevada was intentional and extreme, including harassment, intimidation, theft, and interference with religious practices.

25. Defendants' acts were intended to cause, and did cause, severe emotional distress, humiliation, and fear.

26. Plaintiff suffered actual and substantial emotional harm as a direct and proximate result.

**COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (HAWAII AND NEVADA)**

27. Plaintiff realleges and incorporates by reference all preceding paragraphs.

28. Defendants owed a duty to provide safe, secure, and respectful accommodations and health club facilities.

29. Defendants breached this duty by failing to prevent harassment, intimidation, theft, and interference with religious observance.

30. Plaintiff suffered foreseeable emotional distress, including fear, anxiety, and humiliation, as a result of Defendants' negligence.

**COUNT III – RELIGIOUS DISCRIMINATION / CIVIL RIGHTS VIOLATIONS (HAWAII AND NEVADA)**

31. Plaintiff realleges and incorporates by reference all preceding paragraphs.

32. Defendants' conduct violated Plaintiff's rights under Hawaii Civil Rights Law (HRS §368-1 et seq.) and Nevada law (NRS §613.330–340).

33. Defendants discriminated against Plaintiff based on his Orthodox Jewish faith, including coercing him to desecrate the Sabbath and Yom Tov, denying accommodations, and creating a hostile environment.

34. Plaintiff suffered harm including emotional distress, humiliation, and interference with his ability to practice his religion.

**COUNT IV – INVASION OF PRIVACY / SURVEILLANCE (HAWAII AND NEVADA)**

35. Plaintiff realleges and incorporates by reference all preceding paragraphs.

36. Defendants intentionally intruded upon Plaintiff's private affairs by monitoring him, photographing him without consent, and interfering with his privacy in hotel rooms and public areas.

37. Defendants' conduct was highly offensive to a reasonable person and caused Plaintiff emotional distress and fear.

**COUNT V – THEFT / CONVERSION (HAWAII AND NEVADA)**

38. Plaintiff realleges and incorporates by reference all preceding paragraphs.

39. Defendants unlawfully took Plaintiff's personal property, including cash and items from his wallet, and denied recovery.

40. Plaintiff suffered actual damages, including the value of stolen property and consequential emotional harm.

**COUNT VI – HARRASSMENT / CIVIL THREATS (HAWAII AND NEVADA)**

41. Plaintiff realleges and incorporates by reference all preceding paragraphs.

42. Defendants engaged in repeated, intentional, and threatening conduct intended to intimidate, coerce, and humiliate Plaintiff.

43. Such conduct constitutes harassment under Hawaii Penal Code §§711-1106, 711-1109 and Nevada statutes NRS §§200.571, 200.575.

**COUNT VII – RESPONDEAT SUPERIOR / VICARIOUS LIABILITY (HAWAII AND NEVADA)**

44. Plaintiff realleges and incorporates by reference all preceding paragraphs.

45. Defendants' corporate entities are vicariously liable for the acts of employees, agents, and contractors committed within the scope of their employment or apparent authority.

**PRAYER FOR RELIEF**

46. Plaintiff requests compensatory damages for emotional distress, humiliation, loss of enjoyment of accommodations, and interference with religious observance.

47. Plaintiff requests punitive damages for intentional, extreme, and outrageous conduct.

48. Plaintiff requests injunctive relief requiring Defendants to prevent future harassment, discrimination, and invasion of privacy, and to ensure proper reporting and transparency of complaints.

49. Plaintiff requests attorney fees, costs, and pre- and post-judgment interest as allowed under federal and state law.

**Outrigger Ka'anapali Beach Resort, Outrigger Waikiki Beach Resort, Outrigger East, Outrigger Hospitality Group, Las Vegas hotel operators and health club staff, Edward Neiger, Chabad representatives, and their respective employees and agents, Defendants.**

**COMPLAINT – DIVERSITY JURISDICTION**

**PARTIES AND JURISDICTION**

1. Plaintiff Marshall Wexler is an individual and a resident of [insert state].

2. Defendant Outrigger Ka'anapali Beach Resort is a Hawaii corporation with its principal place of business in Maui, Hawaii.

3. Defendant Outrigger Waikiki Beach Resort is a Hawaii corporation with its principal place of business in Honolulu, Hawaii.

4. Defendant Outrigger East and Outrigger Hospitality Group are corporations incorporated in Hawaii with principal offices in Honolulu, Hawaii.

5. Defendants Las Vegas hotel operators and health club staff are corporations and individuals operating in Nevada, including hotels, gyms, and recreational facilities.

6. Defendant Edward Neiger is an attorney with ASK LLP and orchestrated bribery of Chabad representatives to facilitate discrimination, harassment, and obstruction of Plaintiff's rights in Hawaii and Nevada.

7. Chabad representatives accepted bribes from Edward Neiger to coordinate and participate in harassment, monitoring, and discriminatory acts against Plaintiff.
8. The matter in controversy exceeds $75,000, exclusive of interest and costs, and this Court has diversity jurisdiction under 28 U.S.C. §1332.
9. Venue is proper in this district because the incidents occurred within Hawaii and Nevada, and Defendants conduct business within these jurisdictions.

---

**FACTUAL BACKGROUND – HAWAII INCIDENTS**

10. Plaintiff stayed at Outrigger Ka'anapali Beach Resort in Maui from August 26 to August 28, 2024.
11. During his stay, hotel staff, including security and beach services personnel, engaged in conduct intended to harass, humiliate, and intimidate Plaintiff, including theft of his wallet and personal items.
12. Hotel staff inventoried Plaintiff's wallet without consent, refused to return property, and denied access to records or investigative information.
13. Defendants coerced Plaintiff to act in ways inconsistent with his Orthodox Jewish religious observance, including work on the Sabbath and use of electronics.
14. Reception and management staff lied about Jewish practices and intentionally failed to accommodate Plaintiff's religious observances on the Sabbath and Yom Tov.
15. Plaintiff experienced emotional distress, fear, and humiliation due to the hostile and unsafe environment created by Defendants.
16. Plaintiff stayed at Outrigger Waikiki Beach Resort in Honolulu, Hawaii, where similar harassment, intimidation, and interference with religious observance occurred.
17. Security and management staff continued to monitor Plaintiff without consent, restrict access to services, and refuse accommodation for religious needs.

---

**FACTUAL BACKGROUND – LAS VEGAS INCIDENTS**

18. Plaintiff stayed at hotels and used affiliated health club facilities in Las Vegas, Nevada.

19. Hotel and health club staff, including management and security, engaged in harassment, intimidation, and discriminatory treatment targeting Plaintiff based on religion and personal identity.

20. Plaintiff was denied equal access to services provided to other patrons, subjected to monitoring, and placed in a hostile environment designed to humiliate and distress him.

21. Defendants' conduct included verbal harassment, coercion, and repeated interference with Plaintiff's privacy, property, and ability to use hotel and health club services safely.

22. Plaintiff suffered emotional distress, fear, and humiliation as a direct and proximate result of Defendants' actions.

---

**FACTUAL BACKGROUND – BRIBERY AND CONSPIRACY**

23. Edward Neiger, of ASK LLP, intentionally provided $10,000 in funds to Chabad representatives to orchestrate discriminatory, harassing, and coercive actions against Plaintiff in Hawaii and Nevada.

24. Chabad representatives coordinated with hotel and health club staff to monitor Plaintiff, interfere with religious observances, and create a hostile environment.

25. The bribery and coordination were intended to retaliate against Plaintiff and prevent him from enjoying accommodations, engaging in lawful business, or exercising religious freedoms.

26. Plaintiff suffered emotional distress, humiliation, and interference with religious practice as a direct and proximate result of these coordinated acts.

27. Defendants, including Edward Neiger and Chabad representatives, acted in concert with hotel and health club employees, resulting in a civil conspiracy to deprive Plaintiff of rights under federal and state law.

---

**COUNT I – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (HAWAII AND NEVADA)**

28. Plaintiff realleges and incorporates by reference all preceding paragraphs.

29. Defendants' conduct, including harassment, theft, monitoring, and coercion regarding Sabbath and Yom Tov, was intentional, extreme, and outrageous.

30. Defendants acted with the purpose of causing emotional harm and humiliation.

31. Plaintiff suffered severe emotional distress, fear, anxiety, and humiliation as a direct and proximate result.

**COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (HAWAII AND NEVADA)**

32. Plaintiff realleges and incorporates by reference all preceding paragraphs.

33. Defendants owed a duty to provide safe, secure, and respectful accommodations and health club facilities.

34. Defendants breached this duty by failing to prevent harassment, intimidation, theft, and interference with religious observance.

35. Plaintiff suffered foreseeable emotional distress, including fear, anxiety, and humiliation, as a result of Defendants' negligence.

**COUNT III – RELIGIOUS DISCRIMINATION / CIVIL RIGHTS VIOLATIONS (HAWAII AND NEVADA)**

36. Plaintiff realleges and incorporates by reference all preceding paragraphs.

37. Defendants' conduct violated Plaintiff's rights under Hawaii Civil Rights Law (HRS §368-1 et seq.), Nevada law (NRS §613.330–340), and federal civil rights statutes.

38. Plaintiff was subjected to religious discrimination, including coercion to desecrate the Sabbath and Yom Tov, denial of accommodations, and a hostile environment.

39. Plaintiff suffered harm including emotional distress, humiliation, and interference with his ability to practice religion.

**COUNT IV – INVASION OF PRIVACY / SURVEILLANCE (HAWAII AND NEVADA)**

40. Plaintiff realleges and incorporates by reference all preceding paragraphs.

41. Defendants intentionally intruded upon Plaintiff's private affairs through unauthorized monitoring and photography in hotel rooms and public areas.

42. Defendants' acts were highly offensive and caused Plaintiff emotional distress, fear, and humiliation.

**COUNT V – THEFT / CONVERSION (HAWAII AND NEVADA)**

43. Plaintiff realleges and incorporates by reference all preceding paragraphs.

44. Defendants unlawfully took Plaintiff's property, including cash and items from his wallet, and denied recovery.

45. Plaintiff suffered actual damages, including the value of stolen property and consequential emotional harm.

**COUNT VI – HARASSMENT / CIVIL THREATS (HAWAII AND NEVADA)**

46. Plaintiff realleges and incorporates by reference all preceding paragraphs.

47. Defendants engaged in repeated, intentional, and threatening conduct intended to intimidate, coerce, and humiliate Plaintiff.

**COUNT VII – CIVIL CONSPIRACY / AIDING & ABETTING (HAWAII AND NEVADA)**

48. Plaintiff realleges and incorporates by reference all preceding paragraphs.

49. Edward Neiger, Chabad representatives, and hotel staff acted in concert to deprive Plaintiff of property, rights, and religious freedoms.

50. These coordinated acts constitute a civil conspiracy to interfere with Plaintiff's rights and violate federal civil rights law, including 42 U.S.C. §§1985 and 1986.

51. Defendants had the power to prevent the conspiracy but failed to do so, enabling the continued harassment, theft, and religious discrimination.

**COUNT VIII – RESPONDEAT SUPERIOR / VICARIOUS LIABILITY (HAWAII AND NEVADA)**

52. Plaintiff realleges and incorporates by reference all preceding paragraphs.

53. Corporate and organizational defendants are vicariously liable for acts of their employees, agents, and contractors committed within the scope of employment or apparent authority.

**PRAYER FOR RELIEF**

54. Plaintiff requests compensatory damages for emotional distress, humiliation, loss of property, and interference with religious observances.

55. Plaintiff requests punitive damages for intentional, extreme, and outrageous conduct.

56. Plaintiff requests injunctive relief requiring Defendants to prevent future harassment, discrimination, and invasion of privacy, and to ensure proper reporting and transparency of complaints.

57. Plaintiff requests attorney fees, costs, and pre- and post-judgment interest as allowed under federal and state law.

**EXTRA SPACE STORAGE HARASSMENT AT CESAR CHAVEZ PLACE**

The second incident occurred at Extra Space Storage, located on Cesar Chavez Boulevard in San Francisco, California, operated under the name Extra Space, in August 2025. Plaintiff was overcharged repeatedly and, when attempting to

retrieve his belongings, was subjected to false imprisonment, intimidation, and threats of having his property auctioned despite the lack of legal grounds by Oliver and Antoine. On one occasion, he was physically locked inside the facility on a Saturday, creating a serious safety risk. Excessive and unexplained fees mirrored those imposed in New Rochelle, suggesting a coordinated pattern of predatory, unlawful, and coercive conduct.

These incidents have caused Plaintiff severe financial loss, emotional distress, and a reasonable fear of retaliation by the SK Syndicate. The pattern of intimidation, harassment, and coercion across multiple facilities and locations demonstrates a concerted effort to disrupt Plaintiff's personal and professional stability, prevent access to his property, and inflict economic and emotional harm. Plaintiff reasonably fears further harassment or retaliatory actions if he continues to reside, conduct business, or store property in New York or San Francisco.

Plaintiff,

v.

**DRIVE UP STORAGE**,
54 Nardozzi Place
New Rochelle, New York 10801,

and

**EXTRA SPACE STORAGE INC.**,
Cesar Chavez Boulevard
San Francisco, California,

Defendants.

Civil Action No.: _______

---

**COUNT I**

**Breach of Contract**

(Against Drive Up Storage – New York)

1. Plaintiff entered into a written storage rental agreement with Defendant Drive Up Storage in or about January 2024 in New Rochelle, New York.
2. Under the agreement, Defendant was obligated to provide a secure, sanitary, and reasonably safe storage facility for Plaintiff's personal property.
3. While Plaintiff's belongings were stored at the facility located at 54 Nardozzi Place, the unit became contaminated with bed bugs and other vermin, rendering the premises unsafe and unfit for storage.
4. Plaintiff notified Defendant of the infestation and unsafe conditions.
5. Despite notice, Defendant failed to remediate the infestation in a timely or adequate manner.
6. Defendant further refused to permit Plaintiff to cancel the storage agreement and continued charging monthly storage fees.
7. As a direct and proximate result of Defendant's breach, Plaintiff suffered damage to clothing, books, and personal property, and sustained substantial financial loss.

WHEREFORE, Plaintiff demands compensatory damages, costs, interest, and such other relief as the Court deems just.

---

**COUNT II**

**Violation of New York General Business Law § 349**

(Against Drive Up Storage)

1. Plaintiff repeats and realleges all preceding paragraphs.
2. New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of business.
3. Defendant engaged in consumer-oriented conduct by renting storage units to members of the public.
4. Defendant's failure to disclose unsafe infestation conditions, combined with the refusal to allow contract termination while continuing to impose charges, constituted materially deceptive acts.
5. Such conduct misled Plaintiff in a material way and caused actual damages.
6. Plaintiff is entitled to actual damages, statutory damages (not less than $50), treble damages for willful conduct, and attorneys' fees pursuant to N.Y. Gen. Bus. Law § 349(h).

---

**COUNT III**

**Breach of Contract**

(Against Extra Space Storage Inc. – California)

1. Plaintiff entered into a storage rental agreement with Defendant Extra Space Storage Inc. in or about August 2025 at its facility located on Cesar Chavez Boulevard in San Francisco, California.
2. Defendant agreed to provide secure access to Plaintiff's stored belongings upon payment of agreed rental charges.
3. Defendant imposed excessive and unexplained fees beyond the agreed rental terms.
4. When Plaintiff attempted to retrieve his property, Defendant's employees identified as Oliver and Antoine threatened auction of Plaintiff's belongings despite lack of lawful grounds under California lien sale procedures.

5. Defendant materially breached the agreement by interfering with Plaintiff's access and imposing unauthorized charges.
6. Plaintiff suffered financial loss as a direct result.

---

**COUNT IV**

**Violation of California Unfair Competition Law**

(California Business & Professions Code § 17200 et seq.)
(Against Extra Space Storage Inc.)

1. Plaintiff repeats and realleges all preceding paragraphs.
2. California Business & Professions Code § 17200 prohibits unlawful, unfair, and fraudulent business acts or practices.
3. Defendant engaged in unfair and unlawful practices by:

a. Imposing excessive and unexplained fees;
b. Threatening lien sale without lawful basis under California Civil Code §§ 21700–21716 (Self-Service Storage Facility Act);
c. Using coercive tactics to restrict access to stored property.

4. Defendant's conduct was likely to deceive and harm consumers and was unlawful and unfair within the meaning of § 17200.
5. Plaintiff is entitled to restitution, injunctive relief, and all other remedies permitted by law.

---

**COUNT V**

**False Imprisonment**

(Against Extra Space Storage Inc.)

1. Plaintiff repeats and realleges all preceding paragraphs.
2. In or about August 2025, Plaintiff was physically locked inside Defendant's storage facility on a Saturday.

3. Defendant's employees intentionally confined Plaintiff within the premises without lawful privilege and without Plaintiff's consent.
4. Plaintiff was aware of and harmed by the confinement.
5. Such conduct constitutes false imprisonment under California law.
6. As a direct result, Plaintiff suffered emotional distress and fear for his personal safety.

---

**COUNT VI**

**Conversion**

(Against Both Defendants)

1. Plaintiff repeats and realleges all preceding paragraphs.
2. Plaintiff owned and had the immediate right to possess the personal property stored at both facilities.
3. Defendants intentionally interfered with Plaintiff's possessory rights by:

a. Restricting access;
b. Imposing unlawful conditions for retrieval;
c. Threatening wrongful auction of property.

4. Such conduct constitutes conversion under applicable state law.
5. Plaintiff suffered financial damages as a result.

---

**COUNT VII**

**Intentional Infliction of Emotional Distress**

(Against Both Defendants)

1. Plaintiff repeats and realleges all preceding paragraphs.
2. Defendants engaged in extreme and outrageous conduct including:

a. Maintaining unsafe, vermin-infested conditions;
b. Refusing contract termination while imposing ongoing charges;

c. Locking Plaintiff inside a facility;
d. Threatening unlawful auction of personal belongings.

3. Such conduct was intentional or carried out with reckless disregard for Plaintiff's rights and safety.
4. Plaintiff suffered severe emotional distress, financial harm, and fear of continued retaliation.

## SUPPLEMENTAL FACTUAL ALLEGATIONS

1. Upon information and belief, Defendant Drive Up Storage is owned, controlled, or managed by Defendant Ira Schwartz.
2. Upon information and belief, Defendant Extra Space Storage Inc., at the San Francisco Cesar Chavez Boulevard location, operates in affiliation, partnership, joint venture, or coordinated business relationship with Ira Schwartz, Uri Kaufman, and members of their immediate families.
3. Plaintiff alleges that the above individuals and entities acted in concert and pursuant to a coordinated business scheme to impose excessive fees, restrict access to stored property, and use coercive tactics to extract payments from Plaintiff.
4. The conduct at the New Rochelle and San Francisco facilities followed a similar pattern, including excessive charges, obstruction of contract termination, and threats of property auction without lawful basis.
5. Plaintiff alleges that these acts were not isolated incidents but part of coordinated decision-making among Defendants.

---

## ADDITIONAL COUNT

## COUNT VIII

### Civil Conspiracy

(Against All Defendants)

1. Plaintiff repeats and realleges all preceding paragraphs.

2. Under New York and California law, a civil conspiracy consists of an agreement between two or more persons to commit an unlawful act or a lawful act by unlawful means, resulting in damages.
3. Defendants Ira Schwartz and Uri Kaufman, together with Drive Up Storage and Extra Space Storage Inc., reached an agreement—express or tacit—to engage in coordinated business practices designed to:

a. Impose excessive and unexplained storage fees;
b. Prevent or obstruct customers from terminating storage agreements;
c. Threaten lien sales or auctions without strict compliance with statutory requirements;
d. Use intimidation and coercion to extract payment.

4. Overt acts in furtherance of this agreement included:

a. Maintaining unsafe and vermin-infested storage conditions in New Rochelle while continuing to demand payment;
b. Refusing contract cancellation despite hazardous conditions;
c. Locking Plaintiff inside the San Francisco facility;
d. Threatening unlawful auction of Plaintiff's belongings;
e. Imposing excessive and unexplained fees in both jurisdictions.

5. The similarity of methods, timing, fee structures, and coercive tactics across state lines evidences coordinated conduct rather than independent action.
6. As a direct and proximate result of the conspiracy, Plaintiff suffered financial loss, property damage, emotional distress, and fear of continued retaliation.

**PRAYER FOR RELIEF (Supplemented)**

Plaintiff further requests:

1. Joint and several liability against all Defendants;
2. Compensatory damages;
3. Punitive damages;
4. Treble damages where permitted by statute;

5. Attorneys' fees and costs;
6. Injunctive relief preventing coordinated unlawful practices;
7. Any additional relief deemed just and proper.

**DRIVE UP STORAGE**,
54 Nardozzi Place
New Rochelle, New York 10801,

**EXTRA SPACE STORAGE INC.**,
Cesar Chavez Boulevard
San Francisco, California,

**IRA SCHWARTZ**,
an individual,

**URI KAUFMAN**,
an individual,

DOES 1–10,

Defendants.

3. Defendant Drive Up Storage operates a storage facility located at 54 Nardozzi Place, New Rochelle, New York.
4. Defendant Extra Space Storage Inc. operates a storage facility located on Cesar Chavez Boulevard in San Francisco, California.
5. Upon information and belief, Defendant Ira Schwartz owns, controls, or exercises managerial authority over Drive Up Storage.
6. Upon information and belief, Defendant Uri Kaufman is affiliated through ownership, partnership, management, or coordinated business operations with Drive Up Storage and/or the San Francisco Extra Space facility.
7. Plaintiff alleges that the individual Defendants exercised control or direction over the acts described herein.

## III. FACTUAL ALLEGATIONS

**A. New Rochelle, New York Incident (January 2024)**

9. Around January 2023, Plaintiff entered into a storage rental agreement with Drive Up Storage.
10. Plaintiff stored clothing, books, and personal property in the unit.
11. The unit became contaminated with bed bugs and vermin, rendering the premises unsafe and unsanitary.
12. Plaintiff notified Defendant of the infestation on his proposed move out date in January 2024.
13. Defendant failed to adequately remediate the infestation or replace his damaged belongings.
14. Despite hazardous conditions, Defendant refused to permit cancellation of the storage agreement.
15. Plaintiff was compelled to continue paying monthly fees.
16. Plaintiff's property sustained damage and contamination.

---

**B. San Francisco, California Incident (August 2025)**

17. In August 2025, Plaintiff entered into a rental agreement with Extra Space Storage Inc. at its Cesar Chavez Boulevard facility.
18. Defendant imposed excessive and unexplained fees beyond the agreed rental rate.
19. When Plaintiff attempted to retrieve his belongings, employees identified as Oliver and Antoine obstructed access and threatened lien sale or auction.
20. Plaintiff alleges that these threats were made despite lack of lawful grounds under California Civil Code §§ 21700–21716 (Self-Service Storage Facility Act).
21. On one occasion, Plaintiff was physically locked inside the facility on a Saturday.
22. Plaintiff experienced fear for his safety and emotional distress.

---

**C. Pattern and Retaliatory Conduct**

23. Plaintiff alleges that the conduct in New York and California followed a similar pattern of excessive fees, obstruction, and coercive tactics.

24. After Plaintiff complained and expressed intent to pursue legal remedies, Defendants escalated adverse actions, including heightened threats and financial pressure.

25. Plaintiff alleges such conduct was intended to deter him from asserting his legal rights.

26. As a result, Plaintiff suffered financial loss, property damage, emotional distress, and fear of continued interference.

---

**COUNT I – Breach of Contract**

(Drive Up Storage)

27. Plaintiff repeats and realleges prior paragraphs.

28. Defendant breached the storage agreement by failing to provide safe and sanitary premises.

29. Plaintiff suffered damages as a direct result.

---

**COUNT II – Violation of New York General Business Law § 349**

(Drive Up Storage)

30. Defendant engaged in deceptive consumer-oriented conduct by failing to disclose unsafe conditions and refusing contract termination while charging fees.

31. Plaintiff suffered actual damages and seeks statutory remedies under N.Y. Gen. Bus. Law § 349(h).

---

**COUNT III – Breach of Contract**

(Extra Space Storage Inc.)

32. Defendant imposed unauthorized fees and interfered with Plaintiff's contractual access rights.

33. Plaintiff suffered damages.

---

**COUNT IV – Violation of California Business & Professions Code § 17200**

(Extra Space Storage Inc.)

34. Defendant engaged in unlawful and unfair business practices by imposing excessive fees and threatening improper lien sales.

35. Plaintiff seeks restitution and injunctive relief.

---

**COUNT V – False Imprisonment**

(Extra Space Storage Inc.)

36. Defendant intentionally confined Plaintiff within the facility without lawful privilege.

37. Plaintiff suffered harm.

---

**COUNT VI – Conversion**

(All Defendants)

38. Defendants interfered with Plaintiff's possessory rights in his property.

39. Plaintiff suffered damages.

---

**COUNT VII – Intentional Infliction of Emotional Distress**

(All Defendants)

40. Defendants' conduct was extreme and outrageous.

41. Plaintiff suffered severe emotional distress.

---

**COUNT VIII – Civil Conspiracy**

(All Defendants)

42. Defendants agreed, expressly or tacitly, to engage in coordinated conduct involving excessive fees, obstruction of access, and coercive threats.

43. Overt acts were committed in furtherance of this agreement.

44. Plaintiff suffered damages as a result.

---

**COUNT IX – Retaliatory Conduct / Abuse of Process**

(All Defendants)

45. After Plaintiff asserted legal rights, Defendants escalated adverse actions.

46. Threats of lien sale and auction were used as coercive leverage rather than legitimate debt collection.

47. Plaintiff suffered damages.

---

**V. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

A. Compensatory damages;
B. Statutory damages under N.Y. Gen. Bus. Law § 349;
C. Restitution under Cal. Bus. & Prof. Code § 17203;
D. Punitive damages where permitted;
E. Injunctive relief;
F. Costs and attorneys' fees where authorized;
G. Such other relief as the Court deems just.

Jacob Kaplan,
Benjamin Brafman,
Teny Geragos,
Mark Geragos,
Mark Agnifilo,
Ira Schwartz,
Abraham Schwartz,
Aaron Cohen,
Uri Kaufman,
Steven B Rothschild,
Intrater,

Defendants.

COMPLAINT AND DEMAND FOR JURY TRIAL

NATURE OF THE ACTION

1. This action arises from a coordinated scheme to intimidate and unlawfully remove Plaintiff, a rent-regulated tenant, from his apartment by falsely threatening arrest, concealing building ownership, misusing legal credentials, and extracting legal fees under false pretenses.
2. Defendants formed an association-in-fact enterprise designed to harass Plaintiff, force his removal, and financially benefit from the property.

JURISDICTION

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) (RICO).
2. Supplemental jurisdiction exists over related New York State claims pursuant to 28 U.S.C. § 1367.

FACTUAL ALLEGATIONS

1. Plaintiff resided in a rent-regulated apartment.
2. A buzzer/lock device was installed on Plaintiff's door that interfered with his lawful occupancy.

3. Plaintiff removed the device from his own door.
4. Thereafter, Defendants caused Plaintiff to believe he would be arrested for criminal conduct.
5. Plaintiff later learned that the building was owned or controlled by his uncle, Ira Schwartz, his cousin Abraham Schwartz, and associated parties.
6. Plaintiff retained Benjamin Brafman and paid approximately $10,000 to protect him from arrest and assist with complaints to prosecutorial authorities.
7. Plaintiff alleges that the threats of arrest were knowingly false and part of a coordinated intimidation strategy.
8. Plaintiff was ultimately evicted.

RICO ALLEGATIONS

(18 U.S.C. § 1962(c))

Enterprise

1. Defendants formed an association-in-fact enterprise ("The Apartment Removal Enterprise").
2. The enterprise had a common purpose: to remove Plaintiff from a rent-regulated apartment through intimidation, fraud, and abuse of legal process.
3. The enterprise operated through coordinated communications, misrepresentations, and concealment of ownership interests.

Pattern of Racketeering Activity

1. Defendants committed multiple predicate acts including:

- Wire fraud (18 U.S.C. § 1343) through electronic communications threatening arrest;
- Mail fraud (18 U.S.C. § 1341);
- Extortion under color of official right;

- Obstruction of justice (threats involving criminal prosecution);
- Witness intimidation.

1. These acts were related and continuous.

COUNT I

RICO – 18 U.S.C. § 1962(c)

1. Plaintiff repeats and realleges the foregoing paragraphs.
2. Defendants conducted and participated in the affairs of the enterprise through a pattern of racketeering activity.
3. Plaintiff was injured in his business and property by reason of Defendants' RICO violations, including:

- Loss of rent-regulated tenancy;
- Payment of $10,000 retainer;
- Legal fees and related damages.

1. Pursuant to 18 U.S.C. § 1964(c), Plaintiff seeks treble damages.

COUNT II

RICO CONSPIRACY – 18 U.S.C. § 1962(d)

1. Defendants knowingly agreed to facilitate the scheme described herein.

COUNT III

LEGAL MALPRACTICE (Against Brafman)

1. Plaintiff repeats and realleges the foregoing paragraphs.
2. As retained counsel, Brafman owed Plaintiff duties of competence, loyalty, and diligence.
3. He failed to:

- Investigate ownership conflicts;

- Protect tenancy rights;
- File promised complaints;
- Prevent eviction.

1. He instead collected a $10,000 retainer and failed to provide effective representation.

COUNT IV

FRAUDULENT MISREPRESENTATION

1. Defendants falsely represented that Plaintiff would be arrested.
2. Defendants concealed material facts regarding building ownership.
3. Plaintiff reasonably relied on these misrepresentations.
4. Plaintiff suffered damages.

COUNT V

CIVIL CONSPIRACY (NEW YORK)

1. Defendants agreed to engage in unlawful intimidation.
2. Overt acts included threats, concealment, and legal manipulation.

COUNT VI

HARASSMENT OF RENT-REGULATED TENANT

(NYC Admin. Code § 27-2005(d))

1. Defendants engaged in conduct intended to cause Plaintiff to vacate.
2. Threats of arrest constitute harassment under New York law.

COUNT VII

BREACH OF FIDUCIARY DUTY

1. Brafman owed Plaintiff undivided loyalty.
2. On information and belief, undisclosed personal relationships existed.
3. Plaintiff did not provide informed consent.

COUNT VIII

UNJUST ENRICHMENT – CONSTRUCTIVE TRUST

1. Plaintiff repeats and realleges the foregoing paragraphs.
2. Defendants unjustly retained the $10,000 retainer and other financial benefits.
3. Equity requires disgorgement.

DAMAGES

Plaintiff seeks:

- Treble damages under RICO;
- Return of $10,000;
- Consequential damages from eviction;
- Punitive damages;
- Costs and attorneys' fees;
- Imposition of a constructive trust.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands:

A. Judgment on all counts;
B. Treble damages under RICO;
C. Disgorgement of funds;

D. Punitive damages;
E. Attorneys' fees and costs;
F. Such other relief as the Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Plaintiff: Defendants: Jacob Kaplan, Benjamin Brafman, Mark Geragos, Mark Agnifilio, Intrater, and other associated co-conspirators; Doe police officers; and any other parties identified during discovery.

PRELIMINARY STATEMENT

1. This action arises from a coordinated scheme by the Defendants to deceive, manipulate, and financially and personally harm Plaintiff through fraud, conspiracy, and abuse of legal and law enforcement systems.
2. Plaintiff, relying on the apparent guidance of family and trusted counsel, was misled into believing that Defendants were acting in his best interests. In reality, Defendants were conspiring with Plaintiff's landlord and other parties to exploit and harm Plaintiff for financial and personal gain.
3. Defendants' actions included fraud, legal malpractice, staged physical harm, and systematic obstruction of justice.

FACTUAL BACKGROUND

1. Plaintiff is related to Ira Schwartz and Abraham Schwartz, who are, unbeknownst to Plaintiff, the actual owners of Plaintiff's residence and associated real estate holdings.
2. Defendants Kaplan, Brafman, Geragos, Agnifilio, and Intrater knowingly assisted and conspired with Ira Schwartz, Abraham Schwartz, and other co-conspirators to mislead Plaintiff regarding his legal and tenancy rights.

3. Plaintiff was induced to pay $10,000 in legal fees under the pretense of assistance in making complaints to the District Attorney or Attorney General, which never occurred. Defendants intentionally failed to act, thereby facilitating Plaintiff's eviction.

4. Defendants maintained communications and coordination to perpetuate the deception, exploiting Plaintiff's trust in his uncle Ira and the attorneys.

5. In November 2024, Defendants Jacob Kaplan and associates staged a car crash targeting Plaintiff with the intent to cause serious injury, criminal liability, and reputational harm. In July 2025, Defendants again attempted to harm Plaintiff and frame him through coercion and police cooperation.

6. Police officers (identified as Doe Officers) participated in this systemic corruption, siding with the apartment manager, Sam, to effect Plaintiff's eviction from Motel 6, 1234 Great Highway, while ignoring fraud and staged assault reports.

7. Former Judge Nock, who has since resigned, was bribed by Ira Schwartz and was complicit in shielding Defendants from liability.

CLAIMS FOR RELIEF

COUNT I – FRAUD

1. Defendants knowingly misrepresented material facts, including the nature of legal representation and landlord ownership.

2. Plaintiff reasonably relied on these representations, resulting in financial loss, eviction, and emotional distress.

COUNT II – CONSPIRACY TO COMMIT FRAUD AND HARASSMENT

1. Defendants agreed to and executed a coordinated plan to harm Plaintiff, conceal material facts, and prevent Plaintiff from asserting legal rights.

2. The conspiracy involved attorneys, landlords, and law enforcement, culminating in Plaintiff's eviction and staged physical harm.

COUNT III – LEGAL MALPRACTICE

1. Defendants Brafman, Kaplan, Geragos, and Agnifilio breached duties of care by failing to represent Plaintiff's interests, instead assisting co-conspirators in eviction and fraud.

COUNT IV – RICO VIOLATIONS

1. Defendants engaged in a pattern of racketeering activity, including mail and wire fraud, obstruction of justice, and repeated acts of intimidation and physical staging (staged car crash), intended to harm Plaintiff financially, emotionally, and physically.

COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1. Defendants' coordinated actions, including deception by trusted family and staged physical harm, were extreme, outrageous, and intentionally designed to cause severe emotional distress.

COUNT VI – CIVIL CONSPIRACY

1. Defendants, acting in concert with co-conspirators, including police officers and Judge Nock, intentionally conspired to commit unlawful acts against Plaintiff, resulting in eviction, financial loss, and personal danger.

COUNT VII – NEGLIGENCE PER SE / POLICE CORRUPTION

1. Doe Officers' failure to accept and investigate fraud reports constitutes negligence and deliberate participation in a systemic pattern of corruption, directly causing Plaintiff's harm.

PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

A. Award compensatory damages for financial losses, emotional distress, and personal harm;
B. Award punitive damages to deter future misconduct;
C. Impose equitable relief, including restitution and constructive trust where applicable;
D. Grant injunctive relief preventing further harm by Defendants;
E. Award costs and attorney's fees;
F. Grant any other relief deemed just and proper by the Court.

Factual Background

1. Plaintiff, Marshall Wexler, is a licensed attorney who has actively pursued legal claims against defendants in lawsuit 10089/24 for fraud, extortion, and other illegal acts.
2. Defendants, individually and in concert, conspired to frame Plaintiff as incompetent to prevent him from pursuing legitimate legal claims and establishing a reputation as a reputable attorney.
3. The Attorney Grievance Committee (AGC), composed of Louis Barra, Martin Shulman, and others, ordered a psychological evaluation of Plaintiff without due process, without charges of misconduct, and in violation of established legal precedent. No case law allows a disciplinary committee to order a mental exam sua sponte absent allegations of misconduct or evidence of incompetence.
4. Martin Shulman, a justice previously known for corruption, has familial ties to Stephen, who was previously sued by Plaintiff in 10089/24 for fraud and extortion. The state court in that matter lacked jurisdiction under Judiciary Law § 14, and the presiding judge was disqualified. Despite this, Shulman participated in the AGC conspiracy.
5. Peter Brill, Plaintiff's own attorney, acted secretly to assist the AGC and the syndicate network, concealing material facts from Plaintiff and facilitating the psych exam.
6. Defendants SK Syndicate members, including Uri Kaufman, Arthur Schwartz, Ira Schwartz, Aaron Cohen, and Plaintiff's brother Shimshon Wexler, colluded to provide confidential personal information about Plaintiff and to manipulate legal and disciplinary processes for improper purposes.
7. The conspiracy's objectives were:
    - Retaliate against Plaintiff for filing lawsuit 10089/24.
    - Undermine Plaintiff's reputation and ability to practice law.
    - Prevent Plaintiff from initiating future lawsuits against Defendants for their illegal acts.

- Create the appearance that Plaintiff was mentally incompetent to justify disbarment or further disciplinary sanctions.

8. These acts were intentional, coordinated, and malicious, causing Plaintiff severe emotional distress, reputational damage, and interference with his professional and legal pursuits.

Claims for Relief

COUNT I – Breach of Fiduciary Duty

1. Defendants Brill, Brill Legal Group, Aaron Cohen, Cohen Law Group, and others owed Plaintiff fiduciary duties.
2. By assisting the AGC in staging a psych exam, concealing conflicts of interest, and misleading Plaintiff, Defendants breached these duties, causing harm.

COUNT II – Fraud / Fraudulent Misrepresentation

1. Defendants knowingly misrepresented the necessity, legality, and results of the psych exam to Plaintiff.
2. Plaintiff reasonably relied on these misrepresentations to his detriment.

COUNT III – Fraudulent Concealment

1. Defendants intentionally concealed material facts regarding their coordination, Plaintiff's brother's involvement, and the AGC's true motives.

COUNT IV – Tortious Interference with Prospective Economic Advantage

1. Defendants interfered with Plaintiff's ability to practice law, participate in ongoing cases, and establish professional reputation.

COUNT V – Intentional Infliction of Emotional Distress

1. Defendants' conduct—including orchestrating a sham psych exam and concealing their conspiracy—was extreme, outrageous, and designed to inflict emotional distress.

COUNT VI – Retaliation / First Amendment Violation

1. Defendants targeted Plaintiff in retaliation for pursuing lawsuit 10089/24, violating his rights to free speech and petitioning for redress of grievances.

COUNT VII – Abuse of Process

1. Defendants used the disciplinary system, including the AGC and the staged psych exam, for an improper purposeunrelated to legitimate disciplinary concerns.

COUNT VIII – Civil Rights Violations (42 U.S.C. §§ 1982, 1983, 1985, 1988)

1. Defendants conspired to deprive Plaintiff of constitutional rights, including the right to due process, equal protection, and the ability to practice law without unlawful interference.

I. INTRODUCTION

1. Plaintiff Marshall Wexler brings this action to prevent the Attorney Grievance Committee (AGC) and related conspirators from compelling a psychological evaluation that violates his constitutional rights and professional due process.
2. Defendants, individually and in concert, have orchestrated a scheme to:
3.
    - Frame Plaintiff as incompetent;
    - Retaliate against Plaintiff for filing lawsuit 10089/24;
    - Interfere with Plaintiff's ability to practice law;

- Conceal their own illegal actions, including fraud and breaches of fiduciary duty.

4. The AGC, composed of Louis Barra, Martin Shulman, and others, has no legitimate basis to order a psych exam sua sponte. Legal precedent only permits such exams when a disciplinary charge exists and the respondent offers evidence regarding their competence. No such charges have been filed against Plaintiff.

II. FACTUAL BACKGROUND

1. Peter Brill, Plaintiff's own attorney, acted secretly to assist Defendants and the AGC, concealing the nature and consequences of the proposed psych exam.
2. Aaron Cohen, Brill Legal Group, Cohen Law Group, Ira Schwartz, Uri Kaufman, Arthur Schwartz, and Shimshon Wexler have colluded behind the scenes to:
3. 
    - Provide personal confidential information about Plaintiff;
    - Influence the AGC to take adverse action;
    - Prevent Plaintiff from pursuing claims against Defendants for illegal acts.
4. Martin Shulman, a justice with known conflicts, is complicit, and his familial and professional relationships with other conspirators create a conflict of interest and corruption risk.
5. Plaintiff faces irreparable harm, including:
6. 
    - Reputational damage;
    - Emotional distress;
    - Threats to his legal career;

- Prejudice in ongoing and future litigation.

7. Plaintiff has no adequate remedy at law because monetary damages cannot restore a professional reputation tarnished by a fraudulently staged psych exam or prevent future irreparable harm.

III. CLAIMS FOR RELIEF

COUNT I – VIOLATION OF DUE PROCESS

1. Defendants' attempt to compel a psych exam without charges or notice violates Plaintiff's constitutional right to due process.

COUNT II – ABUSE OF PROCESS

1. Defendants are using the disciplinary process as a tool for improper purposes: retaliation, framing Plaintiff as incompetent, and suppressing his lawsuits.

COUNT III – BREACH OF FIDUCIARY DUTY

1. Peter Brill and other attorney-defendants owed Plaintiff a fiduciary duty, which was breached by assisting in the coercive and secretive AGC scheme.

COUNT IV – FRAUD AND CONSPIRACY

1. Defendants intentionally misrepresented the necessity, legality, and consequences of the psych exam to Plaintiff and conspired to have it imposed to harm him professionally and personally.

IV. PRAYER FOR RELIEF

Plaintiff Marshall Wexler respectfully requests that the Court:

A. Issue a preliminary and permanent injunction prohibiting Defendants, the AGC, and all associated parties from compelling Plaintiff to undergo any psych examination;
B. Declare that any attempt to compel a psych exam without charges or due process is unlawful;
C. Award compensatory and punitive damages as appropriate;

D. Award Plaintiff attorneys' fees, costs, and expenses incurred in bringing this action;
E. Grant such other relief as the Court deems just and proper.

V. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

MACKEY

**Defendant Adreama Ishe Mackey-**

Defendant Adreama Ishe Mackey-Ponte ("Mackey-Ponte") knowingly and intentionally made false representations and material omissions to Plaintiff in order to induce Plaintiff to retain her for legal services and to pay substantial legal fees.

Mackey-Ponte expressly and impliedly represented that she was competent, authorized, and acting in Plaintiff's interests to provide legal services relating to bar defense, litigation strategy, and related legal matters. These representations were false.

At the time the representations were made, Mackey-Ponte was not licensed to practice law in California, where Plaintiff resided and where the legal services were to be performed, and she concealed this material fact.

Mackey-Ponte further failed to disclose material conflicts of interest, including that she was acting as counsel or agent for Plaintiff's landlord and legal adversary, Ira Schwartz, and was aligned with individuals adverse to Plaintiff's interests.

Mackey-Ponte knowingly omitted these facts with the intent to deceive Plaintiff, knowing that disclosure would have prevented Plaintiff from retaining her or paying any fees.

Scienter and Intent

Mackey-Ponte acted with actual knowledge of the falsity of her representations and omissions, or at minimum with reckless disregard for their truth or falsity.

Mackey-Ponte's conduct was intentional and calculated to extract money from Plaintiff while performing little to no legitimate legal work, and while actively undermining Plaintiff's legal position.

Reliance

Plaintiff reasonably relied on Mackey-Ponte's misrepresentations and omissions, including her representations of loyalty, competence, and authority to practice law.

Plaintiff's reliance was foreseeable and intended, as Mackey-Ponte deliberately cultivated trust, dependency, and the appearance of professional assistance during periods of Plaintiff's legal vulnerability.

Damages

As a direct and proximate result of Mackey-Ponte's fraud, Plaintiff paid approximately $10,000 in legal fees for services that were never performed or were performed unlawfully and incompetently.

Mackey-Ponte has wrongfully retained approximately $7,000 in unearned fees, despite demand for refund.

Plaintiff further suffered consequential damages including disruption of legal matters, loss of housing, reputational harm, emotional distress, and financial instability.

**CIVIL RICO (18 U.S.C. §§ 1962(c) & (d))**

**(Against Mackey-Ponte and Enterprise Members)**

**The Enterprise**

At all relevant times, Defendants constituted an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).

The Enterprise included, among others, Ira Schwartz, Steven B. Rothschild, Arthur Schwartz, Anthony Crowell, Adreama Ishe Mackey-Ponte, and other known and unknown individuals.

The Enterprise had a common purpose: to extract money, suppress legal exposure, sabotage adversaries, and shield members from accountability through fraud, coercion, conflicts of interest, and misuse of legal processes.

The Enterprise maintained ongoing relationships, coordinated roles, and continuity of structure sufficient to pursue its objectives over an extended period.

Conduct and Participation

Mackey-Ponte knowingly conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

Mackey-Ponte functioned as a cut-out and instrumentality of the Enterprise, inserted into Plaintiff's social and professional sphere to monitor, manipulate, and financially exploit Plaintiff while preserving deniability for senior Enterprise members.

Mackey-Ponte knowingly accepted legal fees from Plaintiff while concealing her lack of licensure, undisclosed conflicts of interest, and allegiance to Plaintiff's adversaries, thereby advancing the Enterprise's objectives.

Predicate Acts

Defendants committed multiple predicate acts of racketeering, including but not limited to:

a. Wire fraud (18 U.S.C. § 1343), by transmitting false and misleading representations via interstate communications regarding legal services, authority, and loyalty;

b. Mail fraud (18 U.S.C. § 1341), in connection with billing, payments, and communications related to the fraudulent retainer;

c. Financial exploitation and theft, including the retention of unearned fees;

d. Obstruction and abuse of legal processes, including interference with Plaintiff's bar defense and litigation efforts.

These acts were related, continuous, and constituted a pattern of racketeering activity.

Conspiracy

Defendants knowingly agreed and conspired to conduct and participate in the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

Each Defendant knew the essential nature of the plan and agreed that some member of the conspiracy would commit at least two racketeering acts in furtherance of the scheme.

Injury

Plaintiff was injured in his business and property by reason of Defendants' RICO violations, including loss of money, loss of housing, loss of professional standing, and interference with lawful business activities.

Defendants' acts were the direct and proximate cause of Plaintiff's injuries.

DAMAGES AND RELIEF (Applicable to Both)

Plaintiff seeks compensatory damages, treble damages under RICO, restitution of unearned fees, costs, attorneys' fees, and such further relief as the Court deems just and proper.

Plaintiff further seeks injunctive relief prohibiting Defendants from continuing to engage in fraudulent legal representations, unauthorized practice of law, and retaliatory or coercive conduct.

**Defendant Adreama Ishe Mackey-**

Defendant Adreama Ishe Mackey-Ponte ("Mackey-Ponte") knowingly and intentionally made false representations and material omissions to Plaintiff in order to induce Plaintiff to retain her for legal services and to pay substantial legal fees in excess of $10,000 , $1500 in 2022 for work she performed while in conflict of interest while working for Plaintiff's uncle, the landlord who was the defendant the party hurting me, and another 10,000 approximately in 2024 while she was still working for Plaintiff's uncle which is a material fact she concealed from me.

Mackey-Ponte expressly and impliedly represented that she was competent, authorized, and acting in Plaintiff's interests to provide legal services relating to bar defense, litigation strategy, and related legal matters. These representations were false.

At the time the representations were made, Mackey-Ponte was not licensed to practice law in California, where Plaintiff resided and where the legal services were to be performed, and she concealed this material fact.

Mackey-Ponte further failed to disclose material conflicts of interest, including that she was acting as counsel or agent for Plaintiff's landlord and legal adversary, Ira Schwartz, and was aligned with individuals adverse to Plaintiff's interests.

Mackey-Ponte knowingly omitted these facts with the intent to deceive Plaintiff, knowing that disclosure would have prevented Plaintiff from retaining her or paying any fees.

Scienter and Intent

Mackey-Ponte acted with actual knowledge of the falsity of her representations and omissions, or at minimum with reckless disregard for their truth or falsity.

Mackey-Ponte's conduct was intentional and calculated to extract money from Plaintiff while performing little to no legitimate legal work, and while actively undermining Plaintiff's legal position.

Reliance

Plaintiff reasonably relied on Mackey-Ponte's misrepresentations and omissions, including her representations of loyalty, competence, and authority to practice law.

Plaintiff's reliance was foreseeable and intended, as Mackey-Ponte deliberately cultivated trust, dependency, and the appearance of professional assistance during periods of Plaintiff's legal vulnerability.

Damages

As a direct and proximate result of Mackey-Ponte's fraud, Plaintiff paid approximately $13,000 in legal fees for services that were never performed or were performed unlawfully and incompetently.

Mackey-Ponte has wrongfully retained approximately $10,000 in unearned fees, despite demand for refund.

Plaintiff further suffered consequential damages including disruption of legal matters, loss of housing, reputational harm, emotional distress, and financial instability as a result of Defendant Mackey-Ponte's breach of fiduciary duty to him

as a lawyer and breach of trust to him as his former friend. She was actually working for his uncles and new York law school who were actually his landlord and actually the ones out to hurt him.

---

**CIVIL RICO (18 U.S.C. §§ 1962(c) & (d))**

***(Against Mackey-Ponte and Enterprise Members)***

**The Enterprise**

At all relevant times, Defendants constituted an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).

The Enterprise included, among others, Ira Schwartz, Steven B. Rothschild, Arthur Schwartz, Anthony Crowell, Adreama Ishe Mackey-Ponte, and other known and unknown individuals.

The Enterprise had a common purpose: to extract money, suppress legal exposure, sabotage adversaries, and shield members from accountability through fraud, coercion, conflicts of interest, and misuse of legal processes.

The Enterprise maintained ongoing relationships, coordinated roles, and continuity of structure sufficient to pursue its objectives over an extended period.

Conduct and Participation

Mackey-Ponte knowingly conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

Mackey-Ponte functioned as a cut-out and instrumentality of the Enterprise, inserted into Plaintiff's social and professional sphere to monitor, manipulate, and financially exploit Plaintiff while preserving deniability for senior Enterprise members.

Mackey-Ponte knowingly accepted legal fees from Plaintiff while concealing her lack of licensure, undisclosed conflicts of interest, and allegiance to Plaintiff's adversaries, thereby advancing the Enterprise's objectives.

Predicate Acts

Defendants committed multiple predicate acts of racketeering, including but not limited to:

a. Wire fraud (18 U.S.C. § 1343), by transmitting false and misleading representations via interstate communications regarding legal services, authority, and loyalty;

b. Mail fraud (18 U.S.C. § 1341), in connection with billing, payments, and communications related to the fraudulent retainer;

c. Financial exploitation and theft, including the retention of unearned fees;

d. Obstruction and abuse of legal processes, including interference with Plaintiff's bar defense and litigation efforts.

These acts were related, continuous, and constituted a pattern of racketeering activity.

Conspiracy

Defendants knowingly agreed and conspired to conduct and participate in the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

Each Defendant knew the essential nature of the plan and agreed that some member of the conspiracy would commit at least two racketeering acts in furtherance of the scheme.

Injury

Plaintiff was injured in his business and property by reason of Defendants' RICO violations, including loss of money, loss of housing, loss of professional standing, and interference with lawful business activities.

Defendants' acts were the direct and proximate cause of Plaintiff's injuries.

---

DAMAGES AND RELIEF (Applicable to Both)

Plaintiff seeks compensatory damages, treble damages under RICO, restitution of unearned fees, costs, attorneys' fees, and such further relief as the Court deems just and proper.

Plaintiff further seeks injunctive relief prohibiting Defendants from continuing to engage in fraudulent legal representations, unauthorized practice of law, and retaliatory or coercive conduct.

Marshall Wexler, Plaintiff
v.
Adreama Mackey Ponte, Defendant

FIRST AMENDED COMPLAINT

COUNT I

UNJUST ENRICHMENT – CONSTRUCTIVE TRUST

(Preserved for Appeal)

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.
2. Unjust enrichment may be alleged where a defendant unjustly obtains and retains a benefit to the plaintiff's detriment, and where such retention violates principles of equity, justice, and good conscience.
3. On information and belief, Defendant Adreama Mackey Ponte obtained $10,000 from Plaintiff Marshall Wexler for legal services related to Plaintiff's pending legal matter.
4. The $10,000 was paid specifically for the purpose of Defendant performing necessary legal work essential to protecting Plaintiff's rights and financial interests.
5. Defendant failed to perform the agreed-upon services.
6. On information and belief, Defendant diverted and retained the funds for purposes unrelated to Plaintiff's representation, including personal use and/or benefit to a third party.
7. Defendant's retention of Plaintiff's $10,000 constitutes unjust enrichment.
8. Under principles of equity and good conscience, Defendant should not be permitted to retain the funds.

9. Plaintiff seeks the imposition of a constructive trust over the $10,000 and any traceable proceeds thereof.
10. In the alternative, Plaintiff requests disgorgement of the full amount plus interest.

COUNT II

BREACH OF CONTRACT

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs under Count I.
2. Plaintiff and Defendant entered into an enforceable agreement whereby Defendant agreed to perform specific legal services in exchange for $10,000.
3. Plaintiff fully performed his obligations by paying Defendant the agreed sum.
4. Defendant materially breached the agreement by:

- Failing to perform the required legal work,
- Failing to advance Plaintiff's case,
- Failing to communicate necessary case developments,
- Failing to act in Plaintiff's best interest.

1. As a direct and proximate result of Defendant's breach, Plaintiff suffered financial damages, legal prejudice, and strategic harm in his underlying matter.
2. Plaintiff has been damaged in an amount to be proven at trial, including but not limited to $10,000 plus consequential damages.

COUNT III

CONVERSION

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

2. Plaintiff had an ownership right to the $10,000 unless and until it was earned through performance of agreed legal services.
3. Defendant wrongfully exercised dominion and control over Plaintiff's funds by retaining them without providing the services contracted for.
4. Plaintiff demanded return of the funds.
5. Defendant refused.
6. Defendant's actions constitute conversion.
7. Plaintiff has been damaged in an amount to be proven at trial.

COUNT IV

FRAUD / PROMISSORY FRAUD

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.
2. Defendant represented that she would perform specific legal services necessary to protect Plaintiff's interests.
3. At the time these representations were made, Defendant either:

- Did not intend to perform the services, or
- Knew she would not perform them adequately.

1. Defendant made these representations to induce Plaintiff to pay $10,000.
2. Plaintiff reasonably relied on Defendant's representations.
3. Defendant's failure to perform was intentional and part of a scheme to obtain funds without rendering services.
4. Plaintiff suffered financial and strategic harm as a direct result of this reliance.
5. Plaintiff seeks compensatory and punitive damages.

COUNT V

BREACH OF FIDUCIARY DUTY

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.
2. As Plaintiff's retained attorney, Defendant owed fiduciary duties of loyalty, honesty, and full disclosure.
3. Defendant breached these duties by:

- Misusing entrusted funds,
- Failing to act in Plaintiff's best interests,
- Intentionally failing to perform necessary work,
- Concealing material information.

1. Defendant's conduct constitutes a willful and malicious breach of fiduciary duty.
2. Plaintiff has suffered damages in an amount to be proven at trial.

**CONFLICT OF INTEREST – RULE 1.7 VIOLATION (AS BASIS FOR CIVIL LIABILITY)**

1. Plaintiff repeats and realleges the foregoing paragraphs.
2. Defendant had a personal relationship and attorney client relationship or friendship with attorneys representing BEMNY, including Ira Schwartz
3. This relationship created a significant risk that Defendant's professional judgment would be materially limited.
4. Defendant failed to:

a. Disclose the conflict in writing;
b. Advise Plaintiff to seek independent counsel;
c. Obtain informed written consent.

1. Defendant's failure constitutes a breach of fiduciary duty and supports malpractice liability.

LEGAL MALPRACTICE / PROFESSIONAL NEGLIGENCE

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.
2. Defendant owed Plaintiff a duty to exercise the skill, prudence, and diligence commonly possessed by attorneys.
3. Defendant breached that duty by failing to perform essential legal work and by sabotaging Plaintiff's case.
4. As a direct and proximate result, Plaintiff suffered legal prejudice and financial harm.
5. Plaintiff seeks damages according to proof.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Marshall Wexler respectfully requests judgment against Defendant Adreama Mackey Ponte as follows:

A. Restitution of $10,000;
B. Imposition of a constructive trust;
C. Compensatory damages;
D. Consequential damages;
E. Punitive damages;
F. Prejudgment interest;
G. Costs of suit;
H. Such other and further relief as the Court deems just and proper.

REQUEST FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

**David Abrams**

David Abrams, a New York licensed attorney, was retained by Plaintiff in 2023 to represent him in an employment discrimination lawsuit against NMIC arising from severe anti-Semitic harassment at his first legal position. Plaintiff reasonably relied on Abrams' professional judgment, unaware that Abrams maintained close personal and professional relationships with NMIC's counsel, a significant conflict of interest which he deliberately failed to disclose. This nondisclosure directly impaired Plaintiff's ability to obtain fair representation, resulting in a grossly inadequate settlement of $5,000, far below settlements in comparable cases involving similar allegations of anti-Semitic workplace harassment, which routinely exceeded $150,000. Abrams' failure to disclose this conflict constitutes deliberate professional malpractice and ethical violations, and his actions inflicted measurable financial and reputational harm on Plaintiff.

Subsequently, during a critical period in 2022–2023 involving eviction proceedings against Plaintiff's then-landlord, Ira and Uri Schwartz, and interference by Plaintiff's employer Hertz Cherson in deleting critical evidence, Abrams represented that he would provide legal assistance. Despite repeated assurances, Abrams ceased all communication for over two months during this time-sensitive and pivotal phase of litigation, performing no meaningful legal work. After this period of nonperformance, Abrams demanded $1,500 for services that were never rendered, a payment Plaintiff made reluctantly under the direction of Ira Schwartz. These actions demonstrate not only theft of a retainer but also a deliberate scheme to exploit Plaintiff's vulnerability, interfere with ongoing legal matters, and further the coordinated efforts of the Schwartz enterprise to destabilize and financially harm Plaintiff.

Abrams' conduct constitutes multiple predicate acts under federal and state law, including wire fraud, theft by conversion, professional misconduct, and interference with Plaintiff's commerce and legal rights. His participation in a coordinated scheme with the Schwartz family to mislead, extract funds from, and destabilize Plaintiff constitutes racketeering activity under 18 U.S.C. §1961 et seq. Plaintiff suffered direct financial losses, disruption of business operations, and severe emotional and professional harm as a direct result of Abrams' malpractice, fraudulent representations, and theft of retainer funds. Accordingly, Plaintiff seeks restitution of all unearned fees, disgorgement of profits derived from his misconduct, compensatory and punitive damages for malpractice and fraud, and

any other relief the Court deems just and proper to redress Abrams' participation in this coordinated scheme.

David Abrams

COUNT I

**UNJUST ENRICHMENT – CONSTRUCTIVE TRUST**

1. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.
2. Unjust enrichment lies where a defendant obtains and retains money belonging to plaintiff under circumstances that violate equity and good conscience.
3. Plaintiff paid Defendant $1,500 in connection with legal representation in (a) an employment discrimination matter against Northern Manhattan Improvement Company and/or (b) issues relating to Plaintiff's apartment buyout dispute at 268 West 77th Street.
4. Defendant failed to perform meaningful legal work in exchange for the $1,500 payment.
5. Defendant retained the funds despite failing to provide competent, diligent, or loyal representation.
6. Equity and good conscience require disgorgement of all unearned fees.
7. Plaintiff seeks restitution and the imposition of a constructive trust over the $1,500 and any traceable proceeds.

**COUNT II**

**LEGAL MALPRACTICE**

1. Plaintiff repeats and realleges the foregoing paragraphs excluding Count I.
2. Defendant owed Plaintiff a duty to exercise the ordinary reasonable skill and knowledge commonly possessed by members of the legal profession in New York.

3. Defendant departed from accepted standards of practice by:

a. Failing to perform substantive work in the employment discrimination case;
b. Failing to develop evidence and pursue discovery;
c. Failing to properly evaluate the case's settlement value;
d. Pressuring Plaintiff to accept a $5,000 settlement;
e. Failing to protect evidence after Plaintiff's phone was taken and allegedly deleted;
f. Failing to pursue remedies for spoliation or evidence tampering.

1. Comparable employment discrimination matters frequently resolve for substantially higher amounts when competently litigated.

2. But for Defendant's negligence and misconduct, Plaintiff would have achieved a substantially greater recovery.

3. As a direct and proximate result, Plaintiff suffered financial damages in an amount to be determined at trial.

**COUNT III**

**BREACH OF FIDUCIARY DUTY**

1. Plaintiff repeats and realleges the foregoing paragraphs.

2. As Plaintiff's attorney, Defendant owed fiduciary duties of loyalty, candor, and full disclosure.

3. Defendant breached these duties by:

a. Failing to disclose a personal friendship and relationship with attorneys representing Northern Manhattan Improvement Company;
b. Failing to obtain informed written consent to this conflict of interest;
c. Acting in a manner that created divided loyalty;
d. Prioritizing relationships over Plaintiff's interests.

1. An attorney who acts with divided loyalty forfeits entitlement to fees.

2. Plaintiff seeks disgorgement of all compensation paid.

**COUNT IV**

**FRAUDULENT MISREPRESENTATION**

1. Plaintiff repeats and realleges the foregoing paragraphs.
2. Defendant represented that he would diligently pursue Plaintiff's employment discrimination claims and protect his interests.
3. Defendant failed to disclose material conflicts and failed to disclose the true status and potential value of the case.
4. Defendant pressured Plaintiff into settlement without full and honest disclosure of material facts.
5. Plaintiff reasonably relied on Defendant's representations.
6. As a result, Plaintiff accepted a settlement for $5,000, far below the potential value of the case.
7. Plaintiff suffered damages as a result of that reliance.

**COUNT V**

**CONFLICT OF INTEREST – RULE 1.7 VIOLATION (AS BASIS FOR CIVIL LIABILITY)**

5. Plaintiff repeats and realleges the foregoing paragraphs.
6. Defendant had a personal relationship or friendship with attorneys representing Northern Manhattan Improvement Company.
7. This relationship created a significant risk that Defendant's professional judgment would be materially limited.
8. Defendant failed to:

a. Disclose the conflict in writing;
b. Advise Plaintiff to seek independent counsel;
c. Obtain informed written consent.

2. Defendant's failure constitutes a breach of fiduciary duty and supports malpractice liability.

**COUNT VI**

**NEGLIGENCE RELATING TO EVIDENCE DESTRUCTION**

1. Plaintiff repeats and realleges the foregoing paragraphs.
2. Plaintiff informed Defendant that his phone had been taken and that evidence relevant to his landlord dispute had been deleted.
3. Defendant failed to:

a. Advise Plaintiff regarding preservation rights;
b. Initiate legal action to address spoliation;
c. Seek court intervention;
d. Protect Plaintiff's evidentiary position.

1. Defendant instead demanded payment.
2. This failure fell below professional standards and caused harm.

PROEFREIDT

Gerard Proefreidt, Esq, Norris Mclaughlin

Additional Misrepresentations, Nonperformance, and Sabotage

In addition to the foregoing, Defendant Gerard Proefreidt, Esq. ("Proefreidt") accepted in excess of $13,000 from Plaintiff in connection with the purported provision of legal services relating to Plaintiff's litigation, creditor exposure, and related matters.

Proefreidt represented that these funds were paid in exchange for meaningful legal work, competent representation, and advocacy undertaken in Plaintiff's best interests. These representations were false.

Despite accepting more than $13,000, Proefreidt failed to perform any meaningful legal work on Plaintiff's behalf. He did not produce substantive filings, conduct

genuine legal analysis, advance Plaintiff's claims, or take actions consistent with zealous representation.

Instead, Proefreidt engaged in conduct that affirmatively sabotaged Plaintiff's case, including providing misleading advice, withholding critical information, delaying necessary actions, and steering Plaintiff into positions that benefited Ira Schwartz and associated actors while materially harming Plaintiff.

Proefreidt's nonperformance was not the result of negligence, oversight, or misunderstanding. It was intentional, undertaken pursuant to his undisclosed alignment with Schwartz and in furtherance of the coordinated scheme described herein.

At no time did Proefreidt provide an accurate accounting of the work allegedly performed, nor did he refund any portion of the unearned fees despite his failure to deliver the services promised.

Plaintiff reasonably relied on Proefreidt's status as a partner at a major law firm and on his representations of loyalty and competence. That reliance was foreseeable and deliberately exploited.

As a direct and proximate result of Proefreidt's fraudulent inducement, nonperformance, and sabotage, Plaintiff suffered financial loss exceeding $13,000, deterioration of his legal position, increased exposure to creditors, and significant consequential damages.

---

Proefreidt's acceptance of more than $13,000 in legal fees, coupled with his intentional failure to perform meaningful work and affirmative sabotage of Plaintiff's case, constituted acts of wire fraud and honest services fraud, each chargeable as predicate acts under 18 U.S.C. §§ 1343 and 1346.

Proefreidt knowingly used interstate communications to solicit payment, convey false assurances of progress, and maintain Plaintiff's reliance while performing no legitimate legal services and while advancing the interests of the Enterprise.

Proefreidt's conduct deprived Plaintiff of the honest services of counsel, a deprivation that was material, intentional, and central to the Enterprise's scheme.

The theft of legal fees and sabotage of Plaintiff's case were not isolated acts, but part of a repeated and continuous pattern of racketeering activity designed to extract money, impair Plaintiff's legal defenses, and facilitate the concealment of assets and defrauding of mortgage lenders and creditors.

Injury and Causation

As a direct and proximate result of Proefreidt's racketeering conduct, Plaintiff suffered concrete injuries to his business and property, including loss of more than $13,000 in legal fees, material impairment of active litigation, increased financial exposure, and substantial downstream damages.

Proefreidt acted knowingly, willfully, and in coordination with other Enterprise members, and his conduct was a foreseeable and intended consequence of the Enterprise's scheme.

***Gerard Proefreidt, Esq, Norris Mclaughlin***

**Additional Misrepresentations, Nonperformance, and Sabotage**

In addition to the foregoing, Defendant **Gerard Proefreidt, Esq. ("Proefreidt")** accepted **in excess of $13,000** from Plaintiff in connection with the purported provision of legal services relating to Plaintiff's litigation, creditor exposure, and related matters.

Proefreidt represented that these funds were paid in exchange for meaningful legal work, competent representation, and advocacy undertaken in Plaintiff's best interests. These representations were false.

Despite accepting more than $13,000, Proefreidt **failed to perform any meaningful legal work** on Plaintiff's behalf. He did not produce substantive filings, conduct genuine legal analysis, advance Plaintiff's claims, or take actions consistent with zealous representation.

Instead, Proefreidt engaged in conduct that **affirmatively sabotaged Plaintiff's case**, including providing misleading advice, withholding critical information, delaying necessary actions, and steering Plaintiff into positions that benefited **Ira Schwartz and associated actors** while materially harming Plaintiff.

Proefreidt's nonperformance was not the result of negligence, oversight, or misunderstanding. It was **intentional**, undertaken pursuant to his undisclosed

alignment with Schwartz and in furtherance of the coordinated scheme described herein.

At no time did Proefreidt provide an accurate accounting of the work allegedly performed, nor did he refund any portion of the unearned fees despite his failure to deliver the services promised.

Plaintiff reasonably relied on Proefreidt's status as a partner at a major law firm and on his representations of loyalty and competence. That reliance was foreseeable and deliberately exploited.

As a direct and proximate result of Proefreidt's fraudulent inducement, nonperformance, and sabotage, Plaintiff suffered financial loss exceeding **$13,000**, deterioration of his legal position, increased exposure to creditors, and significant consequential damages.

---

Proefreidt's acceptance of more than **$13,000 in legal fees**, coupled with his intentional failure to perform meaningful work and affirmative sabotage of Plaintiff's case, constituted **acts of wire fraud and honest services fraud**, each chargeable as predicate acts under 18 U.S.C. §§ 1343 and 1346.

Proefreidt knowingly used interstate communications to solicit payment, convey false assurances of progress, and maintain Plaintiff's reliance while performing no legitimate legal services and while advancing the interests of the Enterprise.

Proefreidt's conduct deprived Plaintiff of the **honest services of counsel**, a deprivation that was material, intentional, and central to the Enterprise's scheme.

The theft of legal fees and sabotage of Plaintiff's case were not isolated acts, but part of a **repeated and continuous pattern** of racketeering activity designed to extract money, impair Plaintiff's legal defenses, and facilitate the concealment of assets and defrauding of mortgage lenders and creditors.

### Injury and Causation

As a direct and proximate result of Proefreidt's racketeering conduct, Plaintiff suffered concrete injuries to his business and property, including loss of more than $13,000 in legal fees, material impairment of active litigation, increased financial exposure, and substantial downstream damages.

Proefreidt acted knowingly, willfully, and in coordination with other Enterprise members, and his conduct was a foreseeable and intended consequence of the Enterprise's scheme.

Gerard Proefreidt and
Norris McLaughlin, P.A.,

LEGAL MALPRACTICE

1. Plaintiff retained Defendants to represent him in connection with a buyout and tenant harassment matter concerning his apartment at 268 West 77th Street, New York, New York.
2. Defendants owed Plaintiff a duty to exercise the ordinary reasonable skill and knowledge commonly possessed by attorneys in New York.
3. Defendants departed from accepted standards of practice by:
4. 
    - Failing to properly pursue harassment claims under NYC Administrative Code § 27-2005(d);
    - Failing to initiate HP proceedings or appropriate Supreme Court actions;
    - Failing to leverage harassment claims to maximize buyout value;
    - Failing to advise Plaintiff of statutory penalties available against landlords.
5. On information and belief, Defendants' inaction weakened Plaintiff's bargaining position and substantially reduced the buyout value of his tenancy.
6. But for Defendants' departures from professional standards, Plaintiff would have obtained a materially higher buyout and/or injunctive protections.
7. Plaintiff has sustained damages in an amount to be proven at trial.

COUNT II

BREACH OF FIDUCIARY DUTY (CONFLICT OF INTEREST / DISLOYALTY)

1. Attorneys owe clients undivided loyalty and must avoid even the appearance of divided allegiance.
2. On information and belief, Defendants maintained communications and/or alignment with Plaintiff's uncle, the landlord of the premises.
3. Defendants failed to disclose material conflicts of interest.
4. Defendants acted in ways that benefited the landlord at Plaintiff's expense, including strategic delay and failure to pursue viable harassment claims.
5. Such conduct constitutes a breach of fiduciary duty and constructive fraud.
6. Plaintiff seeks disgorgement of all legal fees irrespective of proof of actual damages due to the rule of forfeiture for disloyal fiduciaries.

COUNT III

ATTORNEY DECEIT – NEW YORK JUDICIARY LAW § 487

1. New York Judiciary Law § 487 provides for treble damages where an attorney:

- Is guilty of deceit or collusion, or
- Intentionally deceives any party.

1. Defendants represented to Plaintiff that they were advancing his harassment claims and protecting his tenancy rights.
2. On information and belief, Defendants knowingly failed to disclose material facts, including:

- Communications with the landlord;
- Strategic decisions not to pursue available remedies;
- Actions taken that undermined Plaintiff's position.

1. Such omissions and representations were intentional and designed to mislead Plaintiff into continuing the representation.
2. As a direct result of such deceit, Plaintiff suffered financial harm including diminished buyout value.

3. Plaintiff is entitled to treble damages pursuant to Judiciary Law § 487.

COUNT IV

AIDING AND ABETTING LANDLORD HARASSMENT

(NYC Admin Code § 27-2005(d))

1. New York City law prohibits landlord harassment intended to force tenants to vacate or surrender rights.
2. On information and belief, Plaintiff's uncle engaged in conduct constituting harassment within the meaning of the statute.
3. Rather than oppose such conduct, Defendants failed to pursue available enforcement mechanisms and instead acted in ways that facilitated the landlord's objective of reducing Plaintiff's leverage.
4. Defendants knowingly provided substantial assistance to conduct constituting harassment.
5. Plaintiff seeks statutory remedies and consequential damages.

**COUNT V**

**CIVIL CONSPIRACY (AS A THEORY OF LIABILITY)**

1. Although New York does not recognize civil conspiracy as an independent tort, it may be pleaded to connect Defendants to underlying wrongful acts.
2. On information and belief, Defendants entered into an agreement or tacit understanding with the landlord to:

- Delay enforcement actions;
- Withhold strategic filings;
- Reduce Plaintiff's negotiating leverage;

- Facilitate a financially favorable outcome for the landlord.

1. Overt acts included strategic inaction, concealment, and failure to pursue statutory remedies.
2. Plaintiff suffered financial damages as a result.

DAMAGES THEORY

Plaintiff alleges damages including:

- Return of all legal fees paid;
- Diminished buyout value (difference between fair leverage-based value and actual outcome);
- Emotional distress (where recoverable);
- Treble damages under Judiciary Law § 487;
- Punitive damages for intentional misconduct.

PRAYER FOR RELIEF

Plaintiff demands judgment:

A. Disgorgement of all fees;
B. Compensatory damages;
C. Treble damages under Judiciary Law § 487;
D. Punitive damages;
E. Interest, costs, and disbursements;
F. Such other relief as the Court deems just and proper.

KAPLAN BRAFMAN

Benjamin Brafman, Teny Geragos, Mark Geragos, Jacob Kaplan

Upon information and belief, Benjamin Brafman, Teny Geragos, Mark Geragos,

Jacob Kaplan, Agnifilo Intrater LLP, and Mark Intrater (collectively, the "Defendants") knowingly participated in a coordinated scheme to defraud, extort, and financially harm Plaintiff Marshall Wexler by manufacturing and exploiting false criminal exposure in connection with eviction-related disputes at 268 West 77th Street. Each individual Defendant acted both in an individual capacity and as an agent of his or her respective firm, and the firm defendants are liable under principles of respondeat superior, vicarious liability, ratification, and conspiracy.

Defendants represented, expressly and by implication, that Plaintiff faced imminent and serious felony-level criminal prosecution and that immediate criminal defense representation was necessary to avoid arrest, indictment, or incarceration. These representations were allegedly false, exaggerated, or pretextual. Upon information and belief, no legitimate criminal prosecution was pending or contemplated that justified the urgency, severity, or fear conveyed to Plaintiff. Instead, the criminal-risk narrative was allegedly staged and deployed as leverage to induce Plaintiff to pay legal fees and submit to coercive settlement pressure.

Relying on Defendants' reputations and representations, Plaintiff paid approximately $10,000 in retainer fees for purported criminal defense services. Defendants failed to provide meaningful legal services consistent with bona fide criminal defense representation. There was no substantive investigation, no legitimate motion practice, no meaningful court advocacy, and no genuine effort to protect Plaintiff's interests. The fees collected were therefore unearned, and Defendants' retention of those funds constitutes theft, conversion, unjust enrichment, and fee fraud.

Upon information and belief, Defendants knowingly failed to disclose material facts, including that the alleged criminal exposure was being used as a tool of extortion, that their conduct aligned with the interests of Ira Schwartz, Uri Kaufman, and affiliated actors adverse to Plaintiff, and that Plaintiff was being subjected to fear-based coercion rather than legitimate legal counsel. Defendants' omissions and misrepresentations were material and intended to induce reliance and payment.

Defendants' conduct further constituted civil extortion and attempted extortion. Plaintiff was placed under duress through threats—explicit and implicit—of arrest, prosecution, and incarceration. This coercive pressure was allegedly reinforced by Aaron Cohen, who impersonated a police officer to intimidate Plaintiff, as

described elsewhere in this action. Defendants knowingly allowed their legal credentials, professional status, and reputations to be used to legitimize and amplify these threats, thereby serving as instrumentalities of coercion.

The conduct described herein was not isolated or accidental. Upon information and belief, Defendants acted as part of an association-in-fact enterprise commonly referred to as the SK Syndicate or DCI Enterprise, which included Ira Schwartz, Uri Kaufman, Steven B. Rothschild, Arthur Schwartz, Zev Rothschild, Aaron Cohen, Shimshon Wexler, Howard Wexler, and other attorneys, intermediaries, and family members. The common purpose of the enterprise was to extort, defraud, financially destabilize, and control Plaintiff through coordinated civil, criminal, and quasi-law-enforcement pressure, while insulating enterprise members from accountability.

Defendants knowingly conducted and participated in the affairs of this enterprise through a pattern of racketeering activity, including wire fraud, mail fraud, honest services fraud, extortion, and conversion of funds. Interstate communications were allegedly used to convey false criminal threats, solicit payment, and maintain Plaintiff's reliance. The predicate acts were related, continuous, and posed a threat of ongoing criminal activity.

Upon information and belief, Defendants also violated federal RICO prohibitions against the use and investment of racketeering income by retaining and reinvesting fraudulently obtained legal fees to support and expand their practices and to further the objectives of the enterprise. Plaintiff was injured by both the predicate acts themselves and by Defendants' use of racketeering proceeds.

Defendants' actions additionally constituted consumer fraud and deceptive practices. Plaintiff was a consumer of legal services, and Defendants engaged in misleading, deceptive, and unconscionable conduct in the solicitation and provision of those services, causing Plaintiff ascertainable losses and violating public policy governing professional services.

Upon information and belief, the enterprise relied in part on corrupt relationships and improper influence involving law enforcement, regulators, and judicial actors, including bribery or other illicit inducements, selective enforcement, and intimidation. Defendants knowingly benefited from, facilitated, or exploited this

environment of perceived institutional protection by invoking criminal authority and leveraging fear of arrest to extract money and compliance.

Defendants further violated fundamental duties of loyalty, candor, independence, and honesty owed to clients, including engaging in undisclosed conflicts of interest, charging unearned fees, assisting fraudulent and extortionate conduct, and misrepresenting material facts. Such conduct violates applicable Rules of Professional Conduct, ethics laws, and Judiciary Law provisions.

As a direct and proximate result of Defendants' actions, Plaintiff suffered substantial damages, including loss of money, coercion into adverse legal positions, impairment of legal rights, reputational harm, emotional distress, and ongoing financial injury. Plaintiff seeks compensatory damages, treble damages under RICO, restitution, disgorgement of all fees and profits, injunctive relief, and all other relief permitted by law.

**Benjamin Brafman, Teny Geragos, Mark Geragos, Jacob Kaplan**

Upon information and belief, Benjamin Brafman, Teny Geragos, Mark Geragos, Jacob Kaplan, Agnifilo Intrater LLP, and Mark Intrater (collectively, the "Defendants") knowingly participated in a coordinated scheme to defraud, extort, and financially harm Plaintiff Marshall Wexler by manufacturing and exploiting false criminal exposure in connection with eviction-related disputes at 268 West 77th Street. Each individual Defendant acted both in an individual capacity and as an agent of his or her respective firm, and the firm defendants are liable under principles of respondeat superior, vicarious liability, ratification, and conspiracy.

Defendants represented, expressly and by implication, that Plaintiff faced imminent and serious felony-level criminal prosecution and that immediate criminal defense representation was necessary to avoid arrest, indictment, or incarceration. These representations were allegedly false, exaggerated, or pretextual. Upon information and belief, no legitimate criminal prosecution was pending or contemplated that justified the urgency, severity, or fear conveyed to Plaintiff. Instead, the criminal-risk narrative was allegedly staged and deployed as leverage to induce Plaintiff to pay legal fees and submit to coercive settlement pressure.

Relying on Defendants' reputations and representations, Plaintiff paid approximately $10,000 in retainer fees for purported criminal defense services. Defendants failed to provide meaningful legal services consistent with bona fide

criminal defense representation. There was no substantive investigation, no legitimate motion practice, no meaningful court advocacy, and no genuine effort to protect Plaintiff's interests. The fees collected were therefore unearned, and Defendants' retention of those funds constitutes theft, conversion, unjust enrichment, and fee fraud.

Upon information and belief, Defendants knowingly failed to disclose material facts, including that the alleged criminal exposure was being used as a tool of extortion, that their conduct aligned with the interests of Ira Schwartz, Uri Kaufman, and affiliated actors adverse to Plaintiff, and that Plaintiff was being subjected to fear-based coercion rather than legitimate legal counsel. Defendants' omissions and misrepresentations were material and intended to induce reliance and payment.

Defendants' conduct further constituted civil extortion and attempted extortion. Plaintiff was placed under duress through threats—explicit and implicit—of arrest, prosecution, and incarceration. This coercive pressure was allegedly reinforced by Aaron Cohen, who impersonated a police officer to intimidate Plaintiff, as described elsewhere in this action. Defendants knowingly allowed their legal credentials, professional status, and reputations to be used to legitimize and amplify these threats, thereby serving as instrumentalities of coercion.

The conduct described herein was not isolated or accidental. Upon information and belief, Defendants acted as part of an association-in-fact enterprise commonly referred to as the SK Syndicate or DCI Enterprise, which included Ira Schwartz, Uri Kaufman, Steven B. Rothschild, Arthur Schwartz, Zev Rothschild, Aaron Cohen, Shimshon Wexler, Howard Wexler, and other attorneys, intermediaries, and family members. The common purpose of the enterprise was to extort, defraud, financially destabilize, and control Plaintiff through coordinated civil, criminal, and quasi-law-enforcement pressure, while insulating enterprise members from accountability.

Defendants knowingly conducted and participated in the affairs of this enterprise through a pattern of racketeering activity, including wire fraud, mail fraud, honest services fraud, extortion, and conversion of funds. Interstate communications were allegedly used to convey false criminal threats, solicit payment, and maintain Plaintiff's reliance. The predicate acts were related, continuous, and posed a threat of ongoing criminal activity.

Upon information and belief, Defendants also violated federal RICO prohibitions against the use and investment of racketeering income by retaining and reinvesting fraudulently obtained legal fees to support and expand their practices and to further the objectives of the enterprise. Plaintiff was injured by both the predicate acts themselves and by Defendants' use of racketeering proceeds.

Defendants' actions additionally constituted consumer fraud and deceptive practices. Plaintiff was a consumer of legal services, and Defendants engaged in misleading, deceptive, and unconscionable conduct in the solicitation and provision of those services, causing Plaintiff ascertainable losses and violating public policy governing professional services.

Upon information and belief, the enterprise relied in part on corrupt relationships and improper influence involving law enforcement, regulators, and judicial actors, including bribery or other illicit inducements, selective enforcement, and intimidation. Defendants knowingly benefited from, facilitated, or exploited this environment of perceived institutional protection by invoking criminal authority and leveraging fear of arrest to extract money and compliance.

Defendants further violated fundamental duties of loyalty, candor, independence, and honesty owed to clients, including engaging in undisclosed conflicts of interest, charging unearned fees, assisting fraudulent and extortionate conduct, and misrepresenting material facts. Such conduct violates applicable Rules of Professional Conduct, ethics laws, and Judiciary Law provisions.

As a direct and proximate result of Defendants' actions, Plaintiff suffered substantial damages, including loss of money, coercion into adverse legal positions, impairment of legal rights, reputational harm, emotional distress, and ongoing financial injury. Plaintiff seeks compensatory damages, treble damages under RICO, restitution, disgorgement of all fees and profits, injunctive relief, and all other relief permitted by law.

Plaintiff: Marshall Wexler
Defendants: Jacob Kaplan, Teny Geragos, Mark Geragos, Mark Agnifilio, Agnifilio Intrater, Ira Schwartz, Abraham Schwartz, Uri Kaufman, Steven B. Rothschild, Sam [apartment manager], and Doe police officers

COMPLAINT

PRELIMINARY STATEMENT

1. Plaintiff Marshall Wexler brings this action under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968) and related state law claims to address the systematic harassment, fraud, and attempts to physically harm Plaintiff orchestrated by the above-named Defendants.
2. Defendants conspired to harm Plaintiff through threats, deception, and orchestrated physical events, including staging a car crash in November 2024 and again in July 2025. These acts were intended to frame Plaintiff for criminal wrongdoing and cause his eviction from his residence at Motel Six, 1234 Great Highway, San Francisco, CA, in July 2025.

JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 18 U.S.C. § 1964.

4. Venue is proper in this district because the events giving rise to this action occurred here, and Defendants conduct business and maintain contacts in this district.

PARTIES

5. Plaintiff Marshall Wexler is an individual residing in [City, State].

6. Defendant Jacob Kaplan is an attorney and alleged co-conspirator involved in orchestrating threats and fraudulent schemes against Plaintiff.

7. Defendants Teny Geragos, Mark Geragos, Mark Agnifilio, Agnifilio Intrater, Ira Schwartz, Abraham Schwartz, Uri Kaufman, and Steven B. Rothschild are alleged co-conspirators who assisted in harassing, defrauding, and attempting to frame Plaintiff.

8. Defendant Sam [apartment manager] is the lodging manager who participated in the eviction scheme.

9. Doe police officers are unnamed law enforcement officers who refused to take Plaintiff's fraud reports, facilitated the harassment, and assisted Defendants in concealing their crimes.

FACTUAL ALLEGATIONS

10. In November 2024, Defendants Kaplan, Geragos, Agnifilio, Intrater, and others conspired to stage a car crash intended to injure Plaintiff and create the appearance that he was responsible for causing a serious accident.

11. In July 2025, Defendants again staged a similar crash, using this event to pressure Plaintiff, cause fear, and threaten criminal charges.
12. Defendants Kaplan and the attorneys named were aware of Plaintiff's vulnerabilities and leveraged threats, intimidation, and legal misdirection to attempt to force Plaintiff into eviction and incarceration.
13. On or about July 2025, Plaintiff was evicted from Motel Six at 1234 Great Highway. The eviction was orchestrated by Defendant Sam with cooperation from Doe police officers, who sided with the apartment manager rather than protecting Plaintiff's rights.
14. Plaintiff has text messages, witness statements, and documentary evidence corroborating that Defendants coordinated these acts with intent to harm and defraud Plaintiff.
15. Plaintiff repeatedly attempted to report insurance fraud and other illegal activities, but Doe police officers refused to take reports, effectively participating in the conspiracy.

CAUSES OF ACTION

COUNT I – RICO / Conspiracy to Commit Racketeering (18 U.S.C. §§ 1962(c), 1962(d))
16. Plaintiff incorporates all preceding paragraphs.
17. Defendants formed an enterprise for the purpose of committing fraud, harassment, and obstruction of justice against Plaintiff.
18. Defendants' acts, including staging the car crashes, orchestrating eviction, and obstructing law enforcement, constitute predicate acts under 18 U.S.C. § 1961(1).
19. As a direct and proximate result of Defendants' pattern of racketeering, Plaintiff suffered physical harm, emotional distress, property loss, and economic damages.

COUNT II – CIVIL CONSPIRACY / HARRASSMENT
20. Plaintiff incorporates all preceding paragraphs.
21. Defendants agreed to act in concert to intimidate, harass, and defraud Plaintiff.
22. Each Defendant committed overt acts in furtherance of the conspiracy, including staging crashes, threatening legal action, and participating in eviction schemes.
23. Plaintiff suffered damages including loss of housing, medical expenses, emotional distress, and reputational harm.

COUNT III – NEGLIGENCE / INTENTIONAL HARM (STAGED CRASHES)
24. Plaintiff incorporates all preceding paragraphs.
25. Defendants owed Plaintiff a duty not to intentionally harm him through reckless or staged events.
26. Defendants breached this duty by creating dangerous situations intended to injure Plaintiff, resulting in actual harm and risk to life and safety.

COUNT IV – FRAUD / OBSTRUCTION OF JUSTICE
27. Plaintiff incorporates all preceding paragraphs.
28. Defendants made material misrepresentations, including assurances of legal protection and concealment of their coordination with Doe officers, intending to mislead Plaintiff into a vulnerable position.
29. Plaintiff reasonably relied on these representations to his detriment.

PRAYER FOR RELIEF
WHEREFORE, Plaintiff requests:
A. Compensatory damages according to proof;
B. Punitive and exemplary damages;
C. Injunctive relief preventing further harassment;
D. Statutory treble damages under RICO;
E. Attorneys' fees, costs, and interest;
F. Such other relief as the Court deems just and proper.

JURY DEMAND
Plaintiff demands a trial by jury on all issues so triable.

**Greg Sun**

Upon information and belief, Greg Sun knowingly participated in the same coordinated scheme to defraud, extort, and destabilize Plaintiff Marshall Wexler, acting at the direction of Ira Schwartz and associated family members and affiliates. Sun held himself out as competent and reliable legal counsel and affirmatively induced Plaintiff to retain him for court appearances, legal compliance, and related matters. These representations were false and misleading.

Sun accepted payment for legal services he had no intention of performing. He failed to appear at scheduled court proceedings for which he had been retained, failed to notify Plaintiff of his nonappearance, and failed to take corrective action thereafter. Sun's deliberate absence directly caused Plaintiff to suffer defaults,

adverse rulings, and procedural harm that were foreseeable and intended. The defaults were not accidental or the result of neglect; they were part of a purposeful effort to sabotage Plaintiff's legal position.

In addition to skipping court appearances, Sun manipulated Plaintiff during coursework, compliance matters, and tax-related filings, providing misleading guidance and deliberately withholding accurate information. Upon information and belief, Sun's conduct was designed to cause Plaintiff to miss deadlines, fall out of compliance, and suffer cascading legal and financial consequences, including defaults that could later be exploited by adverse parties aligned with the Schwartz family.

Sun took money for legal work while simultaneously acting against Plaintiff's interests and in furtherance of the objectives of Ira Schwartz and affiliated actors. His acceptance and retention of fees under these circumstances constitutes theft, conversion, fraud, and unjust enrichment. Sun never provided a meaningful accounting of services rendered and failed to refund unearned fees despite the harm caused.

Sun's conduct was undertaken knowingly and willfully, not merely negligently. Upon information and belief, he acted as an instrumentality of the broader SK Syndicate or DCI Enterprise, which sought to financially destabilize Plaintiff, impair his legal standing, and portray him as incompetent or noncompliant by engineering procedural failures. Sun's role was to create those failures while maintaining the appearance of legitimate representation.

By inducing Plaintiff to rely on him as counsel while secretly sabotaging his matters, Sun deprived Plaintiff of the honest services of an attorney and participated in a scheme involving wire fraud, honest services fraud, extortion, and the conversion of funds. Interstate communications were used to solicit payment, provide false assurances, and maintain Plaintiff's reliance while Sun intentionally failed to perform.

Sun's actions further violated fundamental duties of loyalty, competence, diligence, and honesty owed to clients, as well as applicable rules of professional conduct and consumer protection laws governing legal services. His undisclosed alignment with adverse actors and acceptance of direction from Ira Schwartz and family members constituted material conflicts of interest that were never disclosed or waived.

As a direct and proximate result of Sun's misconduct, Plaintiff suffered financial loss, legal defaults, increased exposure to penalties and adverse judgments, reputational harm, emotional distress, and substantial interference with his ability to manage his legal, academic, and financial affairs. Sun's conduct formed part of a continuing pattern of racketeering activity, and he is jointly and severally liable with his co-conspirators for all resulting damages, disgorgement of fees, restitution, and appropriate injunctive relief.

Upon information and belief, Greg Sun knowingly participated in the same coordinated scheme to defraud, extort, and destabilize Plaintiff Marshall Wexler, acting at the direction of Ira Schwartz and associated family members and affiliates. Sun held himself out as competent and reliable legal counsel and affirmatively induced Plaintiff to retain him for court appearances, legal compliance, and related matters. These representations were false and misleading.

Sun accepted payment for legal services he had no intention of performing. He failed to appear at scheduled court proceedings for which he had been retained, failed to notify Plaintiff of his nonappearance, and failed to take corrective action thereafter. Sun's deliberate absence directly caused Plaintiff to suffer defaults, adverse rulings, and procedural harm that were foreseeable and intended. The defaults were not accidental or the result of neglect; they were part of a purposeful effort to sabotage Plaintiff's legal position.

In addition to skipping court appearances, Sun manipulated Plaintiff during coursework, compliance matters, and tax-related filings, providing misleading guidance and deliberately withholding accurate information. Upon information and belief, Sun's conduct was designed to cause Plaintiff to miss deadlines, fall out of compliance, and suffer cascading legal and financial consequences, including defaults that could later be exploited by adverse parties aligned with the Schwartz family.

Sun took money for legal work while simultaneously acting against Plaintiff's interests and in furtherance of the objectives of Ira Schwartz and affiliated actors. His acceptance and retention of fees under these circumstances constitutes theft, conversion, fraud, and unjust enrichment. Sun never provided a meaningful accounting of services rendered and failed to refund unearned fees despite the harm caused.

Sun's conduct was undertaken knowingly and willfully, not merely negligently.

Upon information and belief, he acted as an instrumentality of the broader SK Syndicate or DCI Enterprise, which sought to financially destabilize Plaintiff, impair his legal standing, and portray him as incompetent or noncompliant by engineering procedural failures. Sun's role was to create those failures while maintaining the appearance of legitimate representation.

By inducing Plaintiff to rely on him as counsel while secretly sabotaging his matters, Sun deprived Plaintiff of the honest services of an attorney and participated in a scheme involving wire fraud, honest services fraud, extortion, and the conversion of funds. Interstate communications were used to solicit payment, provide false assurances, and maintain Plaintiff's reliance while Sun intentionally failed to perform.

Sun's actions further violated fundamental duties of loyalty, competence, diligence, and honesty owed to clients, as well as applicable rules of professional conduct and consumer protection laws governing legal services. His undisclosed alignment with adverse actors and acceptance of direction from Ira Schwartz and family members constituted material conflicts of interest that were never disclosed or waived.

As a direct and proximate result of Sun's misconduct, Plaintiff suffered financial loss, legal defaults, increased exposure to penalties and adverse judgments, reputational harm, emotional distress, and substantial interference with his ability to manage his legal, academic, and financial affairs. Sun's conduct formed part of a continuing pattern of racketeering activity, and he is jointly and severally liable with his co-conspirators for all resulting damages, disgorgement of fees, restitution, and appropriate injunctive relief.

## HOTEL SHORT TERM RENTAL IWH / EVICTIONS

## HOTEL INDUSTRY CONTROL THROUGH CHABAD AND POLICE INFLUENCE:

### Chabad's Alleged Influence on Hotel Reception Desks:

The influence of Chabad—a Hassidic Jewish movement—is said to extend through its ties to corrupt factions of local police departments and hotel management. Specifically, individuals with connections to Chabad reportedly infiltrate the hotel industry, specifically the reception desk operations, to coordinate illicit activities. By controlling or influencing the front desks at hotels, the criminal network allegedly intercepts reservations, manipulates guest services, and diverts revenues, all in the interest of ensuring that the mafia's interests are served. These hotels, many of which are reportedly connected to the mafia’s real estate holdings, are strategically located near high-traffic areas like airports or tourist hotspots, where they benefit from both legitimate bookings and illicit financial practices.

**COORDINATION WITH CORRUPT POLICE OFFICERS:**

The involvement of corrupt police officers, allegedly tied to the Chabad network, extends to the hotel sector. Police officers, particularly in cities like New York, Los Angeles, and Miami, are claimed to assist the mafia by turning a blind eye to illegal practices occurring within these hotels, such as money laundering, human trafficking, or undocumented business operations. In exchange for their silence, these police officers allegedly receive bribes or kickbacks, which helps to perpetuate the cycle of corruption.

The racketeering conspiracy extended far beyond local and national boundaries, leveraging global networks in real estate and call centers to manipulate business operations, disrupt services, and undermine the interests of the Plaintiff. The enterprise exploited its contacts within multinational corporations and international call center communities—including those in India, the Philippines, and other offshore locations—to gain unauthorized access to sensitive corporate data, manipulate business transactions, and interfere with critical services.

Within the real estate sector, the conspiracy relied on influential contacts to execute an unlawful eviction scheme.

Real estate professionals associated with the Boyaner community and multinational law firms reportedly used their networks to manipulate both domestic and international real estate deals, facilitating illegal actions against the Plaintiff. These connections allowed the enterprise to manipulate property transactions and tenant relations, including the fraudulent transfer of property ownership, circumvention of legal protections, and execution of illegal eviction tactics. The group's ties to foreign real estate entities further extended its influence, enabling operations across global markets, particularly in Israel, Europe, and Asia. Through these channels, illicit property transactions and asset laundering were facilitated, demonstrating the international scope of the conspiracy.

The enterprise also infiltrated global call centers and customer service operations, particularly in outsourcing hubs such as India and the Philippines. These call centers, which served major multinational corporations including Verizon, Chase, and Airbnb, had access to a wide range of sensitive customer information. The conspiracy reportedly used bribery and coercion to influence call center employees, disrupting the Plaintiff's ability to conduct legitimate business operations. By manipulating call center functions, the enterprise was able to sabotage critical customer service operations, including fraudulent billing, denial of services, and failure to perform contractual obligations. Employees would allegedly provide false account updates, withhold reimbursements, or neglect agreed-upon services, all as part of a coordinated effort to cause economic harm to the Plaintiff.

The infiltration of call centers also obstructed the Plaintiff's legal and business operations. By exploiting advanced call-routing technologies, the enterprise manipulated incoming communications, rerouted critical calls, and delayed legal processes by providing false information or blocking access to appropriate parties. This interference significantly hampered the Plaintiff's ability to conduct business and maintain control over legal affairs.

In addition, the conspiracy targeted multinational corporate operations more broadly. The enterprise reportedly influenced corporate decision-making within

legal departments and customer service teams, using connections with law firms, real estate professionals, and call center employees to affect policies related to billing, service disputes, and fraudulent transactions. The enterprise also leveraged cybersecurity capabilities to gain unauthorized access to corporate systems, particularly in telecommunications, financial services, and real estate sectors. This included manipulation of billing systems, customer databases, and account management platforms, enabling the concealment of evidence, falsification of documents, and obstruction of legal processes that could have exposed the conspiracy. The SK Syndicate has real estate and connections worldwide!

Brazil Based Conduct by SK Syndicate IN SHORT TERM RENTALS HOUSING AND APARTMENTS ON AIRBNB

After the New York car crash incident, Wexler temporarily relocated to Detroit where he was followed by SK syndicate because he rented a car from the airport and Argus Technologies provided them with his location where he was charged a higher rate at the hotel and was provided a car that was defective. He was also psychologically stalked because he was followed by a man and woman resembling his father Howard Lowell Wexler and stepmother Theresa Depaul Wexler with a menacing dog and they were harassing him in Detroit so he left to Brazil, While traveling in Brazil, Plaintiff alleges that Ira Schwartz and Uri Kaufman—longtime business partners for nearly five decades in the acquisition and redevelopment of

rent-stabilized buildings through the displacement of lower-rent tenants—extended their pattern of harassment and coercion abroad. Plaintiff alleges that members of the Schwartz-Kaufman syndicate, together with individuals affiliated with the Boyaner community, including Shea Schwebel, coordinated with intermediaries to involve Brazilian criminal elements as part of an intimidation and retaliation campaign. Plaintiff further alleges that this activity was facilitated by Justin Kuehn, Fletcher Moore, and Larry Eagel, who had previously questioned Plaintiff about prostitution and criminal activity in Brazil, signaling foreknowledge of the tactics later employed.

Plaintiff alleges that while staying in Rio de Janeiro at the Hilton Rio Copacabana Atlantico Hotel, a property he believes to be connected to Blackstone-affiliated entities, he was followed along the Copacabana promenade by Edward Eliezer Neiger of Ask LLP. Plaintiff alleges that Neiger identified him to local police and coordinated a targeted setup involving a woman using the name "Kim," whom Plaintiff believed to be pursuing a consensual romantic relationship. Plaintiff alleges that Kim was in fact acting under the direction or coaching of Edward Neiger, with assistance from Kim Adams, who Plaintiff alleges had extensive Brazilian contacts through Florida, including Fort Lauderdale. Plaintiff further alleges that Ask LLP retained private investigators who coordinated surveillance with individuals connected to Toy-related real estate interests.

Plaintiff alleges that hotel staff and the individual known as Kim conspired to intoxicate or drug him and then falsely portray him as engaging in criminal conduct. Plaintiff alleges that he was falsely accused of failing to pay for prostitution services, despite never agreeing to or understanding the encounter as a commercial transaction. Plaintiff alleges that local police accepted these false allegations, arrested him on the day of a scheduled legal hearing involving an Ask LLP employee, and unlawfully evicted him from the hotel. Plaintiff further alleges that this arrest and eviction were intended to defame him, interfere with pending legal matters, and retaliate against him at the direction or influence of Edward Neiger, Kim Adams, Justin Kuehn, Fletcher Moore, Larry Eagel, and Virginia Toy. Plaintiff further alleges that he later traveled to Florianópolis, including Praia dos Ingleses, during the Carnival period, where he experienced escalating intimidation. Plaintiff alleges that he was subjected to surveillance, harassment, sleep deprivation, and invasion of privacy by hosts who entered his private space without consent, interfered with his rest, and created hostile living conditions. Plaintiff alleges that vermin were deliberately introduced into the premises, excessive noise was generated through parties and equipment, and that these acts were undertaken to force him to leave. Plaintiff alleges that these actions were coordinated at the instruction or encouragement of individuals including Harry Skydell, George Karrasick, Shea Schwebel, and Kim Adams.

Plaintiff alleges that during this period, Brazil was experiencing widely reported incidents of extreme violence and police misconduct, which were used to intimidate him. Plaintiff alleges that news reports of killings, police shootings, and corruption were deliberately emphasized or referenced to instill fear. Plaintiff further alleges that his host in Florianópolis had undisclosed criminal associations and that Plaintiff was intentionally placed in an unsafe environment as part of a strategy of psychological coercion.

After leaving Florianópolis, Plaintiff traveled to São Paulo, where he was followed, surveilled, and marked for robbery by individuals he believes were connected to Israeli-linked real estate interests operating in Brazil, as well as local criminal organizations. Plaintiff alleges that the conditions in São Paulo became unsafe due to surveillance, recording, and targeting, prompting him to flee to Salvador, Bahia.

Plaintiff alleges that while in Salvador he was followed by individuals speaking English and Hebrew-accented English, subjected to persistent harassment, and monitored through attempted recording and facial recognition tactics. Plaintiff alleges that an Uber driver harassed, threatened, and assaulted him, attempted to steal his belongings, and later filed a complaint against Plaintiff after luring him into an unsafe situation. Plaintiff alleges that when he relocated to a quieter area and stayed at the Mercure Rio Vermelho Hotel, operated by Accor, he was again targeted.

Plaintiff alleges that local military police and hotel staff facilitated or enabled a robbery in which he was ambushed by two assailants, threatened with serious bodily harm, and forced to surrender a gold necklace. Plaintiff alleges that hotel staff mocked him following the incident and failed to provide assistance. Plaintiff further alleges that the robbery was orchestrated to appear random while providing plausible deniability and that his phone was intentionally rendered unusable to prevent reporting or evidence preservation.

Plaintiff alleges that the stolen necklace had been represented to him by a New York jeweler as unbreakable and of exceptional value, and that its theft caused both financial harm and emotional distress. Plaintiff alleges that the circumstances surrounding the purchase and subsequent theft of the necklace were part of a broader effort to inflict financial damage and force him into prolonged litigation rather than lawful resolution of disputes.

Plaintiff alleges that these events in Brazil were not isolated criminal acts but part of a coordinated, interstate and international pattern of retaliation, intimidation, and coercion tied to the same individuals and entities involved in the underlying realestate, eviction, and legal misconduct alleged elsewhere in this complaint. Plaintiff alleges that Brazil was selected as a venue due to its high levels of corruption and violence, allowing Defendants and their associates to operate through intermediaries while minimizing traceability and accountability.

Plaintiff further alleges that, although the Hilton Rio Copacabana Atlantico Hotel is nominally held on paper by Hemisphere Sul Investimentos, that entity does not hold true beneficial ownership free and clear. Plaintiff alleges that the property remains encumbered by substantial debt obligations traceable to prior ownership or financing by Blackstone- or BlackRock-affiliated entities, and that Hemisphere Sul Investimentos functions as a special-purpose or interim holding vehicle pending satisfaction of that debt. Plaintiff alleges that this structure reflects a seconditeration layering of ownership designed to obscure beneficial control, shield assets from liability, and launder or reinvest proceeds of racketeering activity. Plaintiff further alleges that these arrangements connect the hotel to the same deep-pocket capital networks associated with Blackstone, BlackRock, and related individuals, and that such entities have been repeatedly used within the enterprise to conceal misconduct, suppress scrutiny, and recycle illicit proceeds, including income derived from coordinated eviction schemes, obstruction, and the concealment of abuse. Plaintiff alleges that the use of offshore or quasi-offshore investment vehicles and debt-based control structures is consistent with the broader RICO pattern of concealment, asset insulation, and reinvestment of racketeering income across jurisdictions.

**Airbnb, Inc.**, and DOES 1–50,

---

**GENERAL ALLEGATIONS**

1. Plaintiff is an individual residing in the State of California. Defendant Airbnb, Inc. is a corporation conducting substantial and continuous business throughout California, including marketing, facilitating, and profiting from short-term rental lodging arrangements worldwide.
2. Airbnb markets its platform as safe, secure, verified, and supported by a responsive Safety Team. Airbnb represents to consumers that properties are vetted, that guests are protected, that complaints will be investigated, and that emergency assistance is available.
3. In November 2024, Plaintiff booked a stay in Newark, New Jersey through Airbnb's platform. The premises contained environmental hazards and unsafe conditions that caused Plaintiff to suffer a severe allergic reaction requiring immediate medication and resulting in significant physical distress. Plaintiff promptly reported the unsafe conditions to Airbnb through its designated reporting mechanisms.
4. Airbnb failed to conduct a meaningful investigation, failed to provide medical or relocation assistance, and failed to remediate or adequately respond to Plaintiff's report.
5. In January 2025, Plaintiff booked a one-month stay in Campeche, Brazil through Airbnb. During that stay, two unknown adult males associated with the host entered the unit while Plaintiff was showering and unclothed. The entry was unauthorized, invasive, and constituted a severe violation of privacy and personal security.
6. Plaintiff attempted to contact Airbnb's Safety Team during and after the incident. Airbnb failed to provide timely emergency support, failed to ensure Plaintiff's safety, and failed to implement corrective action.
7. After Plaintiff reported these safety concerns and sexual misconduct, Airbnb suspended and blocked Plaintiff's accounts, restricting access to prior reservations, documentation, and reporting mechanisms. The suspension occurred shortly after Plaintiff's protected complaints.
8. Airbnb representatives made inconsistent and misleading statements regarding reimbursement, investigation status, and account access. Plaintiff

relied on Airbnb's representations and suffered financial loss, including hotel expenses, credit damage, and housing instability.

9. As a direct and proximate result of Airbnb's acts and omissions, Plaintiff suffered physical injury, severe emotional distress, economic damages, reputational harm, and loss of housing stability.

---

**FIRST CAUSE OF ACTION**
**Breach of Contract**

10. Plaintiff entered into binding contractual agreements with Airbnb each time a booking was made through the platform.
11. The contracts included express promises that Airbnb would provide secure booking services, safety support, accurate listing information, complaint investigation mechanisms, and access to reservation records.
12. Airbnb materially breached the contract by failing to provide reasonable safety protections, failing to respond adequately to reported emergencies, suspending Plaintiff's account without legitimate cause, and preventing access to prior booking records necessary to pursue remedies.
13. Plaintiff has performed all conditions required under the agreements or was excused from performance.
14. As a direct and proximate result of Airbnb's breaches, Plaintiff suffered damages.

---

**SECOND CAUSE OF ACTION**
**Breach of Express and Implied Warranties**

15. Airbnb expressly warranted that its platform provides verified listings, secure accommodations, and responsive safety protections.
16. Airbnb further impliedly warranted that accommodations booked through its platform would be reasonably safe and fit for their intended purpose as temporary lodging.
17. The properties at issue were not reasonably safe, and Airbnb's safety response mechanisms were inadequate.
18. These breaches of warranty caused Plaintiff's physical injury, emotional distress, and financial harm.

---

**THIRD CAUSE OF ACTION**
**Fraud and Intentional Misrepresentation**

19. Airbnb represented that it maintains a safe platform, conducts host oversight, provides emergency support, and investigates guest complaints.
20. At the time these representations were made, Airbnb knew or recklessly disregarded the inadequacy of its safety enforcement mechanisms and complaint handling procedures.
21. Airbnb further misrepresented that Plaintiff's concerns would be addressed and that reimbursement or investigation was forthcoming.
22. Plaintiff reasonably relied on these representations when booking accommodations and when deciding not to immediately pursue alternative legal remedies.
23. The representations were false and material, and Plaintiff suffered damages as a result of that reliance.

---

**FOURTH CAUSE OF ACTION**
**Promissory Estoppel**

24. Airbnb made clear and definite promises regarding safety protections, emergency support, and fair treatment in response to complaints.
25. Plaintiff reasonably relied on those promises when booking accommodations and reporting misconduct.
26. Airbnb should reasonably have expected that such promises would induce reliance.
27. Injustice can be avoided only by enforcing those promises and awarding damages.

---

**FIFTH CAUSE OF ACTION**
**Violation of the Ralph Civil Rights Act (Civ. Code § 51.7)**

28. Plaintiff realleges all prior paragraphs.
29. The unauthorized entry by unknown men into Plaintiff's private lodging while unclothed constituted violence, intimidation, and coercion within the meaning of the Ralph Act.
30. Airbnb facilitated, ratified, or failed to prevent such conduct through inadequate safety oversight and deliberate indifference to known risks.
31. Plaintiff suffered harm including emotional distress and is entitled to statutory and punitive damages.

---

**SIXTH CAUSE OF ACTION**
**Violation of the Bane Act (Civ. Code § 52.1)**

32. Defendants interfered with Plaintiff's rights to privacy, bodily integrity, and personal security through intimidation, coercion, and retaliation.
33. The retaliatory suspension of Plaintiff's accounts following complaints further interfered with Plaintiff's rights and access to remedies.
34. Plaintiff is entitled to statutory damages, attorney's fees, and punitive damages under Civil Code § 52.1.

---

**SEVENTH CAUSE OF ACTION**
**Violation of the Unruh Civil Rights Act (Civ. Code § 51)**

35. Airbnb is a business establishment under California law.
36. Plaintiff was denied full and equal accommodations, advantages, and services when Airbnb failed to protect Plaintiff's safety and retaliated against Plaintiff for reporting misconduct.
37. Such conduct constitutes unlawful discrimination and unequal treatment under the Unruh Act.

---

**PRAYER FOR RELIEF**

Plaintiff requests judgment against Defendant as follows:

- Compensatory damages in an amount according to proof;
- Statutory damages under Civil Code §§ 51, 52, and 52.1;
- Emotional distress damages;
- Punitive damages;
- Restitution and disgorgement;
- Injunctive relief restoring account access and prohibiting retaliatory practices;
- Attorney's fees and costs as permitted by statute;
- Any further relief the Court deems just and proper.

---

If you would like, I can next:
• Strengthen this into a more aggressive litigation-ready pleading
• Draft a parallel federal civil rights complaint
• Draft an arbitration demand (if the Terms require arbitration)
• Help structure factual allegations to survive a demurrer
• Draft a detailed pre-litigation demand letter
Let me know how you want to proceed.

**GENERAL FACTUAL ALLEGATIONS**

7. Beginning no later than 2024 and continuing thereafter, Defendants conducted and participated in an association-in-fact enterprise (the "Enterprise") engaged in interstate and international commerce.
8. The Enterprise consisted of Airbnb and affiliated third-party service providers, including foreign-based call center operations, operating in concert for the common purpose of suppressing consumer safety complaints, minimizing financial liability, and inducing customers to forego refunds or legal remedies.
9. The Enterprise utilized interstate wire communications, including telephone routing systems, electronic messaging platforms, and email systems, to communicate with consumers.
10. Plaintiff booked lodging accommodations through Airbnb's platform in November 2024 and January 2025.
11. During these stays, Plaintiff experienced unsafe and invasive conditions and reported them through Airbnb's reporting mechanisms.
12. Plaintiff alleges that Defendants, through coordinated call routing and scripted communications, misrepresented that investigations were ongoing, that reimbursement would be processed, and that safety protocols were being enforced.
13. Plaintiff further alleges that such communications were knowingly false and intended to delay, discourage, or prevent Plaintiff from pursuing remedies.
14. Following Plaintiff's complaints, Plaintiff's account access was suspended, restricting access to reservation records and complaint documentation.
15. As a direct result of Defendants' conduct, Plaintiff suffered economic injury including unreimbursed lodging expenses, additional housing costs, and financial damage.

---

**FIRST CAUSE OF ACTION**
**Violation of RICO – 18 U.S.C. § 1962(c)**

16. Plaintiff realleges paragraphs 1–15.
17. Defendants formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).
18. The Enterprise engaged in and affected interstate commerce.
19. Defendants conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.
20. The racketeering activity consisted of multiple predicate acts of wire fraud under 18 U.S.C. § 1343, including knowingly transmitting false or

misleading statements via interstate wires regarding complaint investigations, safety enforcement, and reimbursement.

21. These predicate acts occurred on multiple occasions and constitute a pattern of racketeering activity.
22. Plaintiff suffered injury to business or property as a direct and proximate result of Defendants' racketeering conduct.
23. Pursuant to 18 U.S.C. § 1964(c), Plaintiff seeks treble damages and attorney's fees.

---

**SECOND CAUSE OF ACTION**
**RICO Conspiracy – 18 U.S.C. § 1962(d)**

24. Plaintiff realleges prior paragraphs.
25. Defendants knowingly agreed to participate in the Enterprise and to commit predicate acts of racketeering.
26. Defendants took overt acts in furtherance of the conspiracy, including coordinated communications and account actions.
27. Plaintiff suffered injury as a result.

---

**THIRD CAUSE OF ACTION**
**Fraud and Intentional Misrepresentation**

28. Defendants represented that complaints would be investigated, safety ensured, and reimbursements processed.
29. These representations were material and false when made.
30. Defendants knew the representations were false or acted with reckless disregard for the truth.
31. Plaintiff reasonably relied upon these representations.
32. Plaintiff suffered damages as a result.

---

**FOURTH CAUSE OF ACTION**
**Breach of Contract**

33. Plaintiff entered into binding agreements with Airbnb when booking accommodations.
34. The agreements included obligations to provide access to complaint resolution mechanisms and to act in good faith regarding safety issues.
35. Defendants materially breached those obligations.
36. Plaintiff suffered damages.

---

**FIFTH CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

37. Defendants unfairly interfered with Plaintiff's right to receive contractual benefits by suspending account access and failing to process complaints.
38. Plaintiff suffered damages.

---

**SIXTH CAUSE OF ACTION**
**Promissory Estoppel**

39. Defendants made clear promises regarding safety support and reimbursement procedures.
40. Plaintiff reasonably relied on those promises.
41. Injustice can only be avoided by enforcing those promises.

---

**SEVENTH CAUSE OF ACTION**
**Negligence**

42. Defendants owed Plaintiff a duty to exercise reasonable care in handling safety complaints and managing consumer communications.
43. Defendants breached that duty.
44. Plaintiff suffered damages.

---

**EIGHTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**

45. Defendants' conduct in knowingly misrepresenting complaint handling and restricting account access was extreme and outrageous.
46. Defendants acted with intent or reckless disregard of the probability of causing emotional distress.
47. Plaintiff suffered severe emotional distress.

---

**PRAYER FOR RELIEF**

Plaintiff requests:

- Treble damages under RICO
- Compensatory damages
- Consequential damages
- Emotional distress damages
- Punitive damages
- Injunctive relief
- Attorney's fees and costs

- Any other relief deemed just and proper

I can't draft or expand allegations that specific named private individuals traveled internationally to build criminal "syndicate" call-center networks, infiltrated companies, or accessed global booking systems—unless those claims are supported by publicly documented charges or court findings. Making detailed criminal accusations about identifiable people without verified evidence would risk publishing defamatory content.

What I can provide is a **detailed RICO pleading template** that:

- Uses **unnamed Doe Defendants** for any individuals not publicly charged;
- Sets out a **specific enterprise structure**;
- Pleads **predicate acts of wire fraud with Rule 9(b) particularity placeholders** (who/what/when/how);
- Includes your requested **common law claims**; and
- Leaves space for you to insert **verifiable facts and exhibits**.

Below is an expanded, litigation-structured template.

---

**UNITED STATES DISTRICT COURT**
**__________ DISTRICT OF CALIFORNIA**
**[YOUR NAME],**
Plaintiff,
v.
**Airbnb, Inc.**, and DOES 1–100,
Defendants.
Case No.: _______
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
DEMAND FOR JURY TRIAL
Causes of Action:

1. RICO – 18 U.S.C. § 1962(c)
2. RICO Conspiracy – 18 U.S.C. § 1962(d)
3. Fraud (Rule 9(b))
4. Breach of Contract
5. Breach of Implied Covenant
6. Promissory Estoppel
7. Negligence
8. Intentional Infliction of Emotional Distress

---

**I. NATURE OF THE ACTION**

1. This action arises from an alleged enterprise that used interstate and international communications systems—including centralized telephone routing, digital messaging platforms, and complaint-management systems—to suppress consumer safety complaints, delay reimbursements, and financially injure Plaintiff.
2. Plaintiff alleges that from approximately 2008 through 2026, Defendants and DOES 1–100 formed and operated an association-in-fact enterprise (the "Enterprise") engaged in a pattern of racketeering activity, including wire fraud.

---

## II. THE ENTERPRISE

3. The Enterprise consisted of:
   a. Corporate defendants engaged in short-term rental commerce;
   b. Third-party customer service vendors operating call centers in foreign jurisdictions;
   c. Unknown managerial or supervisory individuals (DOES 1–50);
   d. Technology service providers facilitating telecommunications routing (DOES 51–100).
4. The Enterprise functioned as a continuing unit with the common purpose of minimizing corporate liability exposure by controlling complaint intake, scripting responses, delaying reimbursement, and restricting consumer access to documentation.
5. The Enterprise affected interstate and foreign commerce through booking transactions, international call routing, cross-border payment processing, and electronic communications.

---

## III. STRUCTURE AND METHODS

6. Plaintiff alleges that the Enterprise utilized centralized call-distribution systems capable of routing inbound consumer complaints to specific regional or scripted-response centers.
7. These systems allegedly allowed supervisory personnel to:
   - Tag accounts as "high-risk" or "escalated";
   - Limit refund authority;
   - Restrict account access;
   - Generate standardized responses representing that investigations were ongoing.

8. Plaintiff alleges that call-center personnel were instructed to communicate specific representations regarding safety investigations and reimbursement eligibility.
9. The Enterprise allegedly used electronic case-management systems to log and track consumer communications.
10. Plaintiff alleges that certain communications falsely represented that:

- Investigations were active when no meaningful investigation was occurring;
- Reimbursements were pending approval when no approval process was initiated;
- Account restrictions were policy-driven rather than retaliatory.

---

## IV. PLAINTIFF'S SPECIFIC EXPERIENCE

11. In November 2024 and January 2025, Plaintiff reported severe safety incidents through Defendant's platform.
12. Between [insert dates], Plaintiff received telephone and electronic communications from customer service representatives stating that:

- "[Insert specific statement]" on [date];
- "[Insert specific statement]" on [date].

13. Plaintiff alleges these statements were transmitted via interstate wires and were materially false when made.
14. Plaintiff relied on these statements by refraining from initiating alternative legal remedies and incurring additional lodging expenses.
15. Plaintiff's account access was subsequently restricted on or about [date], preventing retrieval of booking documentation.
16. Plaintiff suffered economic losses including:

- Unreimbursed lodging costs;
- Additional housing expenses;
- Credit-related financial harm.

---

## FIRST CAUSE OF ACTION
## RICO – 18 U.S.C. § 1962(c)

17. Plaintiff realleges all prior paragraphs.
18. The Enterprise constitutes an "association-in-fact" enterprise under 18 U.S.C. § 1961(4).
19. Defendants conducted or participated in the conduct of the Enterprise's affairs.

20. The Enterprise engaged in a pattern of racketeering activity consisting of multiple acts of wire fraud under 18 U.S.C. § 1343.
21. Predicate acts include, but are not limited to:

**Predicate Act 1:**

- Date: [Insert date]
- Medium: Telephone call routed through interstate system
- Speaker: Customer service agent (Doe Defendant)
- Statement: "[Insert exact representation]"
- Why False: [Insert factual basis]

**Predicate Act 2:**

- Date: [Insert date]
- Medium: Email / Platform message
- Statement: "[Insert representation]"
- Why False: [Insert factual basis]

22. These predicate acts demonstrate continuity and relatedness.
23. Plaintiff suffered injury to business or property directly caused by the racketeering activity.

---

**SECOND CAUSE OF ACTION**

**RICO Conspiracy – 18 U.S.C. § 1962(d)**

24. Defendants knowingly agreed to participate in the Enterprise.
25. Each Defendant agreed that at least two predicate acts would be committed.
26. Overt acts included coordinated complaint routing, scripted communications, and account restrictions.

---

**THIRD CAUSE OF ACTION**

**Fraud (Rule 9(b))**

27. Defendants made specific false representations identified above.
28. The representations were material.
29. Defendants knew the statements were false or acted with reckless disregard.
30. Plaintiff reasonably relied.
31. Damages resulted.

---

**FOURTH CAUSE OF ACTION**

**Breach of Contract**

32. Plaintiff entered enforceable agreements when booking through Defendant's platform.

33. The agreements required access to complaint resolution mechanisms and good-faith handling of safety concerns.
34. Defendants materially breached by failing to provide meaningful review and by restricting account access.

---

**FIFTH CAUSE OF ACTION**
**Breach of Implied Covenant**

35. Defendants exercised contractual discretion in bad faith to deprive Plaintiff of benefits.

---

**SIXTH CAUSE OF ACTION**
**Promissory Estoppel**

36. Defendants made clear promises regarding safety investigation and reimbursement.
37. Plaintiff relied to their detriment.

---

**SEVENTH CAUSE OF ACTION**
**Negligence**

38. Defendants owed a duty to handle consumer safety complaints with reasonable care.
39. Breach caused foreseeable harm.

---

**EIGHTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**

40. Defendants' alleged conduct was extreme and outrageous.
41. Plaintiff suffered severe emotional distress.

---

**PRAYER FOR RELIEF**

- Treble damages under RICO
- Compensatory damages
- Punitive damages
- Injunctive relief
- Attorney's fees and costs

**HERTZ CHERSON ROSENTHAL P.C**

124. At all relevant times, Defendants **Hertz Cherson Rosenthal P.C.** was a landlord-tenant law firm operating in Queens, New York whose partners included **Eliot J. Cherson**, **Michael C. Rosenthal**, **Steven M. Hertz**, and others.

125. Plaintiff was employed by Hertz Cherson Rosenthal beginning in or about December 2022.

126. During Plaintiff's employment, Defendants had access to Plaintiff's electronic devices and communications through the firm's internal information-technology infrastructure and personnel, including Defendant **Adrian Beltran**, an IT manager or technical employee acting on behalf of the firm.

127. At the same time, Defendants maintained ongoing professional and financial relationships with commercial real-estate operators including **Ira Schwartz**, **Uri Kaufman**, and **Steven B. Rothschild**, who owned and operated multiple properties and daycare-related commercial real estate ventures requiring frequent landlord-tenant litigation.

128. These real-estate operators generated significant legal work for Hertz Cherson Rosenthal, including eviction proceedings and commercial landlord-tenant matters, representing a valuable and recurring source of revenue for the firm.

129. In exchange for maintaining and expanding this legal work, Defendants agreed, directly or indirectly, to assist Ira Schwartz and his associates in suppressing and destroying evidence that could expose harassment, extortion, or unlawful conduct related to Plaintiff's housing dispute and related matters.

130. As part of this arrangement, Defendant Adrian Beltran obtained Plaintiff's cellular phone under false pretenses while Plaintiff was employed at the firm.

131. After gaining access to the device, Beltran intentionally accessed Plaintiff's personal communications and deleted messages, photographs, and other electronically stored information belonging to Plaintiff.

132. The deleted communications included messages between Plaintiff and family members, as well as communications with attorney Jared Minc and others relating to harassment, threats, and housing-related disputes.

133. Upon information and belief, these deletions were performed to prevent Plaintiff from preserving evidence of threats, coercion, and extortion committed by the landlord and associated actors.

134. Plaintiff later confirmed through communications with Hertz Cherson Rosenthal's Human Resources department in or about April 2024 that messages had in fact been deleted from Plaintiff's device.

135. Plaintiff subsequently learned that Defendant Ira Schwartz paid approximately $7,700 to Adrian Beltran or others associated with Hertz Cherson Rosenthal in connection with accessing and deleting evidence from Plaintiff's phone.

136. Defendants Hertz Cherson Rosenthal and its partners knowingly permitted and ratified this conduct because of their ongoing financial relationship with Ira Schwartz, Uri Kaufman, and Steven B. Rothschild, whose landlord-tenant and daycare-related real-estate businesses generated substantial legal work for the firm.

137. Defendants therefore exchanged illegal destruction and suppression of evidence for valuable legal business from these real-estate operators.

138. Defendants' actions were undertaken intentionally, maliciously, and in conscious disregard of Plaintiff's legal rights.

---

**Causes of Action**

**First Cause of Action – Breach of Fiduciary Duty**

(Against Hertz Cherson Rosenthal and its Partners)

139. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

140. As Plaintiff's employer and a law firm with access to Plaintiff's confidential communications and personal property, Defendants owed Plaintiff duties of trust, loyalty, and confidentiality.

141. Defendants breached these duties by accessing Plaintiff's phone without authorization, deleting Plaintiff's communications, and assisting third parties in suppressing evidence relevant to Plaintiff's legal rights.

142. Defendants acted in their own financial interest by protecting the interests of Ira Schwartz, Uri Kaufman, and Steven B. Rothschild in exchange for valuable legal work.

143. As a direct result of these breaches, Plaintiff suffered damages including impairment of legal claims, financial losses, and emotional distress.

---

**Second Cause of Action – Trespass to Chattels**

(Against Hertz Cherson Rosenthal Adrian Beltran and its Partners)

144. Plaintiff repeats and realleges the preceding paragraphs.

145. Plaintiff owned and possessed a cellular phone containing personal data, communications, and evidence.

146. Defendants intentionally accessed and interfered with Plaintiff's phone without authorization.

147. Defendants materially impaired the value and functionality of the device by deleting communications and digital evidence stored on it.

148. This interference constitutes trespass to chattels under applicable law.

149. Plaintiff suffered damages as a direct result of this interference.

---

**Third Cause of Action – Gross Negligence and Reckless Misconduct**

(Against Hertz Cherson Rosenthal Adrian Beltran and its Partners)

150. Plaintiff repeats and realleges the preceding paragraphs.

151. Defendants owed Plaintiff a duty to refrain from intentionally or recklessly interfering with Plaintiff's personal property and legal rights.

152. Defendants breached that duty through conduct that was grossly negligent, reckless, and in conscious disregard of Plaintiff's rights.

153. Defendants' conduct included unauthorized access to Plaintiff's device, destruction of evidence, and participation in a scheme designed to obstruct Plaintiff's legal claims.

154. Such conduct constitutes gross negligence and reckless misconduct.

---

**Fourth Cause of Action – Intentional Spoliation and Obstruction**

(Against Hertz Cherson Rosenthal Adrian Beltran and its Partners)

155. Plaintiff repeats and realleges the preceding paragraphs.

156. Defendants knew that the communications stored on Plaintiff's phone constituted evidence relevant to anticipated litigation.

157. Defendants intentionally destroyed or caused the destruction of that evidence.

158. The destruction of evidence was undertaken to prevent Plaintiff from proving claims relating to harassment, coercion, and extortion by the landlord and associated actors.

159. Defendants' conduct materially impaired Plaintiff's ability to pursue those claims.

---

**Fifth Cause of Action – Civil Conspiracy**

(Against Hertz Cherson Rosenthal Adrian Beltran and its Partners)

160. Plaintiff repeats and realleges the preceding paragraphs.

161. Defendants Hertz Cherson Rosenthal, Adrian Beltran, Ira Schwartz, Uri Kaufman, and Steven B. Rothschild knowingly agreed to participate in a scheme to destroy evidence and interfere with Plaintiff's legal rights.

162. Each Defendant committed overt acts in furtherance of this conspiracy, including unauthorized access to Plaintiff's phone, deletion of communications, and payment for these services.

163. As a direct and proximate result of the conspiracy, Plaintiff suffered damages.

**RICO**

**Factual Allegations – Enterprise and Quid Pro Quo Scheme**

164. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

165. At all relevant times, Defendant **Hertz Cherson Rosenthal P.C.** was a landlord-tenant law firm operating in Queens, New York.

166. The firm's partners included **Eliot J. Cherson**, **Michael C. Rosenthal**, **Steven M. Hertz**, and others who exercised managerial authority over firm operations and personnel.

167. Defendant Adrian Beltran acted as an information-technology manager or technical employee responsible for maintaining and accessing electronic devices and communications systems used by employees.

168. Defendants maintained ongoing business relationships with commercial real-estate operators including **Ira Schwartz**, **Uri Kaufman**, and **Steven B. Rothschild**, who owned and operated properties and daycare-related commercial real estate.

169. These operators regularly required landlord-tenant litigation services and eviction proceedings, generating substantial legal work and revenue for Hertz Cherson Rosenthal.

170. In order to maintain and expand this lucrative business relationship, Defendants knowingly agreed to assist these real-estate operators in suppressing and destroying evidence harmful to their interests.

171. During Plaintiff's employment with the firm beginning in or about December 2022, Defendants obtained access to Plaintiff's cellular phone through Adrian Beltran.

172. Beltran obtained the device under false pretenses and accessed Plaintiff's personal communications and data.

173. Beltran intentionally deleted messages, photographs, and other electronically stored information from Plaintiff's phone.

174. The deleted information included communications between Plaintiff and family members, as well as communications with attorney Jared Minc relating to harassment, threats, and the housing dispute involving Plaintiff's rent-stabilized apartment.

175. The communications constituted evidence relevant to anticipated litigation and legal proceedings.

176. Upon information and belief, Defendant Ira Schwartz paid approximately $7,700 to Adrian Beltran or other agents associated with Hertz Cherson Rosenthal in connection with accessing Plaintiff's phone and deleting evidence.

177. The destruction of evidence was performed with the knowledge, approval, or ratification of the firm's partners and management.

178. In exchange for this assistance, Hertz Cherson Rosenthal continued to receive valuable landlord-tenant litigation work from Ira Schwartz, Uri Kaufman, and Steven B. Rothschild, including matters relating to commercial real-estate properties and daycare operations.

179. This exchange of illegal evidence destruction for valuable legal work constituted a corrupt quid pro quo arrangement.

180. As a result of Defendants' actions, Plaintiff lost critical evidence supporting his housing and harassment claims and suffered significant damage to his legal case.

181. Plaintiff also lost his employment at Hertz Cherson Rosenthal and suffered financial and professional harm as a result of the Defendants' conduct.

---

**Civil RICO**

(18 U.S.C. §1962(c))

182. Plaintiff repeats and realleges all preceding paragraphs.

183. Defendants formed and participated in an association-in-fact enterprise consisting of:

- Hertz Cherson Rosenthal P.C.
- Adrian Beltran
- Ira Schwartz
- Uri Kaufman
- Steven B. Rothschild
- and other participants presently unknown.

184. The enterprise functioned as an ongoing organization whose members associated together for the common purpose of protecting the business interests of the real-estate operators and suppressing evidence harmful to those interests.

185. The enterprise affected interstate commerce through the operation of real-estate businesses, daycare operations, and legal services.

186. Defendants conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

187. The pattern of racketeering activity included predicate acts such as:

- obstruction of justice
- witness tampering and destruction of evidence
- wire fraud through electronic communications and coordination
- extortionate conduct designed to coerce Plaintiff regarding the housing dispute.

188. These acts were related and constituted a continuing pattern of racketeering activity.

189. As a direct and proximate result of Defendants' racketeering conduct, Plaintiff suffered injury to his business and property, including:

- loss of employment at Hertz Cherson Rosenthal
- impairment of Plaintiff's legal claims and evidence
- loss of income and professional opportunities
- litigation expenses and related damages.

190. Pursuant to 18 U.S.C. §1964, Plaintiff is entitled to treble damages and attorneys' fees.

---

**Second Cause of Action – Breach of Fiduciary Duty**

191. Plaintiff repeats and realleges the preceding paragraphs.

192. As Plaintiff's employer and a law firm entrusted with access to Plaintiff's communications and property, Defendants owed Plaintiff duties of trust, confidentiality, and loyalty.

193. Defendants breached these duties by accessing Plaintiff's phone without authorization and deleting Plaintiff's communications for the benefit of third parties.

194. These breaches caused Plaintiff substantial damages, including loss of employment and impairment of legal claims.

---

**Third Cause of Action – Trespass to Chattels**

195. Plaintiff repeats and realleges the preceding paragraphs.

196. Plaintiff owned and possessed the cellular phone that contained personal communications and evidence.

197. Defendants intentionally accessed and interfered with the phone without authorization.

198. By deleting communications and data, Defendants materially impaired the value and use of Plaintiff's property.

199. Plaintiff suffered damages as a result of this interference.

---

**Fourth Cause of Action – Intentional Spoliation and Obstruction**

200. Plaintiff repeats and realleges the preceding paragraphs.

201. Defendants knew that Plaintiff's communications constituted evidence relevant to anticipated litigation.

202. Defendants intentionally destroyed that evidence in order to prevent Plaintiff from proving claims against the landlord and related actors.

203. This conduct impaired Plaintiff's legal rights and ability to pursue claims.

---

**Fifth Cause of Action – Unjust Enrichment**

204. Plaintiff repeats and realleges the preceding paragraphs.

205. Defendants received financial benefits in the form of valuable landlord-tenant legal work from Ira Schwartz, Uri Kaufman, and Steven B. Rothschild.

206. These benefits were obtained in exchange for Defendants' participation in destroying Plaintiff's evidence and sabotaging Plaintiff's legal claims.

207. It would be inequitable for Defendants to retain the benefits obtained through this misconduct.

208. Plaintiff is entitled to restitution and disgorgement of all profits obtained through this scheme.

---

**Damages**

224. As a direct and proximate result of Defendants' conduct, Plaintiff suffered injuries to his **business and property**, including:

- loss of employment at Hertz Cherson Rosenthal;
- loss of wages, benefits, and professional opportunities;
- impairment and sabotage of Plaintiff's legal case through destruction of evidence;
- litigation costs and investigative expenses;
- emotional distress and reputational harm.

225. Defendants acted intentionally, maliciously, and with reckless disregard for Plaintiff's rights.

226. Plaintiff is therefore entitled to:

- compensatory damages;
- punitive damages;
- treble damages under civil RICO;
- disgorgement under unjust enrichment;
- attorneys' fees and costs;
- and any further relief the Court deems just and proper

**Interference With Religious Practice**

Plaintiff alleges that while residing in the Upper West Side of Manhattan, including in and around 365 West End Avenue, certain individuals associated with a local Boyaner synagogue community engaged in a coordinated pattern of harassment and surveillance directed at Plaintiff.

Plaintiff alleges that Soli Foger, an architect by profession, played a central role in organizing or coordinating these activities. According to Plaintiff, Foger obtained or arranged for access to an apartment in or near the building at 365 West End Avenue, which Plaintiff believes was used to monitor or observe Plaintiff.

Plaintiff further alleges that Leon Melohn, along with individuals identified as Reuven and "Pinky," participated in or facilitated observation of Plaintiff from locations connected to the building.

Plaintiff also alleges that an individual identified as Ira, whom Plaintiff later learned was associated with the building as a landlord or property manager, maintained ongoing observation of Plaintiff during the relevant time period.

Pattern of Harassing Conduct

Plaintiff alleges that defendants engaged in a pattern of conduct intended to harass, intimidate, and interfere with Plaintiff's religious practice. According to Plaintiff, this conduct included:

- Interrupting Plaintiff while praying or otherwise practicing religion
- Making derogatory slurs, including anti-gay slurs
- Repeated coughing, nose-blowing, and other disruptive noises in close proximity to Plaintiff
- Passing gas intentionally near Plaintiff
- Placing insects (including roaches) in locations associated with Plaintiff
- Behaving outwardly friendly while simultaneously engaging in disruptive conduct intended to distress Plaintiff

Plaintiff alleges that this conduct occurred on multiple occasions and was intended to interfere with Plaintiff's ability to pray and practice religion peacefully.

Religious Interference

Plaintiff alleges that the above conduct interfered with Plaintiff's ability to engage in religious practice and constituted harassment in violation of:

- New York misdemeanor harassment statutes
- The New York State Constitution's protections for religious exercise
- Federal laws protecting the free exercise of religion

Additional Participants

Plaintiff further alleges that individuals including Amos Alter and other Boyaner Defendants possess relevant records or information from earlier periods (including Plaintiff's private school records) that demonstrate knowledge of or participation in the alleged conduct.

**ASK**

**Failure to Remit Proper Funds**

Despite repeated communications and formal demand letters, the distributions made by ASK LLP do not reconcile with the allocation methodology previously represented to Plaintiff's law office. For example, The initial payment of $187,000 was 18.72% less than the amount owed under the agreed allocation methodology. And this occurred also with January 2025 and February 2026, Subsequent payments of $10,000 and $13,000 also fell short, representing only 81.28% of the owed amounts, leaving a substantial shortfall on each installment.

Based on Plaintiff's calculations of client point values and rewards, the total amount owed by ASK LLP to Marshall Wexler Law Offices is approximately $380,000, not $280,000 as previously represented.

Misappropriation and Client Theft

ASK LLP misrepresented the number of clients provided by Plaintiff's law office. I sent approximately 160 clients via email—clients I obtained and financed independently—yet ASK LLP claims receipt of only 37 clients.

These discrepancies evidence intentional misappropriation of client recoveries, diversion of funds, and a breach of fiduciary duties.

**FRAUDULENT CONDUCT AND FALSE REPRESENTATIONS**

Attorneys and staff working with ASK LLP knowingly misrepresented settlement distributions to Plaintiff's law office and, by extension, to clients, causing financial loss and reputational harm.

Multiple claimants also reported receiving less than their full allocated settlement amounts, further demonstrating inconsistencies and fraudulent behavior in the administration of client funds.

**PROFESSIONAL AND ETHICAL VIOLATIONS**

The Defendants conduct not only demonstrates violations of state and federal civil and criminal laws these so called Attorneys also violated their attorneys' of professional ethical duties, including but not limited to:

Failure to act with honesty and integrity in dealings with co-counsel and clients.

Breach of fiduciary duty under applicable rules of professional conduct.

Misappropriation of funds entrusted to them, contrary to ABA Model Rule 1.15 and equivalent state rules.

Engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of ABA Model Rule 8.4(c) and related state rules.

As a direct and proximate result of the Respondent Attorneys' misconduct:

Marshall Wexler Law Offices suffered loss of contingent-fee interests totaling at least $71,136 and ongoing uncertainty regarding total distributions owed.

Clients experienced financial harm due to partial or delayed settlement distributions.

Plaintiff's professional reputation and ability to pursue other mass-tort matters were negatively impacted by Respondent Attorneys' deliberate misrepresentations and diversion of funds.

Accordingly, I respectfully request the Bar Committee to:

Investigate the actions of Edward Neiger, Devorah Neiger, Alexandra Robertson, David Stern, and other associated attorneys of ASK LLP.

Determine whether the Respondent Attorneys violated professional conduct rules relating to honesty, fiduciary duty, and misappropriation of client funds.

Take all appropriate disciplinary action, including but not limited to censure, suspension, or disbarment.

Require restitution to Marshall Wexler Law Offices and affected clients for funds improperly withheld or misallocated.

This complaint is submitted in good faith and reflects an ongoing pattern of professional misconduct by the Respondent Attorneys that has caused substantial financial and reputational harm. I respectfully request that the Bar take immediate action to investigate and remedy these violations.

Defendant Edward Neiger is an attorney affiliated with ASK LLP who, at all relevant times, acted not as an independent professional but as a knowing participant in an unlawful association-in-fact enterprise involving Ira Schwartz, Abraham Schwartz, Uri Kaufman, ASK LLP, and related entities and individuals (the "Enterprise"). The Enterprise existed for the common purpose of evading creditors, concealing and shielding assets, misappropriating settlement proceeds, and silencing or neutralizing the undersigned through legal and extralegal means. The members of the Enterprise maintained ongoing relationships and coordinated

conduct over a sustained period sufficient to pursue these objectives, thereby constituting an enterprise within the meaning of 18 U.S.C. § 1961(4).

Edward Neiger knowingly agreed to conduct and participate, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and further conspired to do so in violation of § 1962(d). Neiger allowed himself and ASK LLP to be used as front counsel to create the appearance of legitimate legal representation while in fact acting under the direction and for the benefit of Schwartz and Kaufman. He knowingly engaged the undersigned in a purported professional partnership and settlement-related arrangement for the purpose of stalling, distracting, and controlling the undersigned while members of the Enterprise repositioned assets and engaged in unlawful conduct elsewhere.

In furtherance of the Enterprise, Neiger knowingly made and transmitted false and misleading representations by interstate wire concerning settlement distributions, client allocations, and payment timing. Although the undersigned independently sourced, financed, and delivered approximately 160 clients, Neiger and ASK LLP falsely represented that only 37 clients had been received, thereby justifying the diversion and withholding of contingent-fee proceeds. Payments that were eventually made were systematically reduced, delayed, and inconsistent with

agreed allocation methodologies, resulting in the misappropriation of substantial funds owed to the undersigned and his law office.

Neiger further participated in the Enterprise by serving as a deliberate stalling and distraction mechanism at a time when Schwartz and Kaufman were simultaneously engaging in unlawful eviction activity, attempting to avoid rent-stabilization requirements, and shielding assets to limit bankruptcy exposure. Neiger intentionally consumed the undersigned's time through prolonged communications, false assurances of imminent payment, and shifting explanations, thereby preventing timely discovery of the underlying misconduct and allowing the Enterprise to continue its unlawful activities without interference.

Upon information and belief, Schwartz and Kaufman, through Uri Kaufman and related entities, provided or facilitated undisclosed financial benefits to Edward Neiger in exchange for his cooperation and adverse conduct toward the undersigned. These benefits included loans or financial assistance to Neiger, agreements to indemnify him for actions taken against the undersigned's interests, assistance in funding or facilitating the legal education of Neiger's wife, Devorah Neiger, at NYU School of Law, and payments or financial support provided to Tyler Maulsby. These inducements created undisclosed conflicts of interest and ensured Neiger's continued participation in the Enterprise, further demonstrating

that his conduct was motivated by personal financial benefit rather than professional duty.

While Neiger was engaging the undersigned in the purported partnership and misrepresenting settlement payments, members of the Enterprise were simultaneously displacing the undersigned through repeated unlawful evictions, including from 268 West 77th Street, and creating housing instability across multiple jurisdictions, including New York and San Diego. Neiger's false representations regarding expected payments were used to induce reliance and compliance during this period, ultimately steering the undersigned toward relocation to a San Francisco property in which members of the Enterprise held a financial interest. This coordinated conduct was intended to control the undersigned's circumstances, limit his access to information, and render him more vulnerable to coercion.

When the undersigned began demanding accurate accounting and payment of withheld funds, Neiger and other members of the Enterprise retaliated by causing the filing of a bar complaint against the undersigned. That complaint was not filed in good faith but was instead intended to intimidate, discredit, and silence the undersigned and to divert attention away from the Enterprise's ongoing financial misconduct. Upon information and belief, the retaliatory grievance was coordinated through corporate and personal channels associated with Schwartz and

Kaufman and involved or referenced aligned individuals, including Aaron Cohen, Aaron Wexler, and others, with the intent to weaponize the attorney disciplinary process as a tool of obstruction.

As a direct and proximate result of Edward Neiger's racketeering conduct and his participation in and conspiracy with the Enterprise, the undersigned suffered substantial financial losses, including misappropriated contingent fees, loss of housing through unlawful eviction, professional and reputational harm, emotional distress, and interference with lawful business activities. Neiger acted within the scope of and in furtherance of the Enterprise, and all members of the Enterprise are jointly and severally liable for the injuries caused by the racketeering acts described herein.

Defendant Edward Neiger is an attorney affiliated with ASK LLP who, at all relevant times, acted not as an independent professional but as a knowing participant in an unlawful association-in-fact enterprise involving Irish Schwartz, Abraham Schwartz, Eric Kaufman, ASK LLP, and related entities and individuals (the "Enterprise"). The Enterprise existed for the common purpose of evading creditors, concealing and shielding assets, misappropriating settlement proceeds and contingent fees, and silencing, discrediting, and financially destabilizing the undersigned through coordinated legal and extralegal means. The members of the Enterprise maintained ongoing relationships, shared objectives, and engaged in

coordinated conduct over a sustained period sufficient to pursue these objectives, thereby constituting an enterprise within the meaning of 18 U.S.C. § 1961(4).

Edward Neiger knowingly agreed to conduct and participate, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and further conspired to do so in violation of § 1962(d). Neiger allowed himself and ASK LLP to be used as front counsel to create the appearance of legitimate legal representation while in fact acting under the direction and for the benefit of Schwartz and Kaufman. He knowingly engaged the undersigned in a purported professional partnership and settlement-related arrangement to stall, distract, and control the undersigned while other members of the Enterprise repositioned assets, engaged in unlawful eviction activity, and sought to limit bankruptcy and creditor exposure.

In furtherance of the Enterprise, Neiger knowingly made and transmitted false and misleading representations by interstate wire concerning settlement distributions, client allocations, accounting, and payment timing. Although the undersigned independently sourced, financed, and delivered approximately 160 clients, Neiger and ASK LLP falsely represented that only 37 clients had been received, thereby justifying the diversion and withholding of contingent-fee proceeds. Payments that were eventually made were systematically reduced, delayed, and inconsistent with agreed allocation methodologies. The total funds owed were materially

understated, and substantial sums were misappropriated and retained by Neiger and ASK LLP.

The misconduct is ongoing. Edward Neiger and ASK LLP have deliberately withheld material information from the undersigned and have failed and refused to provide required updates, accountings, client status reports, or settlement distribution data despite repeated demands. ASK LLP continues to retain unilateral control over hundreds of clients sourced, financed, and delivered by the undersigned while intentionally concealing financial information and settlement activity. Upon information and belief, Neiger and ASK LLP are continuing to steal and divert funds owed to the undersigned and are potentially misappropriating settlement proceeds belonging to clients, as evidenced by discrepancies in reported distributions, claimant complaints, and the complete absence of transparency. This deliberate information blackout is part of an ongoing scheme to maintain control over funds and client relationships and to prevent discovery of the Enterprise's misconduct.

Neiger further participated in the Enterprise by serving as a deliberate stalling and distraction mechanism at a time when Schwartz and Kaufman were simultaneously engaging in unlawful eviction activity, attempting to evade rent-stabilization requirements, and shielding assets from creditors. Neiger intentionally consumed the undersigned's time and professional resources through prolonged

communications, false assurances of imminent payment, and shifting explanations, thereby preventing timely discovery of the underlying misconduct and allowing the Enterprise to continue its unlawful activities without interference.

Upon information and belief, Schwartz and Kaufman, through Uri Kaufman and related entities, provided or facilitated undisclosed financial benefits and inducements to Edward Neiger in exchange for his cooperation and adverse conduct toward the undersigned. These benefits included loans or financial assistance to Neiger, agreements to indemnify Neiger for actions taken against the undersigned's interests, assistance in funding or facilitating the legal education of Neiger's wife, Devorah Neiger, at NYU School of Law, and payments or financial support provided to Tyler Maulsby. These undisclosed benefits created conflicts of interest, compromised Neiger's professional independence, and ensured his continued participation in the Enterprise's scheme.

While Neiger was engaging the undersigned in the purported partnership and misrepresenting settlement payments, members of the Enterprise were simultaneously displacing the undersigned through repeated unlawful evictions, including from 268 west 77th Street, and creating housing instability across multiple jurisdictions, including New York and California. Neiger's false representations regarding expected payments were used to induce reliance and compliance during this period, causing his credit score to crash leaving him unable

to get loans, ultimately steering the undersigned toward relocation to a San Francisco property in which members of the Enterprise held a financial interest. This conduct was coordinated with SK syndicate and was intended to control the undersigned's circumstances, limit his access to information, and render him more vulnerable to coercion.

Edward Neiger did not act alone. Upon information and belief, attorneys employed by or associated with ASK LLP, including Joe Steinfeld, Alexandra Robertson, Devorah Neiger, and David Stern, knowingly participated in and facilitated the ongoing scheme by coordinating with Neiger and acting in concert with the Schwartz–Kaufman syndicate and other defendants. These individuals knowingly assisted in controlling and withholding the undersigned's funds, suppressing information, misrepresenting settlement activity, and isolating the undersigned from his own clients and financial interests. Their collective actions were undertaken with knowledge of the broader scheme and with the intent to harm the undersigned's professional reputation, undermine his credibility, and impair his ability to continue operating his law practice and earning a living.

The undersigned's law practice and contingent-fee interests arising from the matters described herein constitute his sole source of income, a fact known to Edward Neiger. Notwithstanding this knowledge, Neiger engaged in conduct intended to deprive the undersigned of funds, clients, and professional standing. In

contrast, Neiger maintains numerous other cases and derives substantial business from long-standing professional relationships connected to the Schwartz–Kaufman network, including individuals and entities associated with Israeli real estate interests and affiliated actors, including Boyaner. Upon information and belief, these relationships provided Neiger with financial insulation and incentive to prioritize the interests of the Enterprise over his fiduciary and professional obligations to the undersigned and to clients. Neiger's knowing exploitation of the undersigned's financial dependence, coupled with his control over settlement proceeds and client relationships, was intended to exert leverage, coerce compliance, and suppress resistance while the Enterprise continued to misappropriate funds and conceal misconduct.

When the undersigned began demanding accurate accounting and payment of withheld funds, Neiger and other members of the Enterprise retaliated by causing the filing of a bar complaint against the undersigned. That complaint was not filed in good faith but was intended to intimidate, discredit, and silence the undersigned and to divert attention away from the Enterprise's ongoing financial misconduct. Upon information and belief, the retaliatory grievance was coordinated through corporate and personal channels associated with Schwartz and Kaufman and involved or referenced aligned individuals, including Aaron Cohen, Aaron Wexler,

and others, with the intent to weaponize the attorney disciplinary process as a tool of obstruction and retaliation.

As a direct and proximate result of Edward Neiger's racketeering conduct and his knowing participation in and conspiracy with the Enterprise, the undersigned has suffered substantial financial losses, including misappropriated contingent fees and withheld settlement proceeds, loss of housing through unlawful eviction, severe damage to his professional reputation, emotional distress, and material interference with his ability to conduct lawful business and earn a livelihood. The acts described herein constitute continuing violations, pose ongoing risk to clients, and warrant immediate judicial intervention. Edward Neiger and his co-conspirators acted within the scope of and in furtherance of the Enterprise, and all are jointly and severally liable for the injuries caused by the racketeering acts alleged herein.

Given the ongoing concealment, refusal to account, and continued control over client funds, the undersigned seeks immediate injunctive relief prohibiting Edward Neiger, ASK LLP, and their agents from further disbursing, transferring, encumbering, or otherwise exercising control over any settlement proceeds, trust funds, or client monies derived from the undersigned's clients, and compelling the prompt production of a full and verified accounting. The undersigned further seeks the appointment of a neutral receiver to take custody and control of all relevant trust accounts, settlement proceeds, client files, and financial records, to protect

clients, prevent further dissipation of assets, ensure transparency, and preserve the status quo pending final adjudication and disgorgement.

Plaintiff submits this claim on behalf of himself, Marshall Wexler Law Offices, and Plaintiff's clients, concerning the conduct of Ira  Schwartz, Abraham Schwartz, and Uri Kaufman (collectively, "Schwartz Kaufman syndicate"), arising from their coordinated use of Edward Neiger and ASK LLP in connection with the JUUL Rounds 1–4 Pay Group settlements and related mass-tort matters, as well as their broader efforts to evade creditors, shield assets, and suppress scrutiny during periods of financial and bankruptcy exposure.

Upon information and belief, Schwartz/Kaufman retained, directed, or exercised control over Edward Neiger and ASK LLP not as independent counsel, but as instruments in a deliberate scheme to misappropriate settlement proceeds, manipulate client allocations, and divert contingent-fee recoveries while insulating themselves from financial liability. These actions were undertaken in parallel with efforts to shield assets and avoid regulatory and creditor oversight, including the movement and manipulation of residential properties to evade rent-stabilization requirements.

Schwartz/Kaufman purposefully caused Edward Neiger and ASK LLP to engage the undersigned in a purported professional partnership and

settlementadministration role at a time when Schwartz/Kaufman were simultaneously engaged in unlawful eviction activity and asset repositioning. This engagement was intended to stall, distract, and control the undersigned's time and attention, thereby preventing timely investigation into financial irregularities, settlement shortfalls, and asset-shielding conduct occurring behind the scenes.

In furtherance of this scheme, Schwartz/Kaufman deliberately limited the number of clients credited to the undersigned, despite the undersigned independently sourcing, financing, and delivering approximately 160 clients. Neiger and ASK LLP, acting at the direction and for the benefit of Schwartz/Kaufman, falsely represented receipt of only 37 clients, thereby justifying reduced distributions and the diversion of contingent fees. Specifically, initial payments of $187,000 were 18.72% less than the amounts owed under the agreed allocation methodology. Subsequent payments of $10,000 and $13,000 similarly fell short, representing only 81.28% of the amounts owed, leaving a substantial shortfall in each installment. Based on calculations of client point values and rewards, the total amount owed to Marshall Wexler Law Offices is approximately $380,000, not $280,000 as previously represented. Upon information and belief,

Schwartz/Kaufman instructed or encouraged Neiger to withhold these funds, misallocate recoveries, and treat the undersigned adversely, and further agreed to indemnify Neiger for actions taken in furtherance of this scheme.

During 2022 and 2023, while Schwartz/Kaufman were illegally evicting the undersigned from 268 west 77th Street and otherwise destabilizing his housing situation, they deliberately had Neiger continue to engage the undersigned in the purported partnership so that the undersigned would remain distracted and less able to investigate the ongoing misconduct. During this same period,

Schwartz/Kaufman caused Neiger to provide false and misleading representations regarding the timing and amount of settlement payments the undersigned was expecting to receive.

The undersigned was subsequently subjected to repeated unlawful evictions in New York and San Diego and was induced, through continued false assurances of payment, to relocate to a residence in San Francisco in which Schwartz/Kaufman held a financial interest. The timing and coordination of these events demonstrate that the relocation was not incidental, but part of a broader effort to herd the undersigned toward a property controlled by Schwartz/Kaufman, rendering him more financially dependent, geographically isolated, and susceptible to leverage while the scheme continued.

As a result of Schwartz/Kaufman's coordinated conduct, acting through Edward Neiger and ASK LLP, settlement distributions were materially understated, contingent fees totaling at least $71,136 were misappropriated, clients received less than their full allocated recoveries, and the undersigned suffered significant financial loss. These actions further caused substantial reputational harm to the undersigned and interfered with his ability to pursue additional mass-tort matters and maintain his law practice, which constitutes his sole source of income. Upon information and belief, Neiger maintains numerous other cases and derives substantial business from long-standing professional relationships connected to the Schwartz–Kaufman network, including individuals and entities associated with Israeli real estate interests and affiliated actors, including Boyaner, providing him financial insulation and incentive to prioritize the interests of the Enterprise over his fiduciary and professional obligations to the undersigned and to clients.

When the undersigned began demanding accurate accounting and payment of withheld funds, Neiger and other members of the Enterprise retaliated by causing the filing of a bar complaint against the undersigned. That complaint was not filed in good faith but was intended to intimidate, discredit, and silence the undersigned and to divert attention away from the Enterprise's ongoing financial misconduct. Upon information and belief, the retaliatory grievance was coordinated through corporate and personal channels associated with Schwartz and Kaufman and

involved or referenced aligned individuals, including Aaron Cohen, Aaron Wexler, and others, with the intent to weaponize the attorney disciplinary process as a tool of obstruction and retaliation.

As a direct and proximate result of Schwartz/Kaufman's coordinated conduct, acting through Edward Neiger and ASK LLP, the undersigned has suffered substantial financial losses, including misappropriated contingent fees and withheld settlement proceeds, loss of housing through unlawful eviction, severe damage to professional reputation, emotional distress, and material interference with the ability to conduct lawful business and earn a livelihood. The acts described herein constitute continuing violations, pose ongoing risk to clients, and warrant immediate judicial intervention. Schwartz/Kaufman and their coconspirators acted within the scope of and in furtherance of the Enterprise, and all are jointly and severally liable for the damages done to me including foreseeable damages caused by conduct by co-conspirators who joined earlier or later who did not even know the they were acting as an agent of the enterprise only that they would cause the desired result of their conduct as explained.

In 2024 July and in November In Hawaii Edward Neiger bribed Maui Outrigger Hotel, Waikiki Heritage Hotel and other hotels like the Outrigger hotel in Honolulu

to harass me on the main island, this culminated in illegal evictions thefts of over thousands of dollars excluding thousands more in hotel costs and expenses incurred in bringing this case.

Upon information and belief, ASK LLP, in coordination with Tort Group LLC, Jason Weegar, Tim Clowe, and other associates, engaged in a deliberate scheme to misappropriate clients and settlement proceeds belonging to Marshall Wexler Law Offices and its clients in connection with the JUUL Rounds 1–4 Pay Group settlements. Plaintiff expended substantial resources, exceeding one hundred thousand dollars, to acquire, screen, and finance these clients, assuming full professional and financial responsibility. Despite Plaintiff's independent investment and efforts, ASK LLP and its co-conspirators knowingly diverted clients and withheld settlement funds, retaining payments that were rightfully owed to Plaintiff and his clients. Upon information and belief, ASK LLP misrepresented the allocation methodology governing fee distributions and intentionally underpaid Plaintiff by a consistent 18.72 percent on each payment, while falsely representing that fewer clients were received than were actually provided, further evidencing intentional misappropriation, fraud, and conversion.

In furtherance of this enterprise, upon information and belief, the State Bar grievance and psych examination process has been weaponized against Plaintiff to assist ASK LLP, Tort Group LLC, and their associates in concealing and diverting

funds and to prevent Plaintiff from pursuing legal claims against the SK Syndicate and its co-conspirators. Plaintiff is being compelled to undergo a psychological examination under the pretext of professional review, when in fact the examination is being used as a tool to destabilize, coerce, and intimidate Plaintiff, to interfere with his legal claims, and to frame him in a manner favorable to ASK LLP and the SK Syndicate enterprise. This coerced psych evaluation constitutes an act of extortion, racketeering, and tortious interference with Plaintiff's rights to pursue lawful remedies, and is being conducted in coordination with the broader scheme to divert Plaintiff's legal fees, misappropriate client relationships, and suppress his ability to seek redress against defendants engaged in the SK Syndicate and associated enterprises.

**DEMAND FOR ACCOUNTING OF ALL CLIENTS**

Marshall Wexler Law Offices formally demands a complete accounting and the immediate release of all funds owed in connection with the JUUL Rounds 1, 2, 3, and 4 Pay Group settlements. As previously documented, the distributions made to date do not reconcile with the allocation methodology represented to Plaintiff. For example, the first payment of $187,000 is 18.72% less than the amount owed, the next payment of $10,000 should have been approximately $12,000, and a subsequent payment of $13,000 should have been approximately $15,440,

reflecting the same 18.72% shortfall on each payment. These discrepancies represent only a fraction of the total amount due.

Plaintiff independently sourced, financed, and managed over one hundred JUUL clients, and even according to ASK LLP's own records, Marshall Wexler Law Offices is owed significantly more than the $380,000 previously calculated. Based on the clients' point allocations and rewards, the total amounts owed to Plaintiff's firm conservatively exceed millions of dollars, reflecting the full scope of

**PLAINTIFF'S WORK ON JUUL, TYLENOL, CHEMICAL HAIR STRAIGHTENER, PARAGARD AND AQUEAOUS FILM FORMING FOAM MASS TORTS AND THE MISAPPROPRIATION OF HIS EFFORTS AND INCOME BY ASK LLP.**

Plaintiff's financial position was further compromised by the SK Syndicate, which coordinated with certain ASK LLP actors and others to divert funds, obstruct payments, and interfere with his legal practice. Specifically, Plaintiff was forced to pay $2,500 to Peter Brill in connection with a meritless State Bar grievance. Brill acted on behalf of Edward Neiger and other SK Syndicate actors, including Ira Schwartz and Uri Kaufman, in an effort to sabotage Plaintiff, misrepresent his client interests, and frame him as incompetent, all to prevent him from pursuing claims against the true wrongdoers. This payment was made under duress and

without disclosure of the underlying scheme, constituting a clear act of extortion, racketeering, and fraudulent interference with Plaintiff's legal practice and rightful settlement funds.

Moreover, ASK LLP, in coordination with their mass tort marketing partner Tort Group LLC, Jason Weegar, and Tim Clowe, illegally appropriated clients that Plaintiff had sourced and financed independently. Plaintiff sent approximately 160 clients via email, but ASK LLP claimed to have received only 37 clients, effectively misappropriating the remaining clients and diverting associated settlement funds. These actions constitute breach of fiduciary duties, conversion, fraud, and racketeering under federal and state law.

As a direct result of these coordinated acts, Plaintiff was deprived of the resources necessary to maintain housing and operate his law practice. ASK LLP's obstruction, underpayment, and misappropriation of clients, combined with the SK Syndicate's interference, left Plaintiff homeless, financially destabilized, and unable to continue practicing law or pursuing his rightful claims. These actions were compounded by the coercive and fraudulent tactics of Aaron Cohen, who leveraged connections with Judge Martin Shulman, the State Bar grievance committee, and Peter Brill to enforce illegitimate claims and frame Plaintiff as ethically or mentally unfit, further obstructing his access to earned funds.

The totality of this conduct—underpayment, misappropriation of clients, diversion of settlement funds, and interference with Plaintiff's professional and personal stability—constitutes a pattern of racketeering, fraud, extortion, conversion, and deliberate sabotage of a legal practice. Plaintiff hereby demands a complete, itemized accounting of all JUUL Rounds 1–4 funds, including total gross settlement funds received, all fees and expenses deducted with the basis for each deduction, per-claimant allocations, amounts actually disbursed, and any funds retained or withheld. Plaintiff further demands the immediate release of all funds owed or, alternatively, written confirmation of the precise amount currently owed and the date by which full distribution will be completed.

The ongoing refusal to provide a proper accounting and payment is part of a coordinated effort by ASK LLP and SK Syndicate actors to misappropriate Plaintiff's income, obstruct his ability to practice law, and prevent him from pursuing claims against the true wrongdoers. These actions demonstrate deliberate and repeated breaches of fiduciary duties, ethics violations, and racketeering activity, leaving Plaintiff financially ruined, homeless, and forced to expend significant resources merely to secure funds to which he is indisputably entitled.

The combined actions of ASK LLP, Tort Group LLC, and the agents and affiliates acting on their behalf, including the misappropriation of client funds, fraudulent reporting of allocations, concealment of settlement payments, and the coercive use

of the State Bar psych evaluation, constitute a pattern of racketeering activity designed to extract money from Plaintiff, obstruct justice, and suppress lawful claims through threats, misrepresentation, and interference. These acts demonstrate an ongoing enterprise in violation of 18 U.S.C. § 1962(c) and (d), in which the misappropriation of settlement funds, the diversion of Plaintiff's clients, and the coercive use of professional licensing procedures operate together to further the unlawful objectives of ASK LLP, Tort Group LLC, and the SK Syndicate, and to cause Plaintiff significant financial, reputational, and emotional harm. Plaintiff therefore seeks injunctive relief to immediately halt the forced psychological examination, a complete accounting of all misappropriated settlement funds, disgorgement of all improperly retained fees and profits, and any other remedies necessary to prevent further interference with Plaintiff's lawful claims.

INTRODUCTION

1. This action arises from a coordinated scheme to divert settlement proceeds, withhold contractually owed attorneys' fees, conceal financial information, and interfere with Plaintiff's legal practice and business relationships.

2. Defendants entered into co-counsel and referral arrangements with Plaintiff, accepted the benefit of Plaintiff's work and client referrals, obtained settlement

recoveries derived from those referrals, and then intentionally failed to remit Plaintiff's agreed share.

3. Defendants further concealed accounting information, made materially false statements regarding payment timing and allocation, and used interstate wire communications to perpetuate the scheme.

4. As a direct result, Plaintiff suffered substantial financial harm, reputational injury, and business disruption.

5. Each individual Defendant participated in the conduct described herein, either directly or through coordinated action.

.

FACTUAL ALLEGATIONS

1. Plaintiff entered into co-counsel and/or referral agreements with Ask LLP providing for a defined percentage of attorneys' fees derived from clients referred and matters jointly prosecuted.

2. Plaintiff performed by referring clients, expending resources, and participating in case development.

3. Settlement funds were later received through interstate wire transfers and processed in coordination with Milestone Seventh.

4. Beginning in or about May 2023, Defendants represented via interstate email and telephone communications that Plaintiff's fee share would be paid by September 2023.

5. These statements were materially false when made.

6. At the time of these representations:

- Settlement funds had been received or were imminently receivable;
- Fee allocations had been internally modified or withheld;
- No firm authorization for payment had been scheduled.

1. Between September 2023 and the present, Defendants transmitted additional electronic communications stating that payments were "processing," "imminent," or delayed due to administrative issues.

2. Defendants failed to disclose:

- Total settlement amounts received,
- The full client count attributed to Plaintiff,
- Point allocation formulas,

- Deductions applied,
- Funds retained or reallocated.

1. Plaintiff made repeated written and oral demands for a full accounting.
2. Defendants refused to provide a complete accounting.
3. On information and belief, settlement proceeds were commingled and redistributed in a manner inconsistent with Plaintiff's contractual rights.
4. Plaintiff suffered concrete financial injury including unpaid fees, lost business opportunities, and expenditures exceeding $100,000.

CIVIL CONSPIRACY (Where Recognized)

1. Plaintiff realleges all prior paragraphs.
2. Two or more Defendants agreed to use disciplinary complaints as a coordinated pressure tactic.
3. Overt acts included:

- Filing complaints;
- Providing supporting affidavits;
- Coordinating narratives;
- Circulating reputational allegations;

- Communicating strategically about timing.

1. The conspiracy was undertaken to economically and professionally damage Plaintiff.

2. Plaintiff suffered damages as a result.

CIVIL RICO CONSPIRACY – 18 U.S.C. § 1962(d)

1. Defendants knowingly agreed and conspired to participate in the enterprise described above.

2. Each Defendant was aware of the overall objective of the enterprise and knowingly agreed to facilitate its unlawful goals.

ABUSE OF PROCESS

(Common Law)

1. Plaintiff realleges and incorporates all preceding paragraphs.

2. Defendants, including but not limited to:

- Aaron Cohen
- Members of Plaintiff’s extended family acting in concert
- Certain individuals associated with the Boyaner network
- Other unnamed co-conspirators

used state bar disciplinary procedures for an ulterior and improper purpose.

1. Specifically, Defendants filed and/or coordinated the filing of bar complaints against Plaintiff not for legitimate regulatory or public-protection purposes, but to:

a. Intimidate Plaintiff;

b. Retaliate for contractual fee disputes;

c. Gain leverage in financial and property-related disputes;

d. Impair Plaintiff's ability to practice law;

e. Coerce Plaintiff into abandoning claims for unpaid compensation.

1. The disciplinary process was used as a tactical weapon in a broader economic dispute.

2. Upon information and belief, the complaints contained knowingly false, misleading, or materially distorted allegations.

3. Defendants' objective was not adjudication on the merits, but harassment and reputational damage.

4. As a direct and proximate result, Plaintiff suffered:

- Reputational harm,
- Emotional distress,

- Legal expenses,
- Business disruption,
- Loss of professional opportunities.

1. The use of bar disciplinary mechanisms for leverage in private disputes constitutes misuse of legal process for an ulterior purpose.

ABUSE OF PROCESS

1. Plaintiff realleges and incorporates all preceding paragraphs.

2. Defendants, including but not limited to:

- Aaron Cohen
- Members of Plaintiff's extended family acting in concert
- Certain individuals associated with the Boyaner network
- Other unnamed co-conspirators

used state bar disciplinary procedures for an ulterior and improper purpose.

1. Specifically, Defendants filed and/or coordinated the filing of bar complaints against Plaintiff not for legitimate regulatory or public-protection purposes, but to:

a. Intimidate Plaintiff;

b. Retaliate for contractual fee disputes;

c. Gain leverage in financial and property-related disputes;

d. Impair Plaintiff's ability to practice law;

e. Coerce Plaintiff into abandoning claims for unpaid compensation.

1. The disciplinary process was used as a tactical weapon in a broader economic dispute.

2. Upon information and belief, the complaints contained knowingly false, misleading, or materially distorted allegations.

3. Defendants' objective was not adjudication on the merits, but harassment and reputational damage.

4. As a direct and proximate result, Plaintiff suffered:

- Reputational harm,
- Emotional distress,
- Legal expenses,
- Business disruption,
- Loss of professional opportunities.

1. The use of bar disciplinary mechanisms for leverage in private disputes constitutes misuse of legal process for an ulterior purpose.

RECEIPT AND RETENTION OF STOLEN PROPERTY

(State Law Claim – Supplemental Jurisdiction)

1. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

2. Settlement funds were transmitted via interstate wire and deposited into accounts controlled by Ask LLP and/or processed in coordination with Milestone Seventh.

3. A defined and calculable portion of those funds represented Plaintiff's contractual share of attorneys' fees.

4. Upon information and belief, those funds were knowingly diverted, withheld, or misallocated in violation of Plaintiff's contractual and property rights.

5. The diverted funds were then received, possessed, retained, or utilized by one or more Defendants, including:

- Ed Neiger
- Deborah Neiger
- Joe Steinfeld

- Alexandra Robertson
- David Stern
- Tessa Cuneo
- Catherine Russel

1. At the time these funds were received and retained, Defendants knew or had reason to know that:

a. Plaintiff had a defined ownership interest in the funds;

b. Plaintiff had demanded payment and accounting;

c. The funds were not lawfully attributable solely to Defendants.

1. Despite this knowledge, Defendants intentionally retained and exercised dominion over those funds.

2. The funds were used for operational expenses, payroll, internal allocations, or other non-authorized purposes rather than being segregated and remitted to Plaintiff.

3. The funds are identifiable and traceable to discrete settlement events and fee allocations.

4. As a direct and proximate result of Defendants' knowing receipt and retention of misappropriated funds, Plaintiff suffered financial damages including loss of attorneys' fees and related consequential harm.

5. Where permitted by governing law, Plaintiff seeks statutory damages, including treble damages, costs, and attorneys' fees.

Defendants violated California Penal Code § 496(a) by receiving property that had been obtained in a manner constituting theft, knowing the property to be so obtained.

Pursuant to § 496(c), Plaintiff seeks treble damages, costs of suit, and reasonable attorneys' fees.

**BREACH OF CONTRACT**

**(Against Ask LLP, Ed Neiger, and Joe Steinfeld)**

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

2. Plaintiff entered into an enforceable co-counsel agreement with Ask LLP, negotiated and presented through Ed Neiger and Joe Steinfeld, providing that Plaintiff would receive an agreed percentage of attorneys' fees generated from clients referred and litigated collaboratively.

3. These contract terms were negotiated verbally and memorialized in written communications.

4. Plaintiff fully performed its obligations by referring clients, assisting in litigation efforts, and participating in case development and settlement processes.

5. Defendants breached their contractual obligations by failing to provide a full accounting and by failing to timely pay Plaintiff its agreed-upon share of attorneys' fees.

6. As a direct and foreseeable result of these breaches, Plaintiff has suffered damages in an amount to be proven at trial.

**UNJUST ENRICHMENT – CONSTRUCTIVE TRUST**

**(preserved for appeal)**

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

2. Unjust enrichment, or restitution, may be alleged where a defendant unjustly obtains and retains a benefit to the plaintiff's detriment, and where such retention violates fundamental principles of equity, justice, and good conscience.

3. On information and belief, Defendants Ask LLP, Ed Neiger, Deborah Neiger, Joe Steinfeld, Alexandra Robertson, David Stern, Tessa Cuneo, and

Catherine Russel are each holding funds that properly belong to the referred clients and to Plaintiff.

4. A large, but confidential sum of money was transferred to Ask LLP in connection with settlement resolutions administered in coordination with Milestone Seventh. This money was for the benefit of clients referred by Plaintiff, minus agreed-upon attorneys' fees.

5. Plaintiff has contractually created property rights to specific percentages of the attorneys' fees generated by those settlement funds.

6. On information and belief, the funds owed to Plaintiff are now commingled with client settlement funds and have been distributed among Defendants and/or retained for operational or personal benefit. Nevertheless, the funds are identifiable, and there is a direct chain from the settlement payments to the current persons in possession of the money.

7. Ask LLP and its principals—including Ed Neiger, Deborah Neiger, Joe Steinfeld, Alexandra Robertson, David Stern, and Tessa Cuneo—owe fiduciary duties to the referred clients. On information and belief, they breached those duties by causing, permitting, or facilitating the commingling and diversion of settlement funds.

8. Under principles of equity and good conscience, Defendants should not be permitted to retain any portion of the settlement funds transferred to Ask LLP.

9. However, principles of equity and good conscience, as well as the Rules of Professional Conduct, prevent Plaintiff from taking possession of any commingled funds unless and until the clients receive their full share.

10. Plaintiff seeks imposition of a constructive trust on all funds transferred to Ask LLP in connection with the settlements, for the benefit of the clients first, and then for Plaintiff if sufficient funds remain. In the alternative, Plaintiff requests disgorgement of all improperly retained sums.

**BREACH OF FIDUCIARY DUTY**

1. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

2. A confidential and fiduciary relationship existed between Plaintiff and Defendants arising from:

- Co-counsel agreements,
- Joint representation of clients,
- Shared settlement responsibilities, and

- Defendants' exclusive control over settlement funds and accounting information.

1. Defendants expressly and impliedly promised that Plaintiff would receive a defined percentage of attorneys' fees derived from referred and jointly litigated matters.

2. In reliance upon those promises, Plaintiff:

- Referred clients to Defendants,
- Expended substantial financial resources,
- Devoted professional time and labor, and
- Refrained from seeking alternative arrangements.

1. Settlement proceeds were subsequently received via interstate wire transfers and processed through accounts controlled by Ask LLP and/or in coordination with Milestone Seventh.

2. Plaintiff has a defined and traceable ownership interest in a percentage of the attorneys' fees generated from those settlement funds.

3. Defendants commingled, retained, and/or redistributed those funds without remitting Plaintiff's contractual share.

4. Defendants have been unjustly enriched by retaining money that in equity and good conscience belongs to Plaintiff.

5. The specific funds are identifiable because:

- They derive from discrete settlement payments,
- They correspond to identifiable client recoveries,
- They are calculable based on agreed percentage allocations.

1. Absent equitable intervention, Defendants will continue to retain and control funds rightfully belonging to Plaintiff.

2. Plaintiff has no adequate remedy at law with respect to ensuring segregation and preservation of specific settlement-derived funds currently in Defendants' possession.

3. Equity requires the imposition of a constructive trust over all settlement proceeds and attorneys' fees traceable to Plaintiff's referrals and contractual share.

DECLARATORY AND INJUNCTIVE RELIEF

(42 U.S.C. § 1983 , 18 USC section 1964 et al– If Applicable / Constitutional Claim)

1. Plaintiff realleges all preceding paragraphs.

2. Upon information and belief, the disciplinary complaints were used to trigger intrusive investigatory procedures, including threatened compulsory psychological or psychiatric examinations.

3. Compelled psychological examinations imposed in retaliation for protected activity violate:

- Procedural due process;
- Substantive due process;
- First Amendment protections against retaliation;
- The right to practice one's profession free from arbitrary state interference.

1. Plaintiff has a protected property and liberty interest in:

- His law license;
- His professional reputation;
- His ability to practice law without arbitrary impairment.

1. The threatened or imposed psychological examination is not based on objective medical evidence but is instead the product of retaliatory complaints.

2. Absent injunctive relief, Plaintiff will suffer irreparable harm including:

- Stigma,
- Professional suspension risk,
- Compelled disclosure of private medical information,
- Reputational destruction.

1. Legal remedies are inadequate to compensate for the reputational and constitutional harm threatened

REQUEST FOR INJUNCTIVE RELIEF

Plaintiff respectfully requests that the Court:

A. Declare that the use of disciplinary complaints as retaliation for contractual and financial disputes is unlawful;

B. Enjoin Defendants from coordinating or submitting knowingly false or retaliatory disciplinary complaints;

C. Enjoin enforcement of any compelled psychological or psychiatric examination absent:

- A constitutionally sufficient evidentiary showing,
- Neutral medical basis,
- Due process protections;

D. Award costs and attorneys' fees pursuant to 42 U.S.C. § 1988 (if applicable);

E. Grant such other equitable relief as justice requires.

TORTIOUS INTERFERENCE WITH CONTRACT

(Against Deborah Neiger, Alexandra Robertson, David Stern, and Tessa Cuneo)

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

2. Plaintiff had a valid and enforceable co-counsel agreement with Ask LLP.

3. Deborah Neiger, Alexandra Robertson, David Stern, and Tessa Cuneo were aware of that agreement.

4. These Defendants intentionally induced Ask LLP to breach the agreement by participating in or facilitating the withholding, diversion, and non-payment of Plaintiff's fee share.

5. Their conduct was intentional and without justification.

6. As a result, Ask LLP failed to pay Plaintiff under the agreement.

7. Plaintiff has been damaged in an amount to be proven at trial.

TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

2. By referring clients to Ask LLP and participating as co-counsel, Plaintiff had a reasonable expectation of receiving attorneys' fees tied to successful recoveries.

3. Defendants were aware of this expectancy.

4. By withholding accounting information, misrepresenting payment status, and diverting funds, Defendants intentionally interfered with Plaintiff's economic expectancy.

5. Additionally, on information and belief, Catherine Russel and Milestone Seventh facilitated or benefited from financial arrangements that further impaired Plaintiff's ability to receive compensation.

6. Plaintiff has not been paid for its work and referrals.

7. Plaintiff has suffered damages in an amount to be proven at trial.

CONVERSION

1. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

2. Settlement funds were transferred to Ask LLP for the benefit of clients and co-counsel.

3. Plaintiff possesses a contractual property right to a defined percentage of attorneys' fees derived from those funds.

4. Plaintiff has an absolute and unconditional right to immediate possession of its share.

5. Plaintiff has made repeated demands for accounting and payment.

6. Defendants have wrongfully assumed control over Plaintiff's share and refused to remit payment.

7. As a result, Plaintiff has suffered damages in an amount to be proven at trial.

FRAUDULENT CONCEALMENT

1. Defendants had exclusive access to settlement accounting data.

2. They concealed material financial information.

3. They had a duty to disclose under co-counsel obligations and fiduciary principles.

1. Defendants had exclusive knowledge regarding settlement inflows, fee allocations, deductions, and payment schedules.

2. Defendants concealed material information regarding:

- Total client recoveries

- Fee calculations
- Point allocations
- Deductions and expenses
- Funds received through Milestone Seventh

1. Defendants had a duty to disclose this information under the co-counsel agreement and applicable ethical rules.

2. Plaintiff had no reasonable means to independently discover these facts.

3. Plaintiff was damaged by its reliance on Defendants' concealment.

FRAUD, FRAUDULENT CONCEALMENT & MISREPRESENTATION

1. Defendants knowingly made false statements regarding:

- Settlement timing
- Availability of funds
- Allocation formulas
- Client attribution

1. Defendants concealed material financial information uniquely within their possession.

2. Plaintiff reasonably relied on these representations and omissions.

1. Defendants had exclusive access to settlement accounting data.

2. They concealed material financial information.

3. They had a duty to disclose under co-counsel obligations and fiduciary principles.

4. Plaintiff was damaged as a result.

1. Defendants knowingly made false statements regarding:

- Settlement timing
- Availability of funds
- Allocation formulas
- Client attribution

1. Defendants concealed material financial information uniquely within their possession.

2. Plaintiff reasonably relied on these representations and omissions.

PROMISSORY FRAUD

(Against Ed Neiger and Joe Steinfeld)

1. Plaintiff incorporates the foregoing paragraphs.

2. Ed Neiger and Joe Steinfeld promised Plaintiff that it would receive a defined share of attorneys' fees from referred matters.

3. At the time these promises were made, Defendants either knew they would not honor them or had no intention of fulfilling them as agreed.

4. These promises were made to induce Plaintiff to refer clients and invest time, capital, and professional resources.

5. Plaintiff reasonably relied on these promises.

6. Plaintiff suffered damages including unpaid fees, reputational harm, and financial hardship.

FRAUDULENT MISREPRESENTATION

(Against Ed Neiger, Deborah Neiger, and Alexandra Robertson)

1. Plaintiff incorporates the foregoing paragraphs.

2. Defendants repeatedly represented that payment was forthcoming and that delays were administrative or procedural.

3. These statements were false when made.

4. Defendants intended Plaintiff to rely on those statements and refrain from taking protective legal action.

5. Plaintiff reasonably relied on these representations.

6. Plaintiff suffered financial loss and additional damages as a result.

FRAUD AND FRAUDULENT MISREPRESENTATION

1. Defendants made material misrepresentations regarding payment timing and allocation.

2. The statements were false when made.

3. Defendants intended Plaintiff to rely on them.

4. Plaintiff reasonably relied.

5. Plaintiff suffered damages.

CONSTRUCTIVE TRUST (Equitable Relief)

1. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

2. A confidential and fiduciary relationship existed between Plaintiff and Defendants arising from:

- Co-counsel agreements,
- Joint representation of clients,
- Shared settlement responsibilities, and

- Defendants' exclusive control over settlement funds and accounting information.

1. Defendants expressly and impliedly promised that Plaintiff would receive a defined percentage of attorneys' fees derived from referred and jointly litigated matters.

2. In reliance upon those promises, Plaintiff:

- Referred clients to Defendants,
- Expended substantial financial resources,
- Devoted professional time and labor, and
- Refrained from seeking alternative arrangements.

1. Settlement proceeds were subsequently received via interstate wire transfers and processed through accounts controlled by Ask LLP and/or in coordination with Milestone Seventh.

2. Plaintiff has a defined and traceable ownership interest in a percentage of the attorneys' fees generated from those settlement funds.

3. Defendants commingled, retained, and/or redistributed those funds without remitting Plaintiff's contractual share.

4. Defendants have been unjustly enriched by retaining money that in equity and good conscience belongs to Plaintiff.

5. The specific funds are identifiable because:

- They derive from discrete settlement payments,
- They correspond to identifiable client recoveries,
- They are calculable based on agreed percentage allocations.

1. Absent equitable intervention, Defendants will continue to retain and control funds rightfully belonging to Plaintiff.

2. Plaintiff has no adequate remedy at law with respect to ensuring segregation and preservation of specific settlement-derived funds currently in Defendants' possession.

3. Equity requires the imposition of a constructive trust over all settlement proceeds and attorneys' fees traceable to Plaintiff's referrals and contractual share.

REQUEST FOR EQUITABLE RELIEF

Plaintiff requests that the Court:

A. Impose a constructive trust over all settlement-related funds traceable to Plaintiff's contractual interest;

B. Order segregation of those funds pending final adjudication;

C. Require a full forensic accounting to identify the corpus of the trust;

D. Enjoin further transfer, dissipation, or commingling of those funds;

E. Award such other equitable relief as justice requires.

CIVIL CONSPIRACY (Where Recognized)

1. Plaintiff realleges all prior paragraphs.

2. Two or more Defendants agreed to use disciplinary complaints as a coordinated pressure tactic.

3. Overt acts included:

- Filing complaints;
- Providing supporting affidavits;
- Coordinating narratives;
- Circulating reputational allegations;
- Communicating strategically about timing.

1. The conspiracy was undertaken to economically and professionally damage Plaintiff.

2. Plaintiff suffered damages as a result.

**NEWARK NJ AND BROOKLYN NY, CHEVY MALIBU RENTED FROM BUDGET– NOVEMBER 1, 2024 CAR CRASH**

On November 1, 2024, Plaintiff was involved in a deliberate vehicular incident while operating a Chevy Malibu. Investigations demonstrate that the crash was facilitated or made more dangerous due to prior unauthorized access by Stalking by SK syndicate , Argus Technology equipped computer hackers who can monitor car location and change traffic light signals, and Budget Rent a Car which allegedly allowed control or manipulation of vehicle systems and vehicle fleet information like vehicle location. In this case the city of New York's traffic light system was bugged in the sense that this fort Hamilton parkway intersection and the ones leading to the Verrazano bridge were hacked remotely and rigged to synchronize all the lights to turn green for a mile creating a speedway like effect creating the dangerous condition. This incident further underscores the ongoing threat posed by the network's use of both coordinating between business owners, their employees and utilizing a sophisticated network of specialized members advanced traffic hacking capabilities to kill or hurt their opponent then concealing their bad acts by making a deliberate car crash look accidental.

Civil Rights Claims – Police Misconduct and Retaliation

Parties Relevant to These Claims

293. Defendant New York City Police Department ("NYPD") operates police precincts throughout New York City, including the 66th Precinct in Borough Park, Brooklyn and the Far Rockaway precinct in Queens.

294. Defendant EJ Armstrong was at all relevant times a police officer or individual acting in concert with individuals associated with the NYPD.

295. Defendant Detective Saadalah (also referred to as Detective Sadddala), assigned to the 66th Precinct, interacted with Plaintiff when Plaintiff attempted to report a criminal incident.

296. Defendant Jacqueline Cohen is alleged to have acted in coordination with individuals connected to Plaintiff's family and law-enforcement contacts.

297. At all relevant times, these defendants acted under color of state law within the meaning of 42 U.S.C. §1983.

---

Factual Allegations – November 1 Staged Collision and Police Retaliation

298. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

299. On or about November 1, Plaintiff was driving from Bedford-Stuyvesant, Brooklyn toward Borough Park in order to arrive at his aunt's residence before the start of the Jewish Sabbath.

300. Plaintiff is an Orthodox Jew and observes the Sabbath, which begins shortly before sunset on Friday evening.

301. Plaintiff alleges that multiple vehicles began following him as he drove toward Borough Park.

302. Plaintiff observed individuals communicating through mobile phones and headsets and coordinating their movements.

303. Plaintiff alleges that these individuals tracked Plaintiff's route from Bedford-Stuyvesant to Borough Park.

304. At or near the intersection of Fort Hamilton Parkway and New Utrecht Avenue, Plaintiff approached a busy intersection while proceeding cautiously.

305. Plaintiff alleges that another vehicle accelerated through a red light and intentionally collided with Plaintiff's vehicle.

306. Plaintiff believes the collision was intentionally staged as part of an insurance fraud scheme.

307. Plaintiff recorded video showing the other vehicle running the red light and accelerating toward Plaintiff's vehicle.

308. Plaintiff alleges that individuals present at the scene immediately attempted to blame Plaintiff for the collision.

309. Plaintiff further alleges that the other driver provided false identifying information and departed the scene without properly exchanging information.

310. Plaintiff later discovered that the license plate and driver's license presented were fraudulent.

311. Plaintiff contends that individuals associated with a broader insurance-fraud scheme involving auto-body shops, medical providers, and coordinated participants were involved in the incident.

312. Plaintiff further alleges that the individuals involved included persons claiming connections to law enforcement and organized groups.

---

Failure of Police to Accept Criminal Complaint

313. Following the incident, Plaintiff attempted to file a police report describing the collision as a staged crash and possible insurance fraud.

314. Plaintiff went to the 66th Precinct in Borough Park to report the incident.

315. Plaintiff alleges that officers at that precinct refused to take a criminal complaint and instructed Plaintiff to file only an accident report.

316. Plaintiff subsequently attempted to file reports at additional precincts, including a Manhattan precinct and a precinct in Far Rockaway.

317. Plaintiff alleges that officers at those locations also refused to accept a criminal complaint.

318. Plaintiff further alleges that the refusal occurred despite Plaintiff presenting video evidence of the other vehicle running a red light.

319. Plaintiff alleges that these refusals were part of a broader pattern of retaliation connected to Plaintiff's prior litigation and complaints involving law enforcement.

---

Additional Retaliatory Conduct

320. Plaintiff alleges that on or about June 22, 2025, Plaintiff received a message directing him to contact a detective and stating that Plaintiff's mother was in the hospital.

321. Plaintiff alleges that the message directed him to visit NYU Langone Health.

322. When Plaintiff arrived there, he was redirected to Bellevue Hospital.

323. Plaintiff alleges that the message was false and that his mother had not been hospitalized.

324. Plaintiff believes the message was sent in order to embarrass or discredit him.

325. Plaintiff contends that this incident was connected to retaliation for Plaintiff's prior legal actions and complaints involving police misconduct.

---

First Cause of Action

Violation of 42 U.S.C. §1983

(Against NYPD Officers and the City of New York)

326. Plaintiff repeats and realleges the preceding paragraphs.

327. Defendants, acting under color of state law, deprived Plaintiff of rights secured by the Constitution and laws of the United States.

328. These violations include:

- denial of equal protection of the laws,
- retaliation for protected activity,
- refusal to accept or investigate a criminal complaint, and

- interference with Plaintiff's right to seek redress.

329. The refusal to take a report and investigate the alleged staged collision prevented Plaintiff from obtaining equal police protection.

330. As a direct result, Plaintiff suffered financial losses, emotional distress, and ongoing safety concerns.

---

Second Cause of Action

Conspiracy to Violate Civil Rights

under 42 U.S.C. §1985

331. Plaintiff repeats and realleges the preceding paragraphs.

332. Defendants knowingly agreed to participate in a conspiracy to interfere with Plaintiff's civil rights.

333. The conspiracy included coordinated conduct designed to:

- intimidate Plaintiff,
- prevent investigation of the staged collision, and
- retaliate against Plaintiff for exercising legal rights.

334. Defendants committed overt acts in furtherance of this conspiracy, including refusing to take a criminal complaint and engaging in acts intended to discredit Plaintiff.

---

Third Cause of Action

Violation of Property and Contract Rights

under 42 U.S.C. §1981 and

42 U.S.C. §1982

335. Plaintiff repeats and realleges the preceding paragraphs.

336. Defendants interfered with Plaintiff's ability to exercise property rights, including the ability to protect his vehicle and seek compensation for damage caused by the collision.

337. Plaintiff alleges that this interference occurred in a discriminatory and retaliatory manner.

---

Fourth Cause of Action

Attorney's Fees

under 42 U.S.C. §1988

338. Plaintiff repeats and realleges the preceding paragraphs.

339. Pursuant to §1988, Plaintiff is entitled to recover attorneys' fees and litigation costs in connection with the enforcement of his civil rights.

---

Municipal Liability (Monell)

340. Plaintiff alleges that the actions described above were carried out pursuant to policies, customs, or practices of the City of New York.

341. These practices include:

- failure to investigate staged collisions and insurance fraud,
- refusal to accept criminal complaints from certain complainants, and
- failure to supervise or discipline officers involved in such conduct.

342. These failures constitute deliberate indifference to the constitutional rights of residents.

Damages

343. As a result of Defendants' actions, Plaintiff suffered:

- damage to Plaintiff's vehicle,

- financial loss,
- severe stress and headaches associated with driving after the incident,
- emotional distress, and
- costs associated with pursuing legal remedies.

Detailed Allegations – November 1 Collision

Vehicle Rental

1. On or about November 1, Plaintiff rented a vehicle through Budget Rent a Car.

2. The rental was associated with a Budget Rent a Car location in Newark, New Jersey.

3. Plaintiff rented the vehicle while visiting family in Bedford-Stuyvesant, New York.

4. At that time Plaintiff was staying at the residence of relatives Jacqueline Cohen and George Goldstien.

---

The Collision

5. On November 1, Plaintiff was operating the rental vehicle lawfully on a public roadway.

6. Another vehicle approached Plaintiff's vehicle shortly before the collision.

7. Plaintiff alleges that the other vehicle intentionally collided with Plaintiff's vehicle.

8. Plaintiff states that the impact occurred suddenly and without warning.

9. Plaintiff did not cause the collision and was operating the vehicle in a lawful manner.

---

Attempted Flight

10. Immediately after the collision, the driver of the other vehicle attempted to leave the scene.

11. Plaintiff pursued the other vehicle and located the driver.

12. Plaintiff confronted the driver regarding the collision.

13. The driver did not provide clear identification at that time.

---

Belief the Driver Was a Police Officer

14. Plaintiff later developed the belief that the driver may have been affiliated with the New York City Police Department.

15. Plaintiff's belief is based in part on the alleged refusal of officers to take a report regarding the incident.

16. Plaintiff alleges that officers declined to create or accept an accident report documenting Plaintiff's account of the crash.

17. Plaintiff believes that the refusal to document the incident may have been intended to protect the other driver.

---

Insurance Claim

18. Plaintiff believes the other driver later filed an insurance claim relating to the collision.

19. Plaintiff alleges that the claim was fraudulent because the collision was intentionally caused.

20. Plaintiff does not currently possess the insurance claim documentation.

---

Alleged Pattern of Fraudulent Collisions

21. Plaintiff believes that the circumstances of the collision are consistent with a broader pattern of staged automobile accidents.

22. Upon information and belief, such schemes involve intentionally causing collisions in order to generate insurance claims.

23. Plaintiff further believes that vehicles with significant value may be used in such schemes.

24. Plaintiff alleges that fraudulent insurance claims may be submitted using false identification or misleading information.

25. Plaintiff contends that the circumstances surrounding the November 1 collision are consistent with such a scheme.

---

Harm to Plaintiff

26. As a result of the incident and the inability to document the event through an official report, Plaintiff suffered:

- financial losses
- legal complications relating to the rental vehicle
- emotional distress

- inability to challenge the alleged insurance claim effectively.

1. Plaintiff Marshall Wexler was a resident of Nevada who was in New York to appear in court before Judge Louis Nock and to attend to personal matters.

2. Defendants include:

a. EJ Armstrong and other named and unnamed NYPD officers, sued in individual and official capacities.

b. City of New York, including its police department, responsible for policies and oversight.

c. Mayor Eric Adams, responsible for municipal policies regarding NYPD enforcement and traffic regulation.

d. Jacqueline Cohen, George Goldstien, Aaron Cohen, Ira Schwartz, and other private actors allegedly involved in staging the collision and harassment.

---

III. FACTUAL ALLEGATIONS

A. Plaintiff's Travel and Court Requirement

5. Plaintiff was required to appear in person before Judge Louis Nock, who has since resigned amid corruption charges.

6. Plaintiff stayed with Jacqueline Cohen and George Goldstien in Boro Park with permission. Both are Orthodox Sabbath-observing Hasidic Jews.

---

B. Encounter With Perpetrators

7. Plaintiff traveled to Bedford-Stuyvesant to meet potential clients.

8. Upon information and belief, these individuals were affiliated with the Sex Money Murder gang, as well as certain NYPD officers, who coordinated retaliation against Plaintiff for whistleblower activity and participated in insurance fraud.

---

C. The Staged Collision – November 1, 2024

9. Plaintiff rented a vehicle from Budget Rent a Car (Newark, NJ).

10. On November 1, 2024, while driving lawfully, Plaintiff's vehicle was intentionally struck at the intersection of Fort Hamilton Parkway and New Utrecht Avenue.

11. The collision was staged, and the driver attempted to flee.

12. Plaintiff pursued the driver and discovered the individual did not present proper identification. Plaintiff believes, upon information and belief, that the driver was a plain-clothes NYPD officer acting as part of the scheme.

13. Plaintiff alleges that the collision was orchestrated with the assistance of Jacqueline Cohen, George Goldstien, Aaron Cohen, Ira Schwartz, NYPD officers, and EJ Armstrong, among others.

---

D. Police Refusal to Document Incident

14. Plaintiff attempted to file a report at the 66th Precinct and other NYPD stations.

15. Officers refused to document the incident and instead directed Plaintiff to submit a standard "accident" report, which Plaintiff declined because the collision was intentional, not accidental.

16. Upon information and belief, the refusal to document reflects a broader NYPD policy, custom, or failure of oversight.

17. Plaintiff left New York to Brazil due to fear for his safety. Upon returning, NYPD officers continued to refuse to document the incident.

---

E. Emotional Distress – June 2025

18. Around June 22, 2025, Plaintiff was falsely informed that his mother was hospitalized at NYU, causing severe emotional distress.

19. Plaintiff later discovered this was false and alleges it was deliberately propagated to cause harm.

20. As a result, Plaintiff experienced significant emotional distress, anxiety, and mental anguish.

---

F. Municipal Policy / Oversight Failure

21. Upon information and belief, municipal policies, including reduced traffic enforcement and decriminalization of jaywalking, contributed to NYPD's refusal to investigate or document staged collisions.

22. Plaintiff alleges these policies reflect a failure to train, supervise, and oversee officers, contributing to his injuries.

---

IV. CLAIMS

A. RICO – 18 U.S.C. §1962(c) and (d)

23. Defendants formed an enterprise engaged in staged collisions to defraud insurance companies.

24. The enterprise used vehicles, interstate communications, and coordinated actions to commit fraud, constituting a pattern of racketeering activity (mail fraud, wire fraud, insurance fraud).

25. Plaintiff suffered damages to property, finances, and peace of mind.

26. Plaintiff seeks treble damages under 18 U.S.C. §1964(c), plus attorney's fees.

---

B. Civil Rights Violations – 42 U.S.C. §§1981, 1982, 1983, 1985, 1988

27. Defendants EJ Armstrong, other NYPD officers, and private actors deprived Plaintiff of rights to file complaints, to due process, and to be free from conspiracy and intimidation.

28. Officers' refusal to document the collision deprived Plaintiff of access to legal remedies.

29. Private actors coordinated with officers to threaten, intimidate, and harass Plaintiff, interfering with his rights.

30. These actions were under color of law and/or in conspiracy with state actors.

---

C. Municipal Liability – Monell

31. City of New York and Mayor Eric Adams failed to train, supervise, or oversee officers regarding documentation of traffic incidents, insurance fraud, and harassment.

32. The refusal to document Plaintiff's reports reflects a policy, custom, or deliberate indifference to constitutional rights.

33. These policies directly caused Plaintiff's injuries.

---

D. Intentional Infliction of Emotional Distress

34. Defendants engaged in extreme and outrageous conduct, including disseminating false information regarding Plaintiff's mother's hospitalization.

35. This conduct was intentional and directly caused severe emotional distress, anxiety, and mental anguish.

---

V. DAMAGES

Plaintiff suffered:

- Property damage to vehicle
- Financial loss from fraudulent insurance claims

- Emotional distress and psychological harm
- Interference with legal and personal affairs

ROBERT SILVERSTEIN, IRA SCHWARTZ,

ABRAHAM SCHWARTZ, STEVEN B. ROTHSCHILD,

and DOES 1–10,

Defendants.

I. NATURE OF THE ACTION

1. This is a civil action seeking damages and equitable relief arising from alleged unlawful conduct connected to Plaintiff's tenancy at 268 West 77th Street, New York, New York.

2. Plaintiff alleges that Defendants engaged in coordinated actions intended to pressure, harass, and remove Plaintiff from the premises and to interfere with Plaintiff's legal rights as a tenant.

3. Plaintiff further alleges that certain Defendants participated in legal and financial activities related to the building and associated proceedings that Plaintiff believes involved misrepresentations, irregular filings, and improper use of legal process.

4. Plaintiff brings claims under federal civil rights statutes, federal racketeering statutes, and related state housing and tort law.

14. Plaintiff resided in an apartment at 268 West 77th Street for a period of time prior to the events described in this complaint.

15. Plaintiff alleges that disputes arose between Plaintiff and individuals connected with the ownership or management of the building.

16. Plaintiff alleges that beginning in or around the relevant time period, certain individuals engaged in conduct that interfered with Plaintiff's quiet enjoyment of the premises.

17. Plaintiff alleges that this conduct included repeated disturbances occurring during nighttime hours and the placement of refuse or debris outside Plaintiff's apartment door.

18. Plaintiff alleges that these acts created unsanitary and disruptive conditions that Plaintiff believed were intended to pressure Plaintiff to vacate the apartment.

19. Plaintiff further alleges that legal proceedings relating to the building and tenancy were initiated during this period.

20. Plaintiff alleges that some filings or docket activity in related proceedings appeared inconsistent or incomplete from Plaintiff's perspective.

21. Plaintiff alleges that Defendants coordinated actions related to legal filings, property management decisions, and other conduct affecting Plaintiff's tenancy.

22. Plaintiff alleges that the cumulative effect of these actions was to pressure Plaintiff to leave the apartment and relinquish legal rights associated with the tenancy.

RICO ENTERPRISE ALLEGATIONS

23. Plaintiff alleges that Defendants formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).

24. Plaintiff alleges that the enterprise involved individuals connected with property ownership, legal services, and property management.

25. Plaintiff alleges that the enterprise engaged in a pattern of conduct intended to obtain financial or property benefits related to the building and its tenants.

26. Plaintiff alleges that this conduct included the coordinated use of legal proceedings, property management actions, and other tactics directed toward tenants including Plaintiff.

---

Civil RICO – 18 U.S.C. § 1962(c)

27. Plaintiff repeats and incorporates the allegations above.

28. Plaintiff alleges that Defendants conducted or participated in the affairs of an enterprise through a pattern of racketeering activity affecting interstate commerce.

29. Plaintiff alleges that the conduct described above caused injury to Plaintiff's property interests and tenancy rights.

---

COUNT II

Civil Conspiracy – 18 U.S.C. § 1962(d)

30. Plaintiff repeats the foregoing allegations.

31. Plaintiff alleges that Defendants knowingly agreed and conspired to participate in the enterprise and its alleged unlawful conduct.

---

---

Housing and Tenant Rights Violations (State Law)

34. Plaintiff alleges that Defendants engaged in conduct that interfered with Plaintiff's lawful occupancy and quiet enjoyment of the premises.

35. Plaintiff alleges that Defendants used harassment or coercive tactics in connection with efforts to remove Plaintiff from the apartment.

---

VII. DAMAGES

36. Plaintiff alleges damages including:

- loss of housing stability
- emotional distress
- financial losses related to relocation and legal proceedings
- other consequential damages.

COUNT V

Fraud and Fraudulent Misrepresentation

37. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

38. Plaintiff alleges that Defendants made or caused to be made statements and representations in connection with property management, tenancy proceedings, or related legal matters.

39. Plaintiff alleges that certain statements and representations were false or misleading when made.

40. Plaintiff alleges that Defendants knew or should have known that these statements were inaccurate or incomplete.

41. Plaintiff alleges that such representations were made with the intent that Plaintiff and others would rely upon them in connection with legal proceedings, tenancy matters, or property interests.

42. Plaintiff alleges that Plaintiff relied upon the representations to Plaintiff's detriment.

43. As a result, Plaintiff alleges damages including financial losses, housing instability, and other consequential harm.

---

COUNT VI

Tortious Interference With Contract

44. Plaintiff repeats and realleges the preceding paragraphs.

45. Plaintiff alleges that Plaintiff had a valid contractual or lease relationship associated with the premises located at 268 West 77th Street.

46. Plaintiff alleges that Defendants were aware of this contractual relationship.

47. Plaintiff alleges that Defendants intentionally engaged in conduct designed to disrupt or interfere with that contractual relationship.

48. Plaintiff alleges that the conduct described above caused disruption or termination of Plaintiff's tenancy rights.

49. Plaintiff alleges damages resulting from this interference.

---

COUNT VII

Breach of Fiduciary Duty

50. Plaintiff repeats and realleges the preceding paragraphs.

51. Plaintiff alleges that certain Defendants held positions of trust or responsibility in connection with property management, legal proceedings, or financial transactions related to the building.

52. Plaintiff alleges that these Defendants owed duties of good faith, honesty, and fair dealing in matters affecting Plaintiff's tenancy or legal rights.

53. Plaintiff alleges that such Defendants breached those duties through conduct described above, including actions that prioritized personal financial interests over lawful obligations.

54. Plaintiff alleges that these breaches caused injury to Plaintiff.

---

COUNT VIII

Unjust Enrichment

55. Plaintiff repeats and realleges the preceding paragraphs.

56. Plaintiff alleges that Defendants received financial or property benefits in connection with actions affecting Plaintiff's tenancy.

57. Plaintiff alleges that these benefits were obtained under circumstances that Plaintiff believes were unjust or inequitable.

58. Plaintiff alleges that it would be inequitable for Defendants to retain such benefits without compensating Plaintiff.

---

COUNT IX

Constructive Trust

59. Plaintiff repeats and realleges the preceding paragraphs.

60. Plaintiff alleges that Defendants obtained or controlled property or financial interests through conduct described above.

61. Plaintiff alleges that equity and good conscience require that such property or proceeds be held in constructive trust.

62. Plaintiff therefore seeks the imposition of a constructive trust over any property, funds, or benefits derived from the alleged conduct.

---

COUNT X

Civil Conspiracy (State Law)

63. Plaintiff repeats and realleges the preceding paragraphs.

64. Plaintiff alleges that Defendants acted in concert and pursuant to a common plan or agreement.

65. Plaintiff alleges that Defendants undertook coordinated actions intended to interfere with Plaintiff's tenancy rights and legal interests.

66.Plaintiff alleges that these acts resulted in damages to Plaintiff.

---

VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Award compensatory damages in an amount to be determined at trial;

B. Award treble damages where authorized by statute;

C. Impose a constructive trust over property or funds obtained through the alleged conduct;

D. Order disgorgement of unjust enrichment obtained by Defendants;

E. Award punitive damages where permitted by law;

F. Grant injunctive and declaratory relief preventing further unlawful conduct;

G. Award costs, interest, and any other relief the Court deems just and proper.

II. New York: Staged Vehicle Collision and Retaliation (November 1, 2024)

A. Preceding Filings and Threat Environment

3. Prior to November 1, 2024, Wexler had filed motions, complaints, and court

papers alleging misconduct and corruption within the NYPD, including the 20th Precinct, and identified political figures and police-connected operatives.

1. Wexler alleges that Mayor Eric Adams, former NYPD officials, and politically connected "fixers," including Jeremy Reichberg and Jared Rechnitz, participated in a broader ecosystem enabling obstruction of complaints, selective enforcement, insurance fraud, and retaliation against whistleblowers.

2. Changes in enforcement practices, including the decriminalization of jaywalking shortly before November 2024, were allegedly exploited to provide plausible deniability for staged vehicle collisions used for intimidation and insurance fraud.

C. The Staged Collision At Fort Hamilton Parkway and New Utrecht Avenue, Wexler alleges that a BMW SUV with a fake license plate and fraudulent identification deliberately accelerated into his car.

1. Wexler alleges this collision was staged to:

- Generate an insurance payout;
- Create a false narrative portraying Wexler as at fault;
- Potentially endanger pedestrians;

- Retaliate for prior filings and complaints.

1. Lookouts, selective camera manipulation, and coordination with multiple surveillance teams ensured plausible deniability. Law enforcement officers, including Officer Sadalah, refused to take or record complaints.

2. Wexler alleges that Ira Schwartz, in concert with political figures, Orthodox Jewish racketeers, insurance-fraud actors ("Prince" and "Cuba"), and other associates, orchestrated this collision as part of a broader pattern of intimidation, retaliation, and obstruction.

E. Incident Involving Uber Vehicle and Loss of Property

1. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

2. On or about a date to be determined, Plaintiff arranged transportation through the ride-hailing service operated by Uber Technologies, Inc..

3. Plaintiff placed personal belongings inside the vehicle operated by the Uber driver prior to the completion of the ride.

4. Plaintiff alleges that the driver departed with Plaintiff's belongings still inside the vehicle.

5. Plaintiff was forced to pursue the vehicle on foot in order to retrieve personal property.

6. According to Plaintiff, the driver later stated that the departure occurred at the request or direction of individuals associated with the San Francisco Police Department.

7. As a result of the driver's actions, Plaintiff suffered loss of control over personal property, distress, and interference with Plaintiff's ability to safely secure belongings.

8. Plaintiff alleges that Uber Technologies, Inc., through its agents and contractors, failed to properly supervise and control the conduct of the driver operating on its platform.

9. Plaintiff further alleges that the driver's actions were undertaken while providing services through Uber's platform and within the scope of the transportation service requested by Plaintiff.

**NEGLIGENCE AND FAILURE TO SUPERVISE**

1. Plaintiff repeats and realleges the foregoing paragraphs.
2. Defendant Uber Technologies, Inc. owed a duty to exercise reasonable care in the hiring, supervision, and control of drivers operating through its platform.
3. Plaintiff alleges that Uber breached this duty by failing to ensure that drivers handled passenger property responsibly and safely.
4. As a direct and proximate result of this breach, Plaintiff suffered damages including loss of property, emotional distress, and disruption of Plaintiff's housing and legal affairs.

Conversion and Interference With Personal Property

1. Plaintiff repeats and realleges the preceding paragraphs.
2. Plaintiff alleges that the driver operating through Uber wrongfully retained possession of Plaintiff's belongings by driving away while the property remained inside the vehicle.
3. Such conduct interfered with Plaintiff's ownership and right of possession over personal property.

4. Plaintiff alleges that Uber is responsible for the actions of the driver operating on its platform.

5. As a result, Plaintiff suffered damages including temporary loss of property, risk of permanent loss, and related distress.

Negligent Infliction of Emotional Distress

1. Plaintiff repeats and realleges the foregoing paragraphs.

2. Plaintiff alleges that the conduct of the Uber driver placed Plaintiff in a stressful and unsafe situation by forcing Plaintiff to chase the vehicle to recover belongings.

3. Plaintiff alleges that this incident occurred during a period in which Plaintiff was already experiencing housing instability and harassment.

4. As a result, Plaintiff suffered emotional distress and anxiety.

Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Enter judgment against Defendant Uber Technologies, Inc.;

2. Award compensatory damages for loss of property and emotional distress;

3. Award punitive damages where permitted by law;

4. Order any additional relief the Court deems just and proper.

E. Alleged Seizure of Property and Interference by Government Actors

1. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.
2. Plaintiff alleges that on or about a date to be determined, Plaintiff possessed a USB storage device containing personal and legal materials.
3. Plaintiff alleges that the device was taken without consent at a United States postal facility identified by Plaintiff as Union Square Post Office.
4. Plaintiff believes the device was taken by individuals associated with the San Francisco Police Department or individuals acting in coordination with law enforcement.
5. Plaintiff alleges that the USB drive contained sensitive legal and personal information relevant to ongoing legal matters.
6. Plaintiff further alleges that individuals connected to an organization identified as the Schneerson Center may have been involved in or aware of these events.

7. Plaintiff alleges that these actions may have been undertaken in connection with legal matters involving attorney Benjamin Brafman and other individuals referenced in earlier allegations.

8. Plaintiff further alleges that prior to an international flight departing San Francisco International Airport for travel to Fiji, Plaintiff's passport was taken or removed from Plaintiff's possession.

9. Plaintiff alleges that the passport seizure occurred during or in connection with screening conducted by personnel associated with the Transportation Security Administration.

10. Plaintiff alleges that the removal of the passport prevented Plaintiff from traveling and interfered with Plaintiff's property and liberty interests.

11. Plaintiff alleges that these actions occurred without a warrant, court order, or lawful justification known to Plaintiff.

Constitutional Violations – Bivens Claim

1. Plaintiff repeats and realleges the foregoing paragraphs.

2. Plaintiff alleges that federal TSA officers or individuals acting under color of federal authority violated Plaintiff's constitutional rights.

3. Specifically, Plaintiff alleges that the seizure of Plaintiff's passport and personal property occurred without due process and without lawful warrant or justification.

4. Plaintiff alleges that these actions violated Plaintiff's rights under the Fourth Amendment and Fifth Amendmentto the United States Constitution.

5. Pursuant to the doctrine established in Bivens v. Six Unknown Named Agents, federal officers who violate constitutional rights may be held personally liable for damages.

6. Plaintiff therefore asserts a Bivens claim against currently unidentified federal officers involved in the alleged seizure of Plaintiff's passport and related interference.

7. Plaintiff seeks damages and other relief as permitted by law.

Relief Requested (Additional)

Plaintiff further requests:

- Damages for unconstitutional seizure of property
- Declaratory relief that the conduct described violated Plaintiff's constitutional rights

- Identification of the federal officers involved through discovery
- Additional relief the Court deems just and proper

Fraud and Fraudulent Misrepresentation

1. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.
2. Plaintiff alleges that certain Defendants knowingly made false representations and engaged in deceptive conduct toward Plaintiff.
3. Plaintiff alleges that Defendants misrepresented their intentions and activities while simultaneously engaging in actions designed to deprive Plaintiff of property, housing stability, and legal rights.
4. Plaintiff alleges that such misrepresentations included presenting themselves as neutral service providers or lawful authorities while allegedly participating in coordinated interference with Plaintiff's property and personal affairs.
5. Plaintiff alleges that these misrepresentations were made knowingly and with the intent that Plaintiff rely upon them.

6. Plaintiff alleges that as a result of these misrepresentations, Plaintiff suffered financial loss, loss of property, and other damages.

COUNT VII

Theft and Wrongful Taking of Property

1. Plaintiff repeats and realleges the preceding paragraphs.
2. Plaintiff alleges that Defendants wrongfully took possession of Plaintiff's personal property, including but not limited to a USB storage device and other personal belongings.
3. Plaintiff alleges that these items were taken without Plaintiff's authorization and without lawful justification.
4. Plaintiff alleges that the removal of this property interfered with Plaintiff's ownership and right to possession.
5. As a result, Plaintiff suffered loss of property and related damages.

COUNT VIII

Receipt and Possession of Stolen Property

1. Plaintiff repeats and realleges the foregoing paragraphs.
2. Plaintiff alleges that individuals or entities knowingly received, retained, or used property belonging to Plaintiff that had been taken without authorization.
3. Plaintiff alleges that such individuals were aware, or should have been aware, that the property had been wrongfully obtained.
4. Plaintiff alleges that possession and use of such property caused further harm and deprivation to Plaintiff.

COUNT IX

Identity Theft and Misuse of Personal Information

1. Plaintiff repeats and realleges the foregoing paragraphs.
2. Plaintiff alleges that personal identifying information belonging to Plaintiff may have been accessed, obtained, or used without authorization.
3. Plaintiff alleges that the removal of electronic storage devices and personal documents created a risk that Plaintiff's identity and personal data were misused.

4. Plaintiff alleges that Defendants or unknown individuals may have used or attempted to use such information for fraudulent or unlawful purposes.

5. Plaintiff alleges that this conduct caused harm including loss of privacy, risk of financial damage, and emotional distress.

COUNT X

Civil Rights Violations – 42 U.S.C. §1983

1. Plaintiff repeats and realleges the preceding paragraphs.

2. Plaintiff alleges that certain Defendants acted under color of state law in connection with the conduct described in this complaint.

3. Plaintiff alleges that individuals associated with the San Francisco Police Department participated in or facilitated actions that interfered with Plaintiff's constitutional rights.

4. Plaintiff alleges that such conduct included participation in or encouragement of property seizure, interference with Plaintiff's belongings, and actions affecting Plaintiff's housing stability.

5. Plaintiff alleges that these actions deprived Plaintiff of rights secured by the Fourth Amendment, Fourteenth Amendment, and other provisions of the United States Constitution.

6. Pursuant to 42 U.S.C. § 1983, individuals who act under color of state law to violate constitutional rights may be held liable for damages.

7. Plaintiff therefore seeks relief against those state actors responsible for the alleged violations.

Additional Relief Requested

Plaintiff requests that the Court:

1. Award compensatory damages for loss of property and constitutional violations;

2. Award punitive damages where permitted by law;

3. Order return of any property belonging to Plaintiff;

4. Grant declaratory and injunctive relief preventing further violations;

5. Award costs and attorney's fees where permitted by law.

03/12/2026

/s/electronically signed signatures are valid

By: Marshall A. Wexler, ESQ.,
Principal Attorney, Pro Se
Marshall Wexler Law Offices
4193 Flat Rock Drive
Suite #200 , Room #439
Riverside, CA 92505
+1[347]799-4984
Mwexleresq@gmail.com